**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-01213-NYW-SBP
*Consolidated with Civil Action No. 25-cv-01615-NYW-SBP*

MARK TCHERKEZIAN, Individually and on Behalf of All Others Similarly Situated,

     Plaintiff,

v.

IBOTTA, INC.,
BRYAN LEACH,
SUNIT PATEL,
STEPHEN BAILEY,
AMANDA BALDWIN,
AMIT N. DOSHI,
THOMAS LEHRMAN,
VALARIE SHEPPARD,
LARRY W. SONSINI,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
BOFA SECURITIES, INC.,
EVERCORE GROUP L.L.C.,
UBS SECURITIES LLC,
WELLS FARGO SECURITIES, LLC,
CITIZENS JMP SECURITIES, LLC,
NEEDHAM & COMPANY, LLC, and
RAYMOND JAMES & ASSOCIATES, INC,

     Defendants.

---

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND**

---

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ............................................................................. 1

II.  SUMMARY OF THE ACTION ......................................................................... 2

III.  JURISDICTION AND VENUE ......................................................................... 7

IV.  PARTIES ......................................................................................................... 8

    A.  Plaintiff ................................................................................................. 8

    B.  Defendants ............................................................................................ 8

        1.  Ibotta ......................................................................................... 8

        2.  The Individual Defendants......................................................... 9

        3.  The Underwriter Defendants.................................................... 10

V.  IBOTTA: VENEER VERSUS REALITY...................................................... 15

    A.  Overview of Ibotta's Business ............................................................ 15

        1.  Ibotta's Inception as a Direct-to-Consumer Business.............. 15

        2.  The Introduction of the Ibotta Performance Network and
            Expansion Beyond a Direct-to-Consumer Business................. 16

        3.  Ibotta Goes Public as a Company that Was Growing in Both Its
            Direct-to-Consumer and Third-Party-Publisher Segments ...... 21

    B.  Leading up to the IPO and Thereafter Throughout the Class Period,
        Ibotta's Technology Was Not Capable of Tracking Consumer Behavior or
        Client Campaign Performance in Real Time ....................................... 24

    C.  Fraudulent Transactions Were Rampant on Ibotta Platforms.............. 31

    D.  As Ibotta's Revenue Growth Stalled Around the IPO, Defendants
        Misleadingly Blamed Client-Budget Exhaustion as the Sole Cause .................. 35

        1.  The Array of Undisclosed Problems that Existed as of (and After)
            the IPO that Impaired Ibotta's Sales Capabilities..................... 35

        2.  Chief Revenue Officer Jensen's Sudden Departure Just Three
            Months After the IPO, and Ibotta's Attempts to Sweep It Under the
            Rug............................................................................................ 39

    E.  Defendants Sold Tens of Millions of Dollars of Ibotta Stock During the
        Class Period at Artificially Inflated Prices........................................... 40

        1.  Defendants Sold $74 Million of Company Stock Directly in the
            Offering.................................................................................... 40

        2.  Defendants Lehrman and Doshi Continued to Sell Company Stock
            During the Class Period ............................................................ 41

VI.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ................................................................................... 42

    A.    The Offering Documents ................................................................... 42

        1.    Real-Time Data Technology .................................................. 43

        2.    User Fraud .............................................................................. 46

        3.    Revenue-Mix Shift ................................................................ 48

    B.    Materially False or Misleading Statements and Omissions During the Rest of the Class Period ................................................................... 54

        1.    May 30, 2024 Earnings Call (1Q24) ..................................... 55

        2.    May 31, 2024 Quarterly Report (1Q24) ................................. 58

        3.    August 13, 2024 Earnings Call (2Q24) .................................. 59

        4.    August 14, 2024 Quarterly Report (2Q24) ............................ 64

        5.    November 13, 2024 Earnings Call (3Q24) ............................ 66

        6.    November 14, 2024 Quarterly Report (3Q24) ....................... 72

VII.    THE TRUTH GRADUALLY EMERGES ...................................................... 75

    A.    August 13, 2024 ............................................................................... 75

    B.    November 13, 2024 .......................................................................... 76

    C.    February 26–27, 2025 ...................................................................... 78

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................... 82

IX.    LOSS CAUSATION ...................................................................................... 86

X.    PRESUMPTION OF RELIANCE ................................................................. 87

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS-CAUTION DOCTRINE ............................................................ 90

XII.    CLASS ACTION ALLEGATIONS .............................................................. 90

XIII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................... 93

    COUNT I ...................................................................................................... 93

    COUNT II ..................................................................................................... 96

    COUNT III .................................................................................................... 97

XIV.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................ 98

    COUNT IV .................................................................................................... 98

    COUNT V ................................................................................................... 101

    COUNT VI .................................................................................................. 102

XV.    PRAYER FOR RELIEF ................................................................................ 104

XVI.   DEMAND FOR TRIAL BY JURY ................................................................. 104

Lead Plaintiff Mark Tcherkezian ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation, review and analysis of: regulatory filings made by Ibotta, Inc. ("Ibotta" or "Company") with the U.S. Securities and Exchange Commission ("SEC"), as well as press releases, earnings- and conference-call transcripts, and other disclosures issued and disseminated by Ibotta; news stories, media reports, analyst reports, and other public information about Ibotta and the industry in which it operates; and interviews with former Company employees and other individuals familiar with the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiff Mark Tcherkezian brings this action for violations of the federal securities laws.

2.    Plaintiff brings this federal class action under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") on behalf of a class consisting of all persons and entities that purchased or otherwise acquired shares of Ibotta common stock between April 18, 2024 and February 27, 2025, both dates inclusive (the "Class Period"), including in, pursuant to, and/or traceable to the Company's Registration Statement on Form S-1 (including all amendments made thereto) and related prospectus on Form 424B4 issued in connection with Ibotta's April 18, 2024 initial public stock offering ("IPO" or "Offering"), and were damaged thereby (the "Class"). On April 17, 2024,

the SEC declared effective the final registration statement on Form S-1 ("Registration Statement"), and the following day, on April 18, 2024, the Company filed the final prospectus for Ibotta's IPO on Form 424B4 ("Prospectus," and with the Registration Statement, the "Offering Documents"), which became part of the Registration Statement. Pursuant to the Offering, Defendants offered and made available 6,560,700 shares of Ibotta Class A common stock to the investing public at $88 per share. Plaintiff brings the Securities Act claims against Ibotta, the Individual Defendants (defined below), and the Underwriter Defendants (defined below) (collectively, the "Defendants").

3.      Plaintiff also brings this federal securities class action under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder on behalf of the Class against Defendants Ibotta, Bryan W. Leach ("Leach"), Thomas Lehrman ("Lehrman"), and Sunit S. Patel ("Patel") (collectively, the "Exchange Act Defendants"), with the exception of the §20A claim, which is brought against only Defendant Lehrman.

## II.      SUMMARY OF THE ACTION

4.      This action arises out of material misrepresentations and omissions contained in defective Offering Documents issued in connection with Ibotta's April 2024 IPO, and, with respect to the claims asserted against the Exchange Act Defendants, also arises out of their subsequent, post-IPO materially false or misleading statements made during the Class Period.

5.      Ibotta is a digital-promotions company that allows its clients (largely consumer-packaged-goods brands) to deliver digital promotions to consumers through Ibotta's marquee product, a digital network called the Ibotta Performance Network ("IPN"). Ibotta went public pursuant to Offering Documents that presented it as a growing company with a data-driven

technology platform that delivered real-time analytics and promotional-campaign performance tracking to its clients, enabling its clients to not only closely monitor their promotional campaigns but to adjust and optimize them in response to real-time information regarding consumer behavior.

6.     As multiple former employees and clients of the Company familiar with its technology stated, however, Ibotta's technology suffered from significant delays, was not capable of generating usable real-time data, and required time-consuming manual in-house data sorting and processing.  As a result, Ibotta not only failed to deliver the real-time functionality that was purportedly one of its key features (and a feature its competitors were in fact able to provide), but its capabilities were so weak that some clients ended up waiting up to several *weeks* to get useful data presentations and updates on the status of their promotional campaigns.

7.     In addition to overstating Ibotta's technological capabilities, the Offering Documents misrepresented and failed to disclose the nature and extent of the widespread fraudulent activity that was known to be occurring on Ibotta's platforms.  The Company's cash-back rewards model, combined with weak identity verification and inadequate fraud-detection systems, made it particularly vulnerable to counterfeit-receipt schemes, and allowed fraudsters to obtain cash-back rewards from Ibotta by uploading fake receipts that purported to show the purchase of an item that was on promotion.  While the Offering Documents touted Ibotta's supposedly "sophisticated anti-fraud systems" as a key component of "Ibotta's AI-Driven Technology Platform," in reality, as a former Fraud Operations Agent at Ibotta recounted, Ibotta's anti-fraud measures relied on employees *manually* reviewing receipts, and even this manual process rarely allowed them to reliably determine whether receipts were valid—with the result that management routinely instructed its fraud-prevention staff to take a "let it go" approach to

-3-

encourage sales.  Suspiciously, the entire Fraud Operations team to which that former employee belonged was laid off *in the month of the IPO*.

8.      The Offering Documents also misrepresented and failed to adequately disclose the trajectory of Ibotta's revenue-mix shift as between its direct-to-consumer and third-party-publisher segments.  While the Offering Documents emphasized growth across both Ibotta's direct-to-consumer and third-party-publisher segments, subsequent admissions by Defendants revealed a dynamic (commencing prior to the IPO and continuing through the Class Period) of a "dramatic mix shift" toward third-party-publisher revenue, which in turn was cannibalizing direct-to-consumer revenue, as the two segments were far more zero-sum than mutually sustaining from the perspective of client budgets.  Defendants, however, consistently failed to disclose the extent to which, in the zero-sum world that actually existed, client promotional budgets acted as a severe constraint on both Ibotta's direct-to-consumer and third-party-publisher segments simultaneously.

9.      Against a backdrop of increasingly negative perceptions a mere two months after the IPO—by which time Ibotta's share price had already declined by roughly a third from its post-IPO peak price—the Company deemed it necessary to affirmatively tell the world it was "*not a scam*"[1]:

---

[1]      Kelsey Webb, *Let Us Show You Why Ibotta Is Not a Scam*, Ibotta (June 17, 2024), https://home.ibotta.com/blog/tips-and-tricks/let-us-show-you-why-ibotta-is-not-a-scam [https://perma.cc/BUB7-ETVM].



10.      Moreover, after the IPO and throughout the Class Period, Defendants repeatedly assured investors that growth in the number of persons who redeemed discounts through Ibotta ("redeemers") had a direct correlation to increased client budgets and thus revenue growth for the Company.  Defendants repeatedly made such assurances to try to stave off or lessen the negative impacts of serial adverse developments that were disclosed during the Class Period, which gradually disclosed to the market that Ibotta's condition and business model were not nearly as rosy as the Offering Documents portrayed.  But those assurances were materially false or misleading because they misrepresented Ibotta's true condition and failed to disclose the existence of serious internal problems that contradicted Defendants' growth-begets-growth refrain.  These material adverse problems included unsustainable revenue trajectories in the face of known exhaustion of clients' promotional budgets and Ibotta's inability to maintain past performance levels due to staggering turnover in Ibotta's client-facing sales and support personnel.  These factors, including the abrupt departure of Ibotta's Chief Revenue Officer Chris Jensen just three months after the IPO (after having worked there for eight years)—which Defendants swept under the rug until the end of the fiscal year—were symptomatic of rampant problems that predictably resulted in significantly deteriorating sales execution.

11.    Also throughout the Class Period, in Ibotta's quarterly reports on Form 10-Q, the Exchange Act Defendants made materially misleading "risk factor" statements.  Specifically, Defendants described the risk that fraudulent activity posed to Ibotta's business in purely hypothetical terms—without disclosing that the referenced risks had *already* materialized and were plaguing its operations.  Further, Defendants couched the risk that the departure of key personnel from its senior-management team presented to the business in purely hypothetical terms, even after Chief Revenue Officer Chris Jensen's abrupt departure in July 2024 contributed to increasing turnover among Ibotta's sales force and client-facing personnel.

12.    The truth about the nature and extent of Defendants' materially false or misleading statements during the Class Period emerged only gradually through a series of partial corrective events that revealed, *inter alia*, declining direct-to-consumer metrics, exhaustion of client promotional budgets, and admissions about Ibotta's lack of real-time data capabilities, sales-force execution problems, and fraudulent-activity problems.  Each corrective event triggered significant declines in Ibotta's stock price, culminating in a catastrophic 46% drop at the end of the Class Period, when the Company disclosed further disappointing results which it attributed to basically the same problems described above, which the Exchange Act Defendants were well aware of.  By the end of the Class Period, the price of Ibotta common stock was $33.39 per share, a decline of roughly 60.1% from its IPO price ($88).

13.    Although Plaintiff and the Class have suffered significant losses, several Defendants made off like bandits.  Specifically, Defendants Leach, Lehrman, and Doshi sold over $74 million of their holdings of Ibotta common stock in the Offering, at the artificially inflated Offering price.  Further, Defendant Lehrman sold an additional $35,551,462 of Ibotta stock at

artificially inflated prices after the Offering, including roughly $17 million in sales in November 2024 and another $12 million in sales in December 2024, which were suspiciously timed to occur in the quarter whose disastrous results would be announced shortly thereafter in February 2025.

14.    In this action, Plaintiff, on behalf of himself and the Class he seeks to represent, seeks to hold Defendants accountable for their violations of federal securities laws and recover damages for the significant losses he and the Class have suffered as a result of Defendants' wrongful acts and omissions.

## III.    JURISDICTION AND VENUE

15.    The Exchange Act claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

16.    The Securities Act claims asserted herein arise under and pursuant to §§11, 12, and 15 of the Securities Act, 15 U.S.C. §§77k, 77l, and 77o, and SEC rules promulgated thereunder.

17.    This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §§77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.

18.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa, because the acts and transactions giving rise to the violations of law complained of herein occurred, in part, in this District, and certain Defendants reside and/or transact business in this District.  In addition, the Company's principal executive offices are located in this District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## IV.    PARTIES

### A.    Plaintiff

20.     Plaintiff Mark Tcherkezian purchased Ibotta common stock during the Class Period, as described in his previously filed PSLRA Certification (*see* Dkt. Nos. 18-3 & 18-4) incorporated herein by reference, and suffered damages as a result of the violations of the federal securities laws alleged herein when the truth concerning the Company's business, financial condition, and operations were disclosed as alleged herein, and the artificial inflation was removed from the price of Ibotta common stock.

### B.    Defendants

#### 1.    Ibotta

21.     Defendant Ibotta provides promotional services to publishers, retailers, and advertisers through its Ibotta Performance Network, which includes its direct-to-consumer mobile, web, and browser extension properties and its network of third-party-publisher properties. Ibotta is incorporated under the laws of Delaware, with its principal place of business in Denver, Colorado. Ibotta's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "IBTA."

### 2. The Individual Defendants

22. Defendant Bryan W. Leach founded Ibotta in 2011. Since then, Leach has served as the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Company's Board of Directors ("Board").

23. Defendant Sunit S. Patel served as the Company's Chief Financial Officer ("CFO") from February 2021 until his resignation on March 14, 2025.

24. Stephen Bailey ("Bailey") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Bailey reviewed and contributed to the Registration Statement and is identified therein as a director.

25. Amanda Baldwin ("Baldwin") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Baldwin reviewed and contributed to the Registration Statement and is identified therein as a director.

26. Amit N. Doshi ("Doshi") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Doshi reviewed and contributed to the Registration Statement and is identified therein as a director.

27. Thomas Lehrman ("Lehrman") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Lehrman reviewed and contributed to the Registration Statement and is identified therein as a director.

28. Valarie Sheppard ("Sheppard") served as a director of the Company at the time the Registration Statement was declared effective. Defendant Sheppard reviewed and contributed to the Registration Statement and is identified therein as a director.

29.    Larry W. Sonsini ("Sonsini") served as a director of the Company at the time the Registration Statement was declared effective.  Defendant Sonsini reviewed and contributed to the Registration Statement and is identified therein as a director.

30.    The Defendants named in ¶¶22–29 above are collectively referred to herein as the "Individual Defendants."  The Individual Defendants each signed, or authorized the signing of, the Offering Documents, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the Offering and the Offering Documents, and/or attended or contributed to road shows and other promotions to meet with and present favorable information to Ibotta investors, all motivated by their own and the Company's financial interests.

### 3.    The Underwriter Defendants

31.    The following underwriters were also instrumental in soliciting offers from, and making the securities in the Offering available to, the investing public.  The table below shows the number of shares each Underwriter Defendant offered and sold in the Offering:

| | |
|---|---|
| Goldman Sachs & Co. LLC | 2,230,639 |
| Citigroup Global Markets Inc. | 1,574,569 |
| BofA Securities, Inc. | 787,285 |
| Evercore Group L.L.C. | 492,052 |
| UBS Securities LLC | 492,052 |
| Wells Fargo Securities, LLC | 492,052 |
| Citizens JMP Securities, LLC | 164,017 |
| Needham & Company, LLC | 164,017 |
| Raymond James & Associates, Inc. | 164,017 |

32.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Goldman Sachs served as a joint representative of all the underwriters.  Goldman Sachs also participated in conducting and promoting the Offering.  Goldman Sachs's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Goldman Sachs is incorporated under the laws of New York, with its principal place of business in New York, New York.

33.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.   Citigroup served as a joint representative of all the underwriters.  Citigroup also participated in conducting and promoting the Offering.  Citigroup's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Citigroup is incorporated under the laws of New York, with its principal place of business in New York, New York.

34.     Defendant BofA Securities, Inc. ("BofA") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  BofA served as a joint representative of all the underwriters.  BofA also participated in conducting and promoting the Offering.  BofA's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant BofA is incorporated under the laws of Delaware, with its principal place of business in New York, New York.

35.      Defendant Evercore Group L.L.C. ("Evercore") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.    Evercore also participated in conducting and promoting the Offering.  Evercore's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Evercore is incorporated under the laws of Delaware, with its principal place of business in New York, New York.

36.      Defendant UBS Securities LLC ("UBS") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  UBS also participated in conducting and promoting the Offering.  UBS's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant UBS is incorporated under the laws of Delaware, with its principal place of business in New York, New York.

37.      Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.    Wells Fargo also participated in conducting and promoting the Offering.  Wells Fargo's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Wells Fargo is incorporated under the laws of Delaware, with its principal place of business in New York, New York.

38.      Defendant Citizens JMP Securities, LLC ("Citizens") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Citizens also participated in conducting and promoting the Offering.   Citizens's participation in the solicitation of the Offering was

motivated by its financial interest.  Defendant Citizens is incorporated under the laws of Delaware, with its principal place of business in New York, New York.

39.     Defendant Needham & Company, LLC ("Needham") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Needham also participated in conducting and promoting the Offering.  Needham's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Needham is incorporated under the laws of Delaware, with its principal place of business in New York, New York.

40.     Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Raymond James also participated in conducting and promoting the Offering.  Raymond James's participation in the solicitation of the Offering was motivated by its financial interest.  Defendant Raymond James is incorporated under the laws of Florida, with its principal place of business in St. Petersburg, Florida.

41.     The Defendants listed in ¶¶32–40 are collectively referred to herein as the "Underwriter Defendants."

42.     Pursuant to the Securities Act, each Underwriter Defendant is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.  In addition to having access to internal corporate documents, the

-13-

Underwriter Defendants and/or their agents, including their counsel, had access to Ibotta's management, directors, and lawyers to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which Ibotta's securities would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Ibotta would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Ibotta's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Ibotta's undisclosed then-existing problems and plans and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

43.     Although not an element of Plaintiff's Securities Act claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert an affirmative "due diligence" defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

44.     Each Underwriter Defendant named herein is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees.

45.     As underwriters, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information

about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

46.    Representatives of the Underwriter Defendants also assisted Ibotta and the Individual Defendants to plan the Offering.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company—an undertaking known as a "due diligence" investigation.

47.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with the Offering so that they, and the Individual Defendants, could offer to sell, and did sell, shares of Ibotta common stock to Plaintiff and the members of the Securities Act Class pursuant or traceable to the Offering Documents.

## V.    IBOTTA: VENEER VERSUS REALITY

### A.    Overview of Ibotta's Business

#### 1.    Ibotta's Inception as a Direct-to-Consumer Business

48.    Ibotta is a digital-promotions company founded in 2011.  A promotion is an organized marketing activity designed to increase awareness, interest, or sales in a product (e.g., Kleenex tissues), service (e.g., haircuts at Supercuts), or brand (e.g., Pepsi).  A digital-promotions company creates, maintains, and executes marketing campaigns to promote products, services, or brands through online platforms such as websites and mobile apps.  Traditional promotions, by contrast, rely on offline channels such as television and print advertisements to execute their promotions.

49.     Ibotta specializes in promotions of goods, and in particular, consumer-packaged goods.  Consumer-packaged goods are products sold to retail consumers for personal use that are purchased and consumed on a frequent and regular basis, such as food (e.g., cereal), beverages (e.g., soda), toiletries (e.g., soap), and household items (e.g., paper towels).

50.     Ibotta began as a direct-to-consumer mobile app, which it launched in October 2012 and continues to offer today.  Ibotta's app allows users, among other things, to earn cash back on the user's purchases by scanning their receipts (from, say, a trip to their local Walmart) into the app.  Ibotta's app then digests the receipts, identifies any line-items for consumer-packaged goods that qualify for any of the promotions that Ibotta may be running at the time, and then credits the user with cash back equal to the value of the promotion.  Thus, for example, if Ibotta were running a promotion for $1 off a 12-roll package of Bounty paper towels, a consumer (here, the app user) could upload their receipt showing their purchase of that item into the Ibotta app, and Ibotta then deposits $1 into that user's account in the form of a cash-back reward.  More recently, Ibotta has also expanded its direct-to-consumer platform to include a website and web-browser extension in addition to its app, all of which it still maintains today.

> ### 2.     The Introduction of the Ibotta Performance Network and Expansion Beyond a Direct-to-Consumer Business

51.     Ibotta's direct-to-consumer model remained the sole focus of its business until 2020, when it introduced what is now its flagship product: the *Ibotta Performance Network* ("IPN").

52.     Ibotta describes the IPN as "[a]n AI [artificial intelligence]-enabled technology platform that allows CPG [consumer-packaged-goods] brands to deliver digital promotions to

consumers via a network of publishers, in a coordinated fashion and on a fee-per-sale basis."[2]  A

"*publisher*"[3] on the IPN is either (i) "[a] company that hosts Ibotta-sourced offers on its [own

respective] websites or mobile apps, as part of the IPN," or (ii) "Ibotta itself, which hosts its own

offers on Ibotta [direct-to-consumer] properties."  The IPN allows Ibotta's clients (i.e., consumer-

packaged-goods companies) to run and coordinate their promotions through one platform, while

allowing them to reach a wider audience than Ibotta's direct-to-consumer platform alone allows.

53.    The launch of the IPN allowed Ibotta to expand its business beyond its direct-to-

consumer model, and introduce a new way to run its clients' promotions.[4]  As depicted in the

following images from the Prospectus, Ibotta's clients can use the IPN to run promotional

campaigns simultaneously across both their own properties and platforms (e.g., Walmart stores

and Walmart's website), *as well as* Ibotta's direct-to-consumer platform.  For example, Bounty

can use Ibotta to launch a promotion for $1 off a 12-roll package of paper towels that is available

on Walmart's website, or in store at Walmart, and the Ibotta app.

---

[2]    A consumer-packaged-goods "brand" is a distinct identity or trade name associated with specific products or groups of products owned by a particular company.  For example, Proctor & Gamble is a consumer-packaged-goods brand associated with products like Tide laundry detergent, Pampers diapers, and Gillette razors.

[3]    In quotations herein, the use of italics and underlining indicates the addition of emphasis, while bolded text appears in the original source material.

[4]    In this context, it is useful to distinguish between Ibotta's *clients* (i.e., the companies that pay Ibotta to help promote their products), and "*end-users*" or "*consumers*," which for purposes of this complaint refer to consumers who use apps or otherwise gain access to promotional benefits offered by Ibotta.





54.    As shown in the foregoing images, Ibotta now characterizes its direct-to-consumer

platform as one of the "publishers" on the IPN.  The IPN thus includes Ibotta's own direct-to-

consumer app, website, and browser extension, as well as various third-party-publisher properties.

55.     A *third-party publisher* is "[a] non-Ibotta [direct-to-consumer] publisher that hosts Ibotta-sourced offers on its [own respective] digital properties and is part of the IPN."  Ibotta's largest third-party publisher is Walmart, and others include Dollar General and Kroger.[5]

56.     Through the IPN, Ibotta's third-party publishers can also use Ibotta's technology on a "white-label" basis, which refers to "[a]n arrangement that allows publishers to leverage [Ibotta's] technology and offers to power their loyalty program without Ibotta's brand."

57.     Walmart, for example, uses Ibotta's technology on a white-label basis, meaning Ibotta's technology is the engine behind Walmart's own loyalty-rewards program.  Accordingly, when Walmart runs a promotion for certain products, it uses Ibotta's technology on Walmart's digital platforms, but without displaying Ibotta's name or branding, or otherwise suggesting to the consumer that Ibotta technology (rather than Walmart) is effectively the engine running the promotion on Walmart's behalf.  Consumers can thus take advantage of Walmart's cash-back promotions without having an Ibotta account (or even knowing that Ibotta exists).

58.     The Ibotta–Walmart partnership was announced on June 29, 2021.  Ibotta thereafter became "the exclusive provider of digital item-level rebate offer content" for Walmart in the United States "for online and offline shopping" in the third quarter of 2022, when Ibotta was still a private company.

59.     Once a promotion on the IPN is underway, the IPN, according to the Prospectus, "tracks which offers are selected by consumers, matches offers to the products that have been

---

[5]     The difference between a "publisher" and a "third-party publisher," according to Ibotta's definitions of those terms in the Prospectus, is simply that "publisher" includes Ibotta's direct-to-consumer platforms, while "third-party publisher" does not.

purchased, logs redemptions [of promotional offers], handles the flow of funds, and takes care of all downstream billing and logistics." Using data collected from the IPN—such as whether and when a consumer purchased a product on promotion—Ibotta's clients can monitor the performance of their promotions on an ongoing basis.[6] With respect to data collected on the IPN, the Prospectus explained that the IPN is powered by "cloud-based, serverless technology" used to "ingest and process vast amounts of cross-retailer, item-level purchase data," which builds recommendation algorithms to "distribute the right offer to the right consumer at the right time."

60.     The Prospectus further described Ibotta's "data lake" as a "key component" of the IPN, as Ibotta's "business model requires [it] to know whether a consumer has successfully redeemed an offer by purchasing one or more qualifying items, either in-store or online." Accordingly, the Prospectus claimed, the IPN "is underpinned by a rich, ever-growing repository of data drawn from our retailer POS [point-of-sale] integrations, consumer-provided receipt purchase data, offer selection and redemption data, and inventory data," which the Prospectus described as "a unique set of purchase data." The analysis that Ibotta's clients can perform on promotions that they pay to run on the IPN is only "possible because [Ibotta] receive[s] a large volume of item-level purchase data." As such, the Prospectus trumpeted Ibotta's "unique cross-retailer, omnichannel, item-level purchase dataset," which consists of "billions of lines of purchase data." Ibotta ties the value of the dataset to the value that the IPN provides to its clients, and thus

---

[6]     This is in stark contrast to traditional promotions, such as television-advertising campaigns, for which companies had less insight into the specific effect of their promotion on sales of their products.

the money they can make from the IPN: "Ibotta's technology platform is a key driver of our value-add for clients."

### 3. Ibotta Goes Public as a Company that Was Growing in Both Its Direct-to-Consumer and Third-Party-Publisher Segments

61.     Ibotta tracks its growth using several key performance metrics: number of "redemptions," number of "redeemers" (both as defined below), redemptions per redeemer, and redemption revenue per redemption. Ibotta reports those figures by segment, i.e., separately for its direct-to-consumer and third-party-publisher segments.

62.     A "*redemption*" is a "verified purchase of an item qualifying for an offer by a client on the IPN." For example, when a consumer buys an item on Walmart's website for which Walmart is offering a cash-back reward, that counts as a redemption. A "*redeemer*" is "[a] consumer who has redeemed at least one digital offer within the quarter. If a consumer were to redeem on more than one publisher during that period," then they are "counted as multiple redeemers."

63.     Ibotta generates revenue from two main segments of its business: redemptions and advertisements. Ibotta earns fees from redemptions, typically calculated as a portion of the manufacturer's suggested retail price for the item. Its redemption revenue also includes fees that are "generally charged as a fixed dollar amount per redemption." The following graphic from the Prospectus depicts an illustrative example of how Ibotta earns revenue from a redemption:



64.     Ibotta also generates revenue from advertisements that its clients pay to run on Ibotta's direct-to-consumer platforms.  Ibotta "typically charge[s] fixed dollar amounts for [its] ad products."

65.     Ibotta separately measures and reports revenue from its direct-to-consumer and third-party-publisher segments.   Ibotta's advertising revenue is reported under its direct-to-consumer revenue because its advertising revenue is exclusively derived from its direct-to-consumer platform.

66.     Throughout the Class Period, Defendants presented Ibotta's growth in number of redeemers as the driver of growth in the Company's revenue.  For example, in its quarterly report on Form 10-Q (filed on May 31, 2024) for the first quarter of 2024 (the quarter ending March 31, 2024), Ibotta stated that "[r]edeemers are an indicator of the scale and growth of our business, as *the number of redeemers typically drives our revenue and is an indication of our ability to grow redemptions*."

67.     Similarly (as further detailed in §VI, *infra*), Defendants repeatedly told the market that growing Ibotta's number of redeemers was the key to generating increased revenue for the

Company.  For example, during Ibotta's first quarter 2024 earnings call held on May 30, 2024, Defendant Leach stated, "*The more we add redeemers, that's the key thing because the redeemers are what attract those brand [client] dollars* and we've always seen throughout the history of the company that as you build that scale, while maintaining the efficiency, those investments are more and more attractive and get made in larger and larger amounts."  Defendants' message was clear: "investments" from clients (i.e., client spending) "in larger and larger amounts" had always been a function of "add[ing] redeemers."

68.     In the Offering Documents, Ibotta portrayed its direct-to-consumer and third-party-publisher revenue streams as synergistic.  For example, the Prospectus stated that direct-to-consumer revenue "benefitted as a result of the Walmart launch" (which was a third-party-publisher program) because that launch also "improved the quantity and quality of offers available on [direct-to-consumer] properties."

69.     But in each quarter after its 2024 IPO, Ibotta's third-party-publisher revenue not only became a materially larger portion of total revenue, but cannibalized direct-to-consumer revenue and, as a result, advertising revenue also plummeted.  In turn, during the Class Period, Ibotta was unable to maintain the year-over-year growth of its direct-to-consumer segment—or even keep its direct-to-consumer revenue flat in absolute terms—that it presented in the Offering Documents, instead allowing direct-to-consumer revenue to rapidly decelerate throughout the Class Period (as further detailed in §VI.A.3, *infra*).  That all occurred despite the growth in overall redeemers that Defendants touted.  The following graph overviews Ibotta's revenue-mix shift for all quarters for which it has published financial results through the end of the Class Period:



70.     As set forth in greater detail in §VI.A.3, *infra*, in connection with the IPO, Defendants misleadingly presented a picture of strong year-over-year growth in Ibotta's direct-to-consumer segment, for both direct-to-consumer redemptions and advertisements.  But shortly after the IPO, that year-over-year growth rapidly decelerated.

71.     On April 18, 2024, Ibotta launched its IPO.  The Company offered a total of 6,560,700 shares of Class A common stock.  Of those shares, 2,500,000 shares were newly issued, and the other 4,060,700 shares were offered by various selling stockholders (including 531,003 shares beneficially owned by Defendant Leach).  The IPO offering price was $88 per share.

**B.     Leading up to the IPO and Thereafter Throughout the Class Period, Ibotta's Technology Was Not Capable of Tracking Consumer Behavior or Client Campaign Performance in Real Time**

72.     At bottom, Ibotta is a technology platform for which data capabilities are the whole ballgame.  Ibotta brandishes its "sophisticated capabilities in tracking and data analysis" as the linchpin of its technology.  Indeed, according to the Offering Documents, the foundation of Ibotta's

business proposition is its data capabilities: "at the heart of Ibotta's technology is [its] data lake consisting of item-level purchase data."

73.     In the Offering Documents, Defendants repeatedly (but falsely) claimed that Ibotta's technology tracked and measured data on redemption behavior in real time in two related ways.

74.     *First*, Defendants claimed that Ibotta's data-measurement technology was able to track consumer behavior in real time.  Thus, for instance, if a consumer redeemed an offer when purchasing an item, Ibotta's data-tracking technology would (allegedly) immediately capture that behavior.  For example, the Prospectus expressly represented that Ibotta's "systems are able to track which offers have been selected by consumers *in real-time*, match offers to the specific qualifying products that have been purchased, and log redemptions accordingly."

75.     *Second*, and relatedly, Defendants similarly claimed that the Company's ability to provide "real-time" tracking of consumer redemption behavior allowed Ibotta's clients to track the performance of their promotional campaigns in real time, enabling their clients to adjust their promotions on the fly.  As the Prospectus claimed, Ibotta's "*real-time* campaign tracking allows clients to monitor the success of their campaigns . . . *while the campaign is still ongoing*, arming clients with the information they need to measure the efficacy of their campaigns and to optimize campaign performance and manage their budgets accordingly."

76.     However, as confirmed by several former employees ("FEs") who worked at Ibotta during the relevant period, in reality, as of the IPO and thereafter throughout the Class Period, Ibotta's technology was *not* able to track or measure consumer redemptions or the performance of

-25-

its client campaigns in real time. In particular, these FEs—each of whom was personally knowledgeable about Ibotta's data-tracking technology—provided the following information:

77.    FE-1 was a Decision Scientist on Ibotta's Consumer Brand Packaging Analytics team from November 2021 to February 2025. At Ibotta, FE-1 developed data-measurement tools, typically in response to senior-management requests to support the Company's sales team in its efforts to obtain new clients and/or increase the budgets of existing clients. FE-1 frequently attended meetings with management where they discussed data-analytics and data-measurement projects in relation to client development and efforts to increase sales revenue.

78.    FE-1 recalled a sudden increase in pressure *after* the IPO from Defendant Leach and other C-suite executives to develop tools that would allow Ibotta to get *close to* real-time measurement. According to FE-1, "*real time was never going to be conceivable*," and FE-1's team was asked to "strive" to at least try to get the delay time down to "a couple hours."

79.    FE-1 also described senior management as mercurial about which performance models and related metrics they wanted to develop. FE-1 stated there was no "rhyme or reason" to the models of measurement that management proposed. FE-1 recalled that the C-suite "would create these brainchilds of measurement and it would trickle down to the decisions scientists, and we would have to try and put them together." For example, FE-1 recalled one project that FE-1 worked on for three months—developing a tool to measure how long it would take for clients to generate revenue after running a promotion on the IPN and determining at what point their investment would be paid back—only to have management suddenly scrap it without explanation. Another time, FE-1 recalled, during a meeting FE-1 attended, Defendant Leach declared that "ad-

spend is dead" and "we're not doing that anymore."  FE-1 stated that message was poorly communicated across the Company such that "half of the sales team didn't get the message."

80.     FE-2 was an Account Manager at Ibotta from July 2022 to July 2025.  At Ibotta, FE-2's responsibilities centered around managing client relationships.  FE-2 stated that throughout FE-2's tenure, clients would contact FE-2 with requests to set up promotional campaigns, and FE-2 and the client would negotiate the content, cost, and duration of the campaigns.  FE-2's duties involved communicating with clients, pulling data for client requests, and monitoring client campaigns on Ibotta, among other tasks.  FE-2 reported to a director-level employee.

81.     Consistent with FE-1's recollection about Ibotta's data measurement operating on a delay, FE-2 also confirmed that Ibotta's data-collection system did not operate on a "real-time" basis, but a delayed basis.  This was true both before and after the IPO, as FE-2 added that FE-2 did not observe any changes in or improvements to how Ibotta managed or tracked campaign data while at the Company.

82.     FE-3 was a Technical Manager of B2B Enterprise Partnerships at Ibotta from February 2023 to April 2024.  At Ibotta, FE-3 oversaw the structuring and integration of data between Ibotta and its clients.  FE-3's duties included coordinating with clients and their technical teams about the implementation of their promotional campaigns.  FE-3 reported to the Senior Vice President of Analytics and Models at the Company, who in turn reported to the Chief Technology Officer.  FE-3 attended twice-weekly meetings attended by C-suite and Vice-President-and-above-level personnel, at which attendees discussed matters pertaining to client data requests and other aspects of FE-3's department's data structuring and integration work.

83.     FE-3 described how Ibotta collected, processed, and made available to others redemption data from client promotional campaigns.  FE-3 stated that the raw data associated with promotional campaigns—e.g., data that tracked all consumers who had redeemed coupon $x$ for product $y$ at store $z$ as of time $t$—was fed into a data infrastructure, and that Ibotta engineers then extracted the relevant raw data to store in a separate database.  Once stored, that raw data required additional processing to put in a form that could be understood by both clients and relevant teams at Ibotta (e.g., sales teams).  FE-3 recalled that when FE-3 created dashboards for clients that wanted to know the number or amount of redemptions in a campaign, FE-3 would have to synthesize or otherwise personally sort or interact with the raw data to extract relevant data that was in a usable form.  Accordingly, FE-3 stated that clients had to go "through me or somebody else" at Ibotta "for most of the data" that was both relevant and usable for assessing their campaigns.  Moreover, FE-3 further confirmed that Ibotta's technology did not in any event provide campaign-performance data in real time.

84.     The statements of FE-1, FE-2, and FE-3 that Ibotta's technology was not capable of real-time data tracking are consistent with contemporaneous statements made by various current and former Ibotta partners and clients.

85.     AlphaSense is a market-intelligence platform that provides access to research and various other types of market-relevant information, and publishes interviews with industry professionals familiar with a given company.  Many such professionals familiar with Ibotta through their past or present commercial relationships have given interviews about Ibotta on that platform.  A number of those interviewees further confirmed that Ibotta's campaign-related performance data was simply not available on a real-time basis.  For example:

-28-

86.     Interviewee 1, the Chief Sales Officer at Poppi, gave an interview on April 8, 2024 that was published on April 23, 2024.  Poppi is a soda brand and currently a partner of Ibotta. Interviewee 1 stated that Poppi had worked with Ibotta since 2020, and used Ibotta for promotional campaigns and digital programming.  Interviewee 1 "run[s] the sales department" at Poppi and was personally familiar with Poppi's relationship with Ibotta, including the technology that Ibotta provided to Poppi.

87.     Asked "about Ibotta as a marketing tool" and its "strengths and weaknesses," Interviewee 1 stated that Ibotta suffered from its inability to provide insight into "exactly how things are working just on the fly," which meant that Poppi was unable to "make real-time adjustments" to the campaigns it ran using Ibotta:

> I would say that [Ibotta] also ha[s] reporting that comes two to four weeks after the program is over. Well, that's too late. *We want to make real-time adjustments*.
>
> *I'd love to also know by being able to go into a dashboard exactly how things are working just on the fly*. And if campaign one, creative one, is not working, let's switch to campaign two, creative two. Or if campaign one is working, but the creative line is off, let's switch the line.
>
> *If the redemptions aren't what we were anticipating* them being when we paired ourselves in a digital bundle with another brand that's maybe like brand, a salty snack that goes with soda, *I'd love to be able to swap it real time, but you can't*.
>
> So the way that they like to play is that they give you this program report, it comes two to four weeks later. It's like 40 pages long. They want to do a big presentation. They want to do a Zoom call with your executive team. And sometimes that is like too little too late. We'll have gotten all these insights that are terrific.
>
> But we can't apply the insights retroactively. *So you have to wait until the next campaign run and then you forward look and say, well, what we learned from the last go around is that we need to change A, B and C, let's change those now for the next one*.

88.     Interviewee 1 gave another interview on February 3, 2025 that was published on February 17, 2025.  In discussing limitations on Ibotta's technology, Interviewee 1 again criticized

Ibotta's ability to produce campaign data only on a delayed basis by comparing it to Meta's technology, which, in contrast to Ibotta, allowed Poppi to "optimiz[e]" its campaigns "in real time" based on data about user interactions with such campaigns. As Interviewee 1 added:

> What the data is telling me is that I really should be ho[m]ing in on people ages 50 years old to 70 years old, those baby boomers, because they are interacting with my campaign the most, they're clicking the most, they're buying the most, their conversion rates are the highest, whatever. *With Ibotta, you're not getting that real time. There's optimization, but it comes on a delay.* That's issue number one.

89.      Interviewee 2, the Senior Director of Revenue Growth and Sales Operations at Kinder's Premium Quality Seasonings and Sauces ("Kinder's"), gave an interview on April 3, 2024 that was published on May 16, 2024. Kinder's manufactures and sells seasonings, sauces, rubs, and similar food products, and at that time was a client of Ibotta. Interviewee 2 was personally familiar with Kinder's relationship with Ibotta, including the technology that Ibotta provided, as Interviewee 2 "use[d] Ibotta directly" in Interviewee 2's professional capacity. Kinder's used Ibotta for promotional campaigns.

90.      Interviewee 2 was asked, with respect "to the reporting side and dataset" Ibotta provided, "what data" Kinder's got from Ibotta, including "how quickly that data [wa]s reported back to" Kinder's. Interviewee 2 stated that the data Ibotta provided in its "dashboard" "*takes a day to refresh*," such that sales from the campaign on a given day are not reflected in the dashboard until the next day. Asked specifically "what's the timing with [Ibotta's dashboard] and how fast you get [the data]," Interviewee 2 responded, "[i]t's daily . . . *it's not live*," and "*[i]t takes a day to refresh*."

91.      Interviewee 3, a former Director of Marketing and Digital Product at Kimberly-Clark with responsibility for Kimberly-Clark's "Thinx" brand of leakproof underwear, gave an

interview on June 9, 2025 that was published on June 23, 2025. Kimberly-Clark is a consumer-goods brand that also manufactures personal-care products under such brand names as Kleenex, Huggies, and Scott. Interviewee 3 was personally familiar with Kimberly-Clark's relationship with Ibotta for the Thinx brand, including the technology that Ibotta provided, as Interviewee 3 "oversaw the full marketing budget" for the product, which included working with Ibotta on promotional campaigns for Thinx.

92.      Asked whether Ibotta provided "feedback in real time" during such campaigns, Interviewee 3 stated that that was unfortunately not the case, and instead remained only "*one of my wishes*":

> [Question]  *Are you getting feedback in real time as it's going on or is there any kind of lag?* Maybe one other follow-on question there would be, how much data are you getting back in terms of the shoppers themselves?

> [Answer]  *That would be one of my wishes, to have improved data* and maybe I guess it's been nine months since we ran our last program, so I don't know. Given how quickly things are changing nowadays, maybe they've made some improvements there. *We'd usually get a monthly update on how the campaign was doing. It'd be nice if that was more frequent.*

93.      In sum, both former Ibotta employees familiar with its data-tracking technology and former Ibotta clients that used Ibotta in their promotional campaigns confirmed that Ibotta was simply not able to produce relevant campaign-performance data in real time, and required time-consuming "in-house" refining that meant Ibotta clients would have to wait at least a day to get refreshed dashboards (if not weeks to get more detailed campaign data updates).

### C.      Fraudulent Transactions Were Rampant on Ibotta Platforms

94.      The inability to generate real-time data and provide more timely reporting of campaign data to its clients was not the only problem that the Offering Documents and Defendants

failed to adequately disclose during the Class Period; instead, Ibotta also suffered from undisclosed material problems caused by fraudulent users.

95. Because Ibotta's cash-back rewards model allows users to receive cash deposits in their Ibotta accounts that they can then quickly transfer to their PayPal or bank accounts—compounded by weaknesses in the ability of Ibotta's technology to detect entry of fraudulent user transactional information—unbeknownst to investors Ibotta had a significant and expensive fraudulent usage problem. These problems were confirmed, for example, by the following FE:

96. FE-4 was a Fraud Operations Agent at Ibotta from June 2019 to April 2024. At Ibotta, FE-4's duties involved detecting, mitigating, and reporting on fraudulent activity, including investigating Ibotta accounts that had been flagged for potentially fraudulent activity. FE-4's team comprised FE-4 and six other fraud operations agents. FE-4 reported to FE-4's departmental manager, who reported to Nate Kirk (who became Ibotta's Director of Fraud Mitigation in August 2023). FE-4 attended weekly departmental roundtable meetings every Tuesday, which Defendant Leach frequently attended, at which FE-4's team presented updates (frequently as long as 30 minutes) on fraud attacks and losses.

97. FE-4 described how user fraud was rampant at Ibotta and management at the highest levels of the Company, including Defendant Leach, knew it.

98. For example, FE-4 described several of numerous types of fraudulent activity that plagued Ibotta. One type was cashier fraud, in which cashiers at brick-and-mortar stores used the receipts of paying consumers to fraudulently claim cash-back rewards for items on promotion. FE-4 relayed that Ibotta was particularly susceptible to fraud involving the proliferation of bot accounts, in which persons created numerous bot accounts and uploaded counterfeit receipts

(typically rapidly) to fraudulently claim cash-back rewards in short time frames. As FE-4 explained, "people submitting counterfeit receipts" was "a huge problem," because Ibotta did not require users to verify their identities with a valid ID, and because it effectively offered cash payments (in the form of cash-back rewards) payable to the user's bank or PayPal account. In other words, Ibotta provided an attractive opportunity for fraudsters to quickly obtain cash and exit.

99. FE-4 explained that counterfeit receipts were Ibotta's biggest problem in terms of fraudulent activity. Indeed, FE-4 commented that, based on FE-4's experience, FE-4 had concluded that there were entire online communities that existed for the very purpose of facilitating the creation of counterfeit receipts to submit to Ibotta. FE-4 stated that the only safeguard Ibotta maintained against fraudulent activity was an alert system, but that it had no proactive, preventative measures in place. For example, FE-4 stated that Ibotta lacked a system to screen for tampered-with or counterfeit receipts. Thus, FE-4 and other fraud operations agents were forced to engage in manual review of a huge number of receipts, which was often unable to determine whether a given receipt submitted to Ibotta was real or counterfeit. Faced with that problem, FE-4's team was instructed to "let it go."

100. FE-4 identified Walgreens as one large retailer for which counterfeit receipts were a particular problem. FE-4 also recalled that beauty and cosmetics brands generally presented the highest risk of loss due to fraud, and provided the examples of L'Oreal and Dove. For example, FE-4 recalled that in 2023 there was a very large counterfeit-receipt attack that overwhelmed Ibotta's systems, and leadership and investigators were "very freaked out by that," and that that

attack (or perhaps another fraud attack that occurred around the holidays in either 2022 or 2023) costed Ibotta roughly $33 million.

101.    FE-4 also stated that during key promotional periods for Ibotta—such as over major holidays or during launches involving new clients and/or new products—*Ibotta management specifically instructed FE-4's team to "let things go and find them later"* to encourage stronger redemption and sales figures.  FE-4's team typically could not "find them later," however, because the fraudsters left minimal paper trails.  Although FE-4 was not directly responsible for financial recoupment, FE-4 recalled that it was extremely difficult to recoup any of the cash Ibotta paid to fraudsters, and how management instructed FE-4's team to look the other way during key promotional periods to encourage sales.

102.    FE-4 stated that although FE-4 and other fraud operations agents escalated their concerns about what they perceived were huge financial losses from the fraud, Ibotta's approach of "let it go" did not change.

103.    Despite management's awareness of widespread fraud plaguing Ibotta's business model, FE-4's *entire team* was laid off in the month of the IPO (i.e., in April 2024).

104.    In short, Ibotta had a massive, largely unchecked fraud problem on its hands that was known at the highest levels of the Company, including Defendant Leach.  As detailed in §VI, *infra*, Defendants not only failed to adequately disclose this material problem from investors, but affirmatively misled them about the existence and magnitude of the risk that Ibotta's fraudulent-activity problem posed to its business.

      **D.**      **As Ibotta's Revenue Growth Stalled Around the IPO, Defendants Misleadingly Blamed Client-Budget Exhaustion as the Sole Cause**

105.     Throughout the Class Period (as detailed in this section and §VI, *infra*), Defendants assured investors that as long as Ibotta continued to grow redeemers, clients would increase their budgets with Ibotta, and Ibotta would therefore be able to continue to grow its revenue. But while Defendants were repeating that tale to investors, Defendants had access to material internal information—that investors did not have—that belied these assurances, namely, that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace; Ibotta's Chief Revenue Officer ("CRO") Chris Jensen ("Jensen") abruptly left the Company under suspicious circumstances just three months after the IPO (on July 19, 2024) without a temporary or permanent replacement; turnover in Ibotta's sales force and other client-facing personnel was skyrocketing, causing inadequate client-account coverage and friction in account handoffs that significantly impaired the Company's ability to expand client budgets and land new clients; and Ibotta's remaining, depleted client-facing personnel were left struggling to expand client budgets and land new clients, despite increased pressure from management to close deals using any tactics they could.

      **1.**      **The Array of Undisclosed Problems that Existed as of (and After) the IPO that Impaired Ibotta's Sales Capabilities**

106.     As several former employees with relevant knowledge who worked at Ibotta during the relevant period confirmed, as of and after the IPO, Ibotta's struggling sales force was increasingly having to operate in an environment of interrelated, compounding problems, which included: (i) difficulties in closing new sales with larger clients; (ii) markedly increased turnover and personnel reorganization; (iii) rapidly exhausting client budgets; and (iv) inability, despite

repeated efforts, to get clients to increase their budgets above the levels that (as Defendants knew) were being used up.

107.    FE-1, who frequently attended meetings with management where they discussed analytics projects in relation to client development from November 2021 to February 2025, recalled that Ibotta's analytics and sales strategy increasingly centered on client size and catering to "big, heavy hitters."  For example, FE-1 was the lead analyst on a project to "woo" a very big client roughly five months after the IPO.  Despite working "80-hour weeks" and "grinding every night" on projects to win that client, the client did not sign on with Ibotta.  More importantly, as FE-1 recalled, that experience was consistent with a broader trend that FE-1 observed while at Ibotta, namely, that "larger clients usually wouldn't be impressed by small or minimal increases in their sales" attributable to Ibotta, but instead "often believed that [Ibotta] didn't have any impact on their sales."

108.    FE-1 also recalled that several personnel-related reorganizations at the Company contributed to FE-1's decision to leave the Company in early 2025.  FE-1 stated that Ibotta's analytics team was disorganized, and FE-1 was "kicked around" within the analytics department during FE-1's tenure at Ibotta.

109.    FE-2 recalled there was a "big concern of going through [client] budgets too quickly" at the Company after the IPO.

110.    Relatedly, FE-2 recalled that at or just after the IPO, account managers were pressured to employ "any technique" possible to increase sales and to "look for ways to extend client budgets" however they could, which soon had a dramatic adverse impact on employee morale.  As FE-2 recalled, "there was a pretty immediate switch post-IPO" whereby working at

Ibotta "became a living hell."  For example, FE-2 recalled that—in contrast to before the IPO—there was now suddenly "an expectation to work long hours," and employees were even "contacted [while] on vacation" in the service of a much more pressurized environment where "everyone just had to work more."

111.    Unsurprisingly, FE-2 confirmed that this deteriorating environment led to a sharp and sudden increase in turnover among employees after the IPO.  FE-2 estimated the turnover rate was approximately 75%, "especially for account managers in my last year" (i.e., for the period July 2024 to July 2025).

112.    FE-5 was an Account Executive in Ibotta's sales department from September 2022 to May 2024, whose duties centered around five clients (one of which was a large alcohol and beverage company that maintained a roughly $1.5 million quarterly budget with Ibotta, and one of which was a cosmetics company that maintained a roughly $800,000 quarterly budget with Ibotta). FE-5's responsibilities included assisting those five clients in running promotional campaigns with Ibotta, and FE-5 recalled attending weekly virtual sales team meetings each Monday that CRO Jensen also regularly attended when he did not have other commitments.

113.    FE-5 also recalled increased pressure being applied to the sales force around the IPO (i.e., leading up to and after), which was "coming from higher-ups," with management "breathing down our necks concerning the [sales] numbers."  Indeed, FE-5 recalled revenue issues were discussed "constantly and intensely" at the weekly sales team meetings; and FE-5 further recalled that it was  around the time of the IPO that the sales team began to receive constant pressure from senior management to pitch massive projects to clients that would result in increased client budgets, whether by enlarging or lengthening existing promotions, or by embarking on new

ones. FE-5 stated that the projects and budgets that FE-5 and others in the sales team were asked to try to sell clients on were often sufficiently ridiculous or otherwise inapt that they were virtually certain to be rejected, and it became harder to get clients to agree to larger projects and larger budgets. As FE-5 also explained, one of the issues that contributed to clients refusing to agree to larger budgets was that many of them viewed Ibotta as a short-term promotional tool, and would thus refuse to sign on to promotions longer than several weeks. Accordingly, FE-5 stated that if, for example, a client had a new snack bar coming out, that client might well want to run a promotional campaign for only four weeks during the back-to-school season, although Ibotta would always push for promotional campaigns to run at least six to eight weeks.

114.    Interviewee 4 was a Senior Vice President in Ibotta's Finance department from summer 2023 to April 2024. Interviewee 4 gave an interview to AlphaSense on March 26, 2025 that was published on April 3, 2025. At Ibotta, Interviewee 4 "led FP&A [Financial Planning and Analysis] corporate development and investor relations," and had significant responsibilities centered around the IPO which included "all the IPO prep and IPO workstreams in the run-up to the IPO." Interviewee 4 also reported directly to the C-suite. When asked about any of their "negatives[] or concerns" about Ibotta's business, Interviewee 4 stated:

> *There's been a lot of turnover on the sales side.* The chief revenue officer [Jensen] left for weird reasons and the whole[] sales org imploded. *If you don't put salespeople out there to generate leads, you cannot generate revenue.* I think that's really what happened. I'm not sure I necessarily buy this whole seasonality thing. If you listen to their earnings calls, I don't think that this is necessarily the case because I know for a fact that marketing budgets are allocated year-round.
>
> I think there's some operational issues that they need to fix and resolve to hopefully get back to not just growth in general, but the high growth rates that were expected around the time that the IPO and that if you think about the IPO valuations that you need to believe in in order to justify that valuation.

-38-

Later in the interview, Interviewee 4 added: *"The entire sales force just left last year after the CRO was gone*."

> ### 2. Chief Revenue Officer Jensen's Sudden Departure Just Three Months After the IPO, and Ibotta's Attempts to Sweep It Under the Rug

115.    CRO Jensen joined Ibotta in 2016, just a few years after its founding.  He served as Vice President of Partnerships from October 2016 to July 2018, Senior Vice President of Partnerships and Business Development from July 2018 to August 2021, and Executive Vice President of Revenue from August 2021 to December 2022.  Then, he became the Company's CRO in December 2022.

116.    Jensen served as Ibotta's CRO until his abrupt, unannounced departure from the Company on July 19, 2024.

117.    That occurred a few weeks before Ibotta's scheduled earnings call for the second quarter of 2024 ("2Q24").  In fact, just three days earlier, on July 16, 2024, Ibotta announced it was going to report its 2Q24 financial results the following month.[7]  As detailed in §VII, *infra*, the Company reported disappointing results during that earnings call, after which Ibotta's share price plummeted 26.7%, erasing roughly $1.3 billion of market capitalization in a single day.

118.    Defendants did not contemporaneously disclose Jensen's departure, instead choosing to sweep it under the rug.  In Ibotta's quarterly report on Form 10-Q for 2Q24, Ibotta obliquely referred to Jensen as its "former Chief Revenue Officer" in passing in a section of the

---

[7]    IBOTTA, INC., *Ibotta to Announce Second Quarter 2024 Financial Results on August 13, 2024* (July 16, 2024), https://investors.ibotta.com/news-events/press-releases/detail/100/ibotta-to-announce-second-quarter-2024-financial-results-on-august-13-2024    [https://perma.cc/KE97-T3WA].

quarterly report about the "Securities Trading Plans of Directors and Executive Officers" and Jensen's adoption of a Rule 10b5-1 trading plan.

119.    It was not until December 23, 2024—*five months later*—that Ibotta announced it had a new CRO named Chris Riedy ("Riedy").[8]  Thus, against the backdrop of stalled growth, struggling sales, and share-price freefalls, Ibotta operated without a CRO for the entire second half of 2024.

120.    The reason for Ibotta's silence cannot be that the position of CRO did not matter. To the contrary, for fiscal year 2024, Jensen qualified as a "named executive officer" of Ibotta because he was its third-highest-paid executive, according to the Company's April 11, 2025 Proxy Statement.  Further, as Interviewee 4 stated, after Jensen's departure many sales personnel followed.

### E.    Defendants Sold Tens of Millions of Dollars of Ibotta Stock During the Class Period at Artificially Inflated Prices

121.    Defendants reaped significant profits from sales of Ibotta stock during the Class Period, both directly in the Offering and thereafter.

#### 1.    Defendants Sold $74 Million of Company Stock Directly in the Offering

122.    The following table shows the open-market sales of Ibotta common stock that Defendants made on April 22, 2024 in connection with the Offering.  As reported in the relevant

---

[8]    IBOTTA, INC., *Ibotta Appoints Chris Riedy as new Chief Revenue Officer* (Dec. 23, 2024), https://investors.ibotta.com/news-events/press-releases/detail/112/ibotta-appoints-chris-riedy-as-new-chief-revenue-officer [https://perma.cc/CA4M-YSVE].

Forms 4 filed with the SEC, all sales were made to the Underwriters at the Offering price of $88 per share.[9]

| Seller | Security | Price | Units | Value |
|---|---|---|---|---|
| Defendant Leach | Class B Common Stock | $88 | 531,003 | $46,728,264 |
| Defendant Lehrman | Class A Common Stock | $88 | 258,441 | $22,742,808 |
| Defendant Doshi | Class A Common Stock | $88 | 52,748 | $4,641,824 |
| | | *Totals* | *842,192* | *$74,112,896* |

123.    The table above is not an exhaustive list of all of Ibotta's selling stockholders who sold shares of Ibotta to the Underwriters in connection with the Offering.   It is limited to Defendants in this action.

**2.     Defendants Lehrman and Doshi Continued to Sell Company Stock During the Class Period**

124.    Defendants Lehrman and Doshi continued to sell shares of Ibotta common stock at artificially inflated prices throughout the Class Period.

125.    The following table shows the sales of Ibotta common stock that Defendants Lehrman and Doshi made during the Class Period.   According to the relevant Forms 4 filed with the SEC, all sales were of Class A common stock that occurred on the open market (i.e., not in connection with Rule 10b5-1 trading plans).   The "Δ Own" column reports the change in the percentage of the seller's Ibotta holdings that sale represented, according to data on the relevant Forms 4 filed with the SEC.

---

[9]       Because the Underwriters' commission was $5.28 per share, the net proceeds to the selling shareholders was $82.72 per share.

| Date | Seller | Price | Units | Value | Δ Own |
|---|---|---|---|---|---|
| Sept. 3, 2024 | Defendant Lehrman | $56.35 | 36,386 | $2,050,224 | 5% |
| Sept. 5, 2024 | Defendant Lehrman | $53.98 | 4,297 | $231,958 | 1% |
| Sept. 9, 2024 | Defendant Lehrman | $50.77 | 32,477 | $1,648,797 | 4% |
| Sept. 9, 2024 | Defendant Lehrman | $50.77 | 38,130 | $1,935,738 | 14% |
| Sept. 11, 2024 | Defendant Lehrman | $51.26 | 10,354 | $530,770 | 1% |
| Nov. 19, 2024 | Defendant Lehrman | $64.87 | 73,766 | $4,784,991 | 11% |
| Nov. 22, 2024 | Defendant Lehrman | $67.67 | 67,506 | $4,568,035 | 11% |
| Nov. 25, 2024 | Defendant Lehrman | $71.69 | 41,566 | $2,980,056 | 8% |
| Nov. 28, 2024 | Defendant Lehrman | $71.12 | 66,135 | $4,703,232 | 13% |
| Dec. 3, 2024 | Defendant Doshi | $73.66 | 13,437 | $989,803 | 6% |
| Dec. 12, 2024 | Defendant Lehrman | $73.55 | 164,743 | $12,117,661 | 44% |

126.     Thus, Defendant Lehrman—who was Defendant Leach's classmate in law school—unloaded a total of $58,294,270 of Ibotta common stock throughout the Class Period ($35,551,462 of which was not directly in the Offering), which represented significant portions of his holdings in both absolute terms and as percentages of his holdings.

## VI.     DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

### A.     The Offering Documents

127.     The Offering Documents contain materially false or misleading statements and omissions about the real-time nature of Ibotta's technology, the non-existence of fraudulent transactions on Ibotta's platforms, and Ibotta's watershed changes to its business model, which involved the Company all but abandoning the direct-to-consumer segment that had been its bread and butter until the IPO in favor of its nascent third-party-publisher platform to drive revenue growth.

### 1.    Real-Time Data Technology

128.    The Class Period begins on April 18, 2024, when Defendants filed with the SEC the Prospectus, which became part of the Registration Statement.  Therein, Defendants repeatedly claimed that Ibotta's data-measurement technology—the foundation of its business—was capable of tracking consumer behavior in real time.  In turn, Ibotta claimed, that allowed its clients to track the performance of their promotional campaigns with Ibotta in real time, enabling their clients to adjust their promotions on the fly.

129.    For instance, in describing "Ibotta's Value Proposition" for CPG brands (i.e., Ibotta's clients), Defendants brandished a platform called the Ibotta Partner Portal, which the Prospectus claimed allowed Ibotta's clients to track their promotional campaigns on Ibotta "in real time":

> . . . . *We provide our CPG brands with a platform called the Ibotta Partner Portal that enables them to set up and measure the performance of campaigns across our network in real-time*. This makes the execution and measurement of campaigns simpler and more efficient for CPG brands, saving them time and increasing our client retention.

130.    The statements identified in ¶129 were materially false or misleading for the following reasons.  At the time they were made, according to several former employees and current and past Ibotta clients familiar with its data-tracking technology, data on consumer redemptions and the performance of client campaigns was simply not available in real time.  Those persons uniformly described that there was a delay between the underlying activity (e.g., a consumer redemption) and that activity being reflected in Ibotta's data metrics.  For example, Interviewee 1 recalled the inability of Ibotta's technology—from the client's perspective—to provide insight into "exactly how things are working just on the fly" in a promotional campaign, and the related

inability of Poppi to "make real-time adjustments" to its campaign on Ibotta. Similarly, Interviewee 2 stated the data received from Ibotta was "not live," and Interviewee 3 stated it would have been "one of my wishes" for Ibotta to provide "feedback in real time as" campaigns were occurring. Further, to the extent Ibotta tracked consumer redemptions and the performance of client campaigns, any data reflecting that information required manual synthesis by Ibotta to render it in a format usable to Ibotta's clients. For example, as FE-3 stated, clients had to go "through me or somebody else" at Ibotta "for most of the data" about their campaigns. Thus, it was materially false or misleading for Ibotta to claim its technology allowed clients to "measure the performance of campaigns across [its] network in real-time" because any such campaign-performance measurement did not occur in real time.

131.    In describing "Ibotta's AI-Driven Technology Platform," the Prospectus claimed that Ibotta's platform allowed its clients to track the performance of their campaigns in real time, "while the campaign is still ongoing":

> **Purchases and redemptions**. Our technology platform helps orchestrate purchases and redemptions through our sophisticated capabilities in tracking and data analysis. *Our systems are able to track which offers have been selected by consumers in real-time, match offers to the specific qualifying products that have been purchased, and log redemptions accordingly. Our real-time campaign tracking allows clients to monitor the success of their campaigns* - providing visibility into total unit movement, sales lift, demographic and geographic data, market share, brand switching behavior, and ROAS [return on ad spend] *while the campaign is still ongoing, arming clients with the information they need to measure the efficacy of their campaigns and to optimize campaign performance and manage their budgets accordingly.*

132.    The statements identified in ¶131 were materially false or misleading for the following reasons. At the time they were made, according to several former employees and current and past Ibotta clients familiar with its data-tracking technology, data on consumer redemptions

and the performance of client campaigns was simply not available in real time.  Those persons uniformly described that there was a delay between the underlying activity (e.g., a consumer redemption) and that activity being reflected in Ibotta's data metrics.  For example, Interviewee 1 recalled the inability of Ibotta's technology—from the client's perspective—to provide insight into "exactly how things are working just on the fly" in a promotional campaign, and the related inability of Poppi to "make real-time adjustments" to its campaign on Ibotta.   Similarly, Interviewee 2 stated the data received from Ibotta was "not live," and Interviewee 3 stated it would have been "one of my wishes" for Ibotta to provide "feedback in real time as" campaigns were occurring.  Further, to the extent Ibotta tracked consumer redemptions and the performance of client campaigns, any data reflecting that information required manual synthesis by Ibotta to render it in a format usable to Ibotta's clients.  For example, as FE-3 stated, clients had to go "through me or somebody else" at Ibotta "for most of the data" about their campaigns.  Thus, it was materially false or misleading for Ibotta to claim its "real-time campaign tracking allows clients to monitor the success of their campaigns . . . while the campaign is still ongoing . . . and to optimize campaign performance and manage their budgets accordingly" because it misleadingly presented clients' abilities "to optimize campaign performance and manage their budgets" as capable of occurring on a real-time basis when, in fact, clients could not do so.

133.   Defendants framed Ibotta's supposedly real-time "data lake" as "the heart of Ibotta's technology":

> **Data ingestion**. Our business model requires us to know whether a consumer has successfully redeemed an offer by purchasing one or more qualifying items, either in-store or online. Therefore, at the heart of Ibotta's technology is our data lake consisting of item-level purchase data. In 2023 alone, Ibotta ingested and stored over 3 billion lines of purchase data. *We use cloud-based, serverless technology to ingest and process vast amounts of cross-retailer, item-level purchase data in near*

*real-time*. This data is ingested from several sources, including our POS integrations with 85 retailers, as of December 31, 2023, as well as from consumer-provided receipt purchase data. . . .

134.    The statements identified in ¶133 were materially false or misleading for the following reasons.  At the time they were made, according to several former employees and current and past Ibotta clients familiar with its data-tracking technology, data on consumer redemptions was simply not available in real time.  Those persons uniformly described that there was a delay between the underlying activity (e.g., a consumer redemption) and that activity being reflected in Ibotta's data metrics.  For instance, according to FE-1, whose entire role at Ibotta concerned data metrics, "*real time was never going to be conceivable*."  Thus, it was materially false or misleading for Ibotta to claim its "technology" could "process vast amounts of cross-retailer, item-level purchase data in near real-time" because it could not.

### 2.    User Fraud

135.    Because of Ibotta's cash-back rewards model, it was a hotbed for fraudulent activity.

136.    The Prospectus touted Ibotta's supposedly "sophisticated anti-fraud systems" as a key component of "Ibotta's AI-Driven Technology Platform":

**Payments and finance**. Critical to our success is our ability to deliver technology that manages the flow of funds to consumers, CPG brands, and publishers. Our systems are able to maintain rewards ledgers for each consumer within each publisher environment, track the accumulation of rewards through a digital wallet, orchestrate the flow of funds, and take care of all downstream billing and logistics. *Our sophisticated anti-fraud systems work to prevent third parties from committing fraudulent activities such as improperly claiming referral discounts or submitting counterfeit receipts to improperly claim cash back rewards. With our capabilities reducing both the risks and the number of instances of fraud, we are positioned to win the trust of CPG brands and publishers, and more effectively serve our entire ecosystem.*

137.    The statements identified in ¶136 were materially false or misleading, and omitted to state material facts necessary to make the statements not misleading, for the following reasons. At the time they were made, according to FE-4, whose role at Ibotta centered on fraudulent activity, Ibotta did not have a system to screen for tampered-with or counterfeit receipts at all, and Ibotta's fraud operations agents were simply unable to manually determine whether a receipt submitted to Ibotta was real or counterfeit.  Further, as FE-4 explained, counterfeit receipts were Ibotta's biggest problem in terms of fraudulent activity.  Thus, it was materially false or misleading for Ibotta to claim it was using "sophisticated anti-fraud systems" that "work[ed] to prevent third parties from committing fraudulent activities . . . such as . . . submitting counterfeit receipts to improperly claim cash back rewards" because, in reality, its anti-fraud measures were incapable of identifying counterfeit receipts, which led to significant losses.  In addition, Ibotta brass encouraged members of the Company's fraud department to let suspicious transactions slide during key periods, such as new product launches or major holidays.  By concealing and failing to disclose those known facts belying the statements identified in ¶136—despite putting at issue the supposedly "sophisticated anti-fraud systems" Ibotta had—Defendants rendered the statements identified in ¶136 materially false or misleading for this additional reason.

138.    In addition, the Prospectus couched the existing, known problem of rampant fraudulent transactions in purely hypothetical terms under its discussion of "Risk Factors" affecting Ibotta's business:

> **Failure to deal effectively with fraudulent or other improper transactions could harm our business.**
>
> *<u>It is possible</u> that third parties <u>may</u> commit fraudulent activities such as improperly claiming referral rewards, account takeover attacks, or submitting counterfeit receipts to improperly offer stack and/or claim rewards or discounts. While we use*

-47-

*anti-fraud systems, <u>it is possible</u> that individuals will circumvent them using increasingly sophisticated methods or methods that our anti-fraud systems are not able to counteract.* Further, *we <u>may not</u> detect any of these unauthorized activities in a timely manner.* The legal measures we take or attempt to take against third parties who succeed in circumventing our anti-fraud systems may be costly and may not be ultimately successful. While we have taken measures to detect and reduce the risk of fraud, these measures need to be continually improved and may not be effective against new and continually evolving forms of fraud or in connection with new offerings. If these measures do not succeed, our business will be negatively impacted.

139.     The statements identified in ¶138 were materially false or misleading for the following reasons.   At the time they were made, Ibotta was, in fact, already experiencing widespread problems of fraudulent activity on its platforms, consistent with the statements of FE-4.  For example, just one attack caused Ibotta roughly $33 million in losses.  Defendant Leach was personally aware of those problems because he attended regular meetings at which they were discussed.  Thus, Defendants' presentation of the risk of fraudulent activity on Ibotta's platforms as purely hypothetical—i.e., that fraudulent activity was only "possible" and "may" occur in the future—was materially false or misleading because it represented to investors that fraud was not already occurring on Ibotta's platforms when, in reality, it was.

### 3.     Revenue-Mix Shift

140.     Ibotta went public as a company that was growing.  Thus, investors cared about the trajectory of all segments of Ibotta's revenue growth, including direct-to-consumer revenue growth specifically (even assuming a growing third-party-publisher revenue segment).

141.     In the Offering Documents, Defendants presented a clear picture of year-over-year growth in Ibotta's direct-to-consumer segment, for both redemptions and advertisement:





142. Accordingly, the market took Defendants at their word. To illustrate, analysts modeled their valuations of Ibotta based on Ibotta's direct-to-consumer segment, at minimum, maintaining its existing revenue, if not modestly growing.

143. For instance, in a May 13, 2024 Wells Fargo analyst report initiating coverage of Ibotta, Wells Fargo stated it "believe[d] that Ibotta's D2C+Ads business can operate as a flat to low-single-digit margin business and will grow in line with inflation." Wells Fargo further stated "the D2C [direct-to-consumer] business will remain a critical part of Ibotta's offerings," despite noting Ibotta's shift in focus to the third-party-publisher segment. Thus, Wells Fargo modeled the following trajectory of Ibotta's revenue post-IPO:



144.    Similarly, in a May 13, 2024 UBS analyst report, UBS's model assumed "DTC [direct-to-consumer] [r]edeemers are essentially flat" over time.

145.    Thus, analysts and the market were taken by surprise when that ultimately did not pan out.  What Defendants did not disclose to investors was the true dynamic between Ibotta's direct-to-consumer and third-party-publisher segments (among other things).  Specifically, as borne out by Defendants' subsequent admissions, at the time of the IPO they knew that Ibotta's trajectory of increased reliance on the third-party publishers would actively cannibalize direct-to-consumer revenue (both redemptions and advertising).  As Defendants knew at the time of the IPO, but did not disclose, growth in Ibotta's direct-to-consumer and third-party-publisher segments were essentially zero sum.  As Ibotta went all-in on its third-party publishers, direct-to-consumer revenue (both from redemptions and advertisements) was certain to suffer.

146.    For example, during the Company's August 13, 2024 earnings call for its second quarter 2024 financial results, Defendant Patel disclosed that as "*a greater portion of [client] budgets are getting consumed on third-party properties,*" that "*leav[es] relatively fewer*

redemption opportunities for D2C [direct-to-consumer] redeemers" because "offers are distributed across the IPN democratically."  In other words, Defendant Patel presented direct-to-consumer and third-party-publisher redemption growth as zero-sum through the lens of client budgets: as third-party-publisher redemption growth goes up, direct-to-consumer growth must come down because clients allocate only a certain amount of money—i.e., budget—to a campaign.

147.    Defendant Patel did not claim he was previously unaware of this dynamic.  Thus, it stands to reason that he knew it at the time Ibotta issued the Offering Documents because this dynamic is simply a function of client budgets and offer supply.

148.    Similarly, at the September 11, 2024 Communacopia and Technology Conference, Defendant Leach presented to investors on behalf of Ibotta.  Asked about the Company's plummeting direct-to-consumer segment, he drove home the direct relationship between direct-to-consumer redemption and advertising revenue, stating that when "offer redemptions go . . . up on D2C," so too does advertising revenue increase because advertising revenue "tracks the eyeballs and so forth in the [Ibotta direct-to-consumer] app":

> If you have more offers supply, deeper budgets, you're going to see offer redemptions go way up on D2C. _And with it tends to go the ad products because it tracks the eyeballs and so forth in the app_.

149.    Defendant Leach did not claim he was previously unaware of this dynamic.  Thus, it stands to reason that he knew it at the time Ibotta issued the Offering Documents because this dynamic is simply a function of client budgets and offer supply.

150.    The following graph depicts the year-over-year changes in Ibotta's quarterly direct-to-consumer revenue, showing a dramatic deceleration in growth after the IPO:



151.    But despite that dynamic beginning to emerge in the lead up to the IPO, as shown in the graph above, Defendants addressed the risk that it posed to Ibotta's business in purely hypothetical terms in the Offering Documents:

**We have a history of net losses, we anticipate increasing expenses in the future, and we may not be able to continue to be profitable.**

\*                    \*                    \*

. . . .    Additionally, we may not realize, or there may be limits to, the efficiencies we expect to achieve through our efforts to scale the business, reduce friction in the direct-to-consumer (D2C) shopping experience, customer support, and consumer acquisition and onboarding costs. *Our efforts to encourage the growth of loyalty programs on third-party publishers' apps and websites <u>may</u> cause fewer consumers to use our D2C properties, leading to a loss of revenue and adversely affecting our financial position.* We will also face greater compliance costs associated with the increased scope of our business and being a public company.

152.    The statements identified in ¶151 were materially false or misleading for the following reasons.  At the time they were made, Ibotta was, in fact, already experiencing declining growth in its direct-to-consumer segment as a result of its increased focus on its third-party-publisher segment.  Thus, Defendants' presentation of the risk associated with Ibotta's pivot to focusing its business on the third-party-publisher segment—i.e., that it "*may cause* fewer

consumers to use [its] D2C properties, leading to a loss of revenue"—was materially false or misleading because it represented to investors that Ibotta's revenue-mix shift was not already adversely affecting its revenue growth when, in reality, it was.

153. Further, Defendants were required to disclose the material adverse information related to Ibotta's anticipated revenue-mix shift—that any growth in Ibotta's third-party-publisher segment would come at the direct expense of its direct-to-consumer segment, and cause direct-to-consumer revenue to rapidly decelerate—for at least two independent reasons.

154. *First*, under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), Defendants had an independent duty to disclose in the Offering Documents any known trends or uncertainties that have had, or that the registrant reasonably expects will have, a material favorable or unfavorable impact on net sales, revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition. As of the IPO and the issuance of the Offering Documents, Defendants were aware, but did not disclose, that Ibotta's revenue-mix shift away from its direct-to-consumer segment in favor of its third-party-publisher segment was likely to have a material adverse effect on the performance of both portions of Ibotta's direct-to-consumer revenue (i.e., redemptions and advertisements). Specifically, as Defendants knew, Ibotta's exclusive focus on its third-party-publisher segment would not merely detract from the revenue generated by its direct-to-consumer platform, but actively cause it to decelerate.

155. *Second*, the failure of the Offering Documents to disclose the material adverse information related to Ibotta's anticipated revenue-mix shift—that any growth in Ibotta's third-party-publisher segment would come at the direct expense of its direct-to-consumer segment, and

cause direct-to-consumer revenue to rapidly decelerate—also violated Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105").  Specifically, Item 105 provides, in pertinent part, that the "Risk Factors" section of offering documents filed with the SEC discuss the most significant factors that make an offering risky or speculative and that each risk factor adequately describes the risk.  But as addressed in ¶¶151–152, *supra*, Defendants' description of that risk in the Offering Documents was inadequate, in violation of Item 105.

B.    **Materially False or Misleading Statements and Omissions During the Rest of the Class Period**

156.    After the Offering and for the remainder of the Class Period, Defendants engaged in a pattern of making materially false or misleading statements to investors in attempts to maintain the artificial inflation in Ibotta's stock price as long as possible.

157.    Specifically, Defendants assured investors that as long as Ibotta continued to grow redeemers, clients would increase their budgets with Ibotta, and Ibotta would thus be able to continue to grow its revenue.  But while Defendants were repeating that tale to investors, Defendants knew material facts to which investors were blind that belied it, namely, that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace; Ibotta's CRO Jensen left the Company suddenly and under suspicious circumstances just three months after the IPO (on July 19, 2024) without a temporary or permanent replacement; contemporaneously with Jensen's departure, turnover among Ibotta's sales force skyrocketed, which caused inadequate client-account coverage and friction in account handoffs that significantly impaired the Company's ability to expand client budgets and land new clients; and Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients, despite amplified pressure from management to close deals using any tactics they could.

-54-

### 1.    May 30, 2024 Earnings Call (1Q24)

158.    On May 30, 2024, after market hours, Ibotta issued a press release on Form 8-K filed with the SEC containing its investor presentation and reporting its financial results for first quarter 2024.  During the associated earnings call on the same day, Defendant Leach touted his visibility of and confidence in Ibotta's clients increasing their budgets in line with growth in the Company's redeemers.   Defendant Leach tethered his expectations to existing facts about dynamics "we've always seen" between redeemer growth and client investments being "made in larger and larger amounts":

> [Question (Securities Analyst)] . . . .  And then the second part of that question would be just as we enter into a more promotional environment here, really, what is that visibility that the brands have? Does the visibility increase or decrease as we're in a ramping period or is there really any impact at all?
>
> . . . .
>
> [Answer (Defendant Leach)] . . . .  I do think that in terms of visibility and in terms of just continued investment, look, brands are looking for an at-scale place where they can earn and where they can put money to work where it's completely measurable and where it's all charged on a fee per sale basis. *The more we add redeemers, that's the key thing because the redeemers are what attract those brand dollars and we've always seen throughout the history of the company that as you build that scale, while maintaining the efficiency, those investments are more and more attractive and get made in larger and larger amounts.*
>
> In terms of the visibility that we have to that, there are a number of different ways that we track that. I mean we know when a campaign is running the breadth, the quality of that campaign, and we are always encouraging our clients to use best practices in a way that is the most advantageous for both them and the ultimate end consumer. And we also have visibility as we enter into partnerships with companies that are going to use us with a seasonal calendar, and we can see, okay, we know that they're going to spike during these periods of time during the year. And every company is different. We work with 750 different clients. In some cases, we have more visibility; in some cases, less. But overall, we feel good about the environment being one in which *as long as we do our part in growing redeemers and those addressable audiences that we'll have plenty of interest from the advertiser side.*

159.    The statements identified in ¶158 were materially false or misleading when made for the following reasons.  Defendant Leach misleadingly claimed that as long as Ibotta "add[ed] redeemers," clients would make "investments" in Ibotta "in larger and larger amounts," such that "growing redeemers" was all Ibotta had to do to maintain its growth.  In reality, however, Ibotta's revenue growth at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Leach knew about.  Specifically, Defendant Leach knew that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace, consistent with FE-2's statements about the widely known problem of client-budget exhaustion within the Company, which meant its sales team had to execute significant new sales to maintain Ibotta's revenue growth.  Concurrently, and compounding that problem, the sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company.  And still further compounding that problem, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

160.    When asked about expanding client budgets, Defendant Leach stated it would simply follow the growth of redeemers:

> [Question (Securities Analyst)]  I wanted to go back to one of your earlier answers about the flywheel of the business, Bryan. For Family Dollar and AppCard and other large retailers that come on board, can you talk about what happens with CPG

budgets as you do have major retailers come on board? Do they expand with those? Is there a lag? How do we think about that?

. . . .

[Answer (Defendant Leach)]  Thanks, Andrew. Yes, to the flywheel, yes, it's a 2-sided market. You are -- well, really it's a 3-sided market, right? You have these consumers, you have publishers and you have the CPG brands. I think *what we're focused on is spinning that flywheel by growing redeemers primarily across the network*. One way in which we do that is we bring in a new publisher. But *the main way we do that is by growing within the substantial headroom we have at the current publishers*.

161.    The statements identified in ¶160 were materially false or misleading when made for the following reasons.  Defendant Leach misleadingly claimed that as long as Ibotta "focused on . . . growing redeemers primarily across the network," clients' budgets would grow in tandem. In reality, however, Ibotta's revenue growth at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Leach knew about.  Specifically, Defendant Leach knew that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace, consistent with FE-2's statements about the widely known problem of client-budget exhaustion within the Company, which meant its sales team had to execute significant new sales to maintain Ibotta's revenue growth.  Concurrently, and compounding that problem, the sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company.  And still further compounding that problem, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants

-57-

and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

### 2.    May 31, 2024 Quarterly Report (1Q24)

162.    On May 31, 2024, Ibotta filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2024 ("1Q24 Form 10-Q").  In relevant part, the 1Q24 Form 10-Q contained a risk statement about fraudulent transactions that was substantially identical to the risk statement contained in the Offering Documents.

163.    The 1Q24 Form 10-Q couched the existing, known problem of rampant fraudulent transactions in purely hypothetical terms under its discussion of "Risk Factors" affecting Ibotta's business:

> **Failure to deal effectively with fraudulent or other improper transactions *could* harm our business.**
>
> *<u>It is possible</u> that third parties <u>may</u> commit fraudulent activities such as improperly claiming referral rewards, account takeover attacks, or submitting counterfeit receipts to improperly offer stack and/or claim rewards or discounts. While we use anti-fraud systems, <u>it is possible</u> that individuals will circumvent them using increasingly sophisticated methods or methods that our anti-fraud systems are not able to counteract. Further, we <u>may not</u> detect any of these unauthorized activities in a timely manner.* The legal measures we take or attempt to take against third parties who succeed in circumventing our anti-fraud systems may be costly and may not be ultimately successful. While we have taken measures to detect and reduce the risk of fraud, these measures need to be continually improved and may not be effective against new and continually evolving forms of fraud or in connection with new offerings. If these measures do not succeed, our business will be negatively impacted.

164.    The statement identified in ¶163 was materially false or misleading for the following reasons.  At the time it was made, Ibotta was, in fact, already experiencing widespread problems of fraudulent activity on its platforms, consistent with the statements of FE-4.  For example, just one attack caused Ibotta roughly $33 million in losses.  Defendant Leach was

personally aware of those problems because he attended regular meetings at which they were discussed. Thus, Defendants' presentation of the risk of fraudulent activity on Ibotta's platforms as purely hypothetical—i.e., that fraudulent activity was only "possible" and "may" occur in the future—was materially false or misleading because it represented to investors that fraud was not already occurring on Ibotta's platforms when, in reality, it was.

### 3.    August 13, 2024 Earnings Call (2Q24)

165.    On August 13, 2024, after market hours, the Company issued a press release on Form 8-K filed with the SEC reporting its financial results for second quarter 2024. During the associated earnings call on the same day, Defendants Leach and Patel misleadingly claimed that so long as Ibotta continued to grow redeemers, Ibotta's clients would increase their budgets, and thus Ibotta's revenue would benefit. Defendant Patel stated, in relevant part:

> Although D2C redemption revenue is down year-over-year, we remain focused on overall redemption revenue growth, which is very robust. Given the outperformance of third-party redeemer growth, a greater portion of budgets are getting consumed on third-party properties, leaving relatively fewer redemption opportunities for D2C redeemers, as offers are distributed across the IPN democratically.
>
> *Ultimately, however, advertiser budgets follow audiences. And thus, we expect client budgets to grow in proportion to the growth in redeemers network-wide as we've seen over the last couple of years.*

166.    The statements identified in ¶165 were materially false or misleading when made for the following reasons. Defendant Patel misleadingly claimed that "client budgets [would] grow in proportion to the growth in redeemers network-wide," as had occurred in the past. In reality, however, the growth in Ibotta's client budgets (and thus revenue) at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Patel knew about. Specifically,

Defendant Patel knew that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace, consistent with FE-2's statements about the widely known problem of client-budget exhaustion within the Company, which meant its sales team had to execute significant new sales to maintain Ibotta's revenue growth. Concurrently, and compounding that problem, the sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover among employees after the IPO. A substantial part of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances a few weeks earlier without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in connection with their discussion of the Company's revenue problems, leaving Ibotta without a CRO for a crucial sales period). Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure. And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

167.    When an analyst asked about what to make of Ibotta's revenue-mix shift, Defendant Leach explained there was no cause for concern, and even if third-party-publisher redemption growth detracted from direct-to-consumer redemption growth, Ibotta's expected increase in redeemers would cause clients to increase their budgets, thus maintaining overall growth:

> [Question (Securities Analyst)]  Bryan, I wanted to ask a little bit more about the D2C and the 3PP network and the expectations here. Just -- I think you said 3PP

redeemers are tracking ahead of expectations at Walmart. And I want to understand a little bit more about what might be driving the strength at the Walmart partnerships that clearly was a positive in the quarter. And then similarly, the challenges at D2C. I've seen that you talked about several, but wanted to understand that a little bit more as 3PP becomes a bigger part of the business.

[Answer (Defendant Leach)] . . . . *We do think that as overall audience size grows, so too go advertiser investment levels*. And so these are not completely continuous processes as we step up and are able to go back to our advertisers and say, look, we're really growing faster than anticipated here. In terms of overall redemption revenue, we're doing really well. We're growing. And then third party, we're way ahead of expectations, and that mix shift has kind of accelerated. *We're confident that they will allocate the kind of budget to take advantage of not only the third-party growth but also the exciting audience that we have on D2C*. So again, we really focus on overall redemption revenue growth and we're very pleased with how that's playing out.

168.    The statements identified in ¶167 were materially false or misleading when made for the following reasons.  Defendant Leach misleadingly claimed that "as overall audience size grows, so too go advertiser investment levels" for Ibotta, and similarly claimed that Ibotta's clients "will allocate the kind of budget to take advantage of" redeemer growth.  In reality, however, the growth in Ibotta's clients' investments (i.e., budgets) at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Leach knew about.  Specifically, Defendant Leach knew that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace, consistent with FE-2's statements about the widely known problem of client-budget exhaustion within the Company, which meant its sales team had to execute significant new sales to maintain Ibotta's revenue growth.  Concurrently, and compounding that problem, the sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover among employees after the IPO.  A

substantial part of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances a few weeks earlier without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in connection with their discussion of the Company's revenue problems, leaving Ibotta without a Chief Revenue Officer for a crucial sales period). Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure. And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

169. In response to a question from an analyst about expanding client budgets, both Defendants Leach and Patel again misleadingly stated that growth in redeemers alone was driving client-budget growth, which they tethered to existing facts about not only the dynamics "we've seen over the last 12 years consistently," but also "interest pick[ing] up a lot with our clients just here in this month":

> [Question (Securities Analyst)] I wanted to ask about expanding budgets. They were really healthy, right? $50,000 budgets grew, I think, 50% this quarter, but it sounds like some 3 key redemption, just demand, pushed out demand on D2C. And so the question is, can you help us understand how you can unlock more budgets to better match supply and demand across the network? Is that a thought or am I misinterpreting that? And then secondly, general merchandise almost doubled year over year. Can you just help us understand the drivers of that growth, just given the potential size of that category?

> [Answer (Defendant Leach)] Thank you, Andrew. Great question. So let's take them in turn. *First, we expand budgets within the CPG universe. The thing we've seen over the last 12 years consistently is that advertisers want to capitalize on large and growing audiences. And so as the overall redeemer audience on our*

*network grows, so too is the interest in getting out in front of the audience very high*, I think, particularly so because of the macro. . . .

. . . .

[Answer [Defendant Patel]]  Just one other thing on the previous question. I mean he asked a question on budgets. We've literally more than doubled the business over the last couple of years and [are] still seeing significant growth. So sometimes you might see slight lags. But as I was saying, *we are seeing interest pick up a lot with our clients just here in this month. So over time, we've not had that issue that audiences have grown. We've generally been able to grow our budgets with our clients without much of a problem.*

170.    The statements identified in ¶169, individually and in concert, were materially false or misleading when made for the following reasons.  Defendant Leach misleadingly claimed that "as the overall redeemer audience on [Ibotta's] network grows, so too is the interest [from Ibotta's clients] in getting out in front of the audience very high."  Defendant Patel misleadingly drove home Defendant Leach's appeal to "interest pick[ing] up a lot with [Ibotta's] clients" by tethering it to their oft-repeated dynamic of "be[ing] able to grow [Ibotta's] budgets with [its] clients" when "audiences have grown."  In reality, however, the growth in Ibotta's client budgets at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendants Leach and Patel knew about.  Specifically, Defendants Leach and Patel knew that Ibotta's clients were already depleting their 2024 budgets at an unsustainable pace, consistent with FE-2's statements about the widely known problem of client-budget exhaustion within the Company, which meant its sales team had to execute significant new sales to maintain Ibotta's revenue growth.  Concurrently, and compounding that problem, the sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover

among employees after the IPO. A substantial part of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances a few weeks earlier without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in connection with their discussion of the Company's revenue problems, leaving Ibotta without a CRO for a crucial sales period). Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure. And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

### 4. August 14, 2024 Quarterly Report (2Q24)

171. On August 14, 2024, Ibotta filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2024 ("2Q24 Form 10-Q"). In relevant part, the 2Q24 Form 10-Q contained a risk statement about fraudulent transactions that was substantially identical to the risk statements about that subject contained in the Offering Documents and the 1Q24 Form 10-Q.

172. The 2Q24 Form 10-Q couched the existing, known problem of rampant fraudulent transactions in purely hypothetical terms under its discussion of "Risk Factors" affecting Ibotta's business:

**Failure to deal effectively with fraudulent or other improper transactions *could* harm our business.**

*<u>It is possible</u> that third parties <u>may</u> commit fraudulent activities such as improperly claiming referral rewards, account takeover attacks, or submitting counterfeit receipts to improperly offer stack and/or claim rewards or discounts. While we use*

*anti-fraud systems, <u>it is possible</u> that individuals will circumvent them using increasingly sophisticated methods or methods that our anti-fraud systems are not able to counteract.* Further, *we <u>may not</u> detect any of these unauthorized activities in a timely manner.* The legal measures we take or attempt to take against third parties who succeed in circumventing our anti-fraud systems may be costly and may not be ultimately successful. While we have taken measures to detect and reduce the risk of fraud, these measures need to be continually improved and may not be effective against new and continually evolving forms of fraud or in connection with new offerings. If these measures do not succeed, our business will be negatively impacted.

173.    The statement identified in ¶172 was materially false or misleading for the following reasons.  At the time it was made, Ibotta was, in fact, already experiencing widespread problems of fraudulent activity on its platforms, consistent with the statements of FE-4.  For example, just one attack caused Ibotta roughly $33 million in losses.  Defendant Leach was personally aware of those problems because he attended regular meetings at which they were discussed.  Thus, Defendants' presentation of the risk of fraudulent activity on Ibotta's platforms as purely hypothetical—i.e., that fraudulent activity was only "possible" and "may" occur in the future—was materially false or misleading because it represented to investors that fraud was not already occurring on Ibotta's platforms when, in reality, it was.

174.    The 2Q24 Form 10-Q also contained a risk statement about the potential that Ibotta might lose members of its "senior management team or key personnel," which "could significantly harm [its] business."  That risk statement was couched in purely hypothetical terms even though that very risk had come to pass through the loss of CRO Chris Jensen:

> **The loss of Bryan Leach, our Founder, Chief Executive Officer, President, and Chairman of our board of directors, or one or more of our senior management team or key personnel, or our failure to attract new or replacement members of our senior management team or other key personnel in the future, *could* significantly harm our business.**

We depend on the continued services and performance of our Founder, Chief Executive Officer, President, and Chairman of our board of directors, Bryan Leach; members of our senior management team; and other key personnel. Mr. Leach has been responsible for setting our strategic vision, and should he stop working for us for any reason, it is unlikely that we would be able to immediately find a suitable replacement. We do not maintain key man life insurance for Mr. Leach and do not believe any amount of key man insurance would allow us to recover from the harm to our business if Mr. Leach were to leave us for any reason. *Similarly, members of our senior management team and key employees are highly sought after, and others may attempt to encourage these executives to leave us. The loss of one or more of the members of the senior management team or other key personnel for any reason <u>could</u> disrupt our operations, create uncertainty among investors, adversely impact employee retention and morale, and significantly harm our business.*

175.     The statement identified in ¶174 was materially false or misleading for the following reasons.  It presented the risk of the departure of "members of [Ibotta's] senior management team and key employees" as purely hypothetical when, in reality, at the time the statement was made Defendants knew CRO Jensen had left the Company just a few weeks earlier. CRO Jensen's departure came amid, and contributed to additional, increasing turnover among Ibotta's client-facing personnel.  Thus, it was not merely possible that "[t]he loss of one or more of the members of the senior management team or other key personnel for any reason *could* disrupt [Ibotta's] operations" and "adversely impact employee retention."  That risk had already materialized when the statement was made, as Defendants knew.

### 5.     November 13, 2024 Earnings Call (3Q24)

176.     On November 13, 2024, after market hours, the Company issued a press release on Form 8-K filed with the SEC reporting its financial results for third quarter 2024.  During the associated earnings call on the same day, Defendant Leach suddenly disclosed that Ibotta had exhausted its clients' budgets allegedly faster than anticipated.  But in doing so he continued to

mislead, without disclosing the full truth contributing to Ibotta's continued decaying growth and weaker-than-expected guidance for the next quarter:

> I'd now like to briefly address some of the dynamics we've seen in our business more recently. As you can see from our Q3 results, we had a very strong end to the third quarter, moving through CPG promotional budgets faster than anticipated. *As we look at the current quarter, however, despite it being our seasonally strongest quarter in the past, the rapid growth in our redeemer base, coupled with intense demand for savings on everyday items has caused us to exhaust 2024 budgets faster than anticipated. This has put short-term downward pressure on our redemption revenue in Q4, resulting in our guidance. We believe this downward pressure is temporary* because we continue to see extremely high rates of client retention, indicating our clients are happy with the quality of what we are delivering. *We have received indications from many of our top clients that they intend to increase their investment levels as their annual budgets reset in 2025.*

177.    The statements identified in ¶176 were materially false or misleading for the following reasons.  Defendants kept track of the rate at which client budgets were used up or exhausted on an ongoing basis, consistent with FE-3's recollection.  Thus, to say budgets were depleted "faster than anticipated" suggested Defendants were surprised when, in reality, Defendants had ongoing (albeit not real-time) insight into client-budget use, which they knew at the time the statement was made.  Further, in blaming client-budget exhaustion as the sole cause of the "short-term downward pressure on [Ibotta's] redemption revenue in Q4," Defendant Leach misled investors by concealing the true set of factors contributing to Ibotta's stalled revenue growth.  At the time, Ibotta's sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover among employees after the IPO.  A substantial part of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in

-67-

connection with their discussion of the Company's revenue problems, leaving Ibotta without a Chief Revenue Officer for a crucial sales period).  Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure.  And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

178.    On that call, analysts asked many questions on the issue of Ibotta's client-budget exhaustion.  Defendant Leach continued to tout the supposedly then-existing indications that Defendants were receiving from clients about growing their budgets with Ibotta as a function of "the growth in [Ibotta's] network":

> [Question (Securities Analyst)]  Two questions, if I may. First, Bryan, how do you think about -- at what point do you think you'll have confidence in the supply side of offers to fulfill what could be a very strong demand year in terms of the number of redeemers and as you add the Instacart demand to the platform?
>
> . . . .
>
> [Answer (Defendant Leach)]  Thanks, Ken. Both great questions. First one, look, *we have confidence in the supply side of our business because, as I said, we have 12 years of history of watching it follow the growth in our network. And we've had a lot of conversations with our top clients to the effect of we're excited. We are so excited about Instacart coming on board. We're going to be ready to go in the beginning of the year. We're excited about the growth of your network, and there's just sort of a, well, you've earned the right to grow your budget by this percent. And so we have that visibility.* We don't provide guidance out beyond this current quarter because we just haven't done that, and it is difficult to see an entire year of that.

-68-

179.    The statements identified in ¶178 were materially false or misleading when made for the following reasons. Defendant Leach misleadingly touted "visibility" into clients allegedly stating Ibotta had "earned the right to grow [their] budgets" as a function of "the growth in [Ibotta's] network." In reality, however, the growth in Ibotta's client budgets at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Leach knew about. Specifically, Ibotta's sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover among employees after the IPO. A substantial part of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances a few weeks earlier without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in connection with their discussion of the Company's revenue problems, leaving Ibotta without a CRO for a crucial sales period). Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure. And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

180.    Defendants reemphasized that client budgets and Ibotta's revenue grow in tandem with Ibotta's redeemer base, such that Ibotta's ability to continue to grow redeemers would

compensate for any problems caused by Ibotta's clients exhausting their budgets. Defendant Leach went so far as to claim he was "not aware of" *a single client* that was "planning on not taking advantage of the larger volume" Ibotta gets from "the growth of [its] network":

> [Question (Securities Analyst)]  Bryan, I just want to go back to the comment you had made about a small number of large clients that need to re-up. Can you just talk about the consistency in the past, either on a percentage basis or on a dollar basis and which kind of over a multiyear period, those budgets have stepped up? Are they consistent? Are they kind of growing incrementally each year?
>
> [Answer (Defendant Leach)] . . . .  We're dealing with different buckets and different situations. But what I would say is that *overall, I'm not aware of very many clients that aren't planning on -- I can't -- sitting here right now, I'm not aware of any clients that are planning on not taking advantage of the larger volume that we get from, say, Instacart or just the growth of the network*. And generally, they're like, this is great. Our problem for the first 8, 9 years was we would perpetually hear, there's not enough cowbell. Now we're giving them all this scale, and they're adjusting to the idea that Ibotta is really the kind of tactic that you can use that can move the percentage of your Nielsen points by a point or 2 in a matter of weeks. And that mindset takes more than a minute to sort of seep into planning and into the consciousness.

181.  The statements identified in ¶180 were materially false or misleading when made for the following reasons.  Defendant Leach misleadingly stated he was "not aware of any clients that are planning on not taking advantage of the larger volume" Ibotta associated with the simple fact of "the growth of [Ibotta's] network" alone.  In reality, however, the growth in Ibotta's client budgets at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Leach knew about.  Specifically, Ibotta's sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover among employees after the IPO.  A substantial part

of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in connection with their discussion of the Company's revenue problems, leaving Ibotta without a CRO for a crucial sales period). Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure. And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

182. Defendant Leach drove his misleading refrain home by again equating growth in client budgets to growth in Ibotta's revenue on a virtually one-to-one basis:

> [Question (Securities Analyst)] Maybe just to start, especially with adding Instacart and we think there's still room to grow redeemers with Walmart. We think redeemers are going to grow over the next 12 to 24 months. Bryan, let's just get your confidence that you're able to kind of fill this demand or redeemer growth with budgets?
>
> . . . .
>
> [Answer (Defendant Leach)] I mean *if we right now double the budgets and the offers that we have today with the audience that we have today at Walmart, we would nearly double the revenue that we have today.* There is -- *you don't need to do anything more than deepen the existing budgets. You don't even need new brand partners. You just need more powder to keep the offers live longer, and they will be gobbled up extremely quickly on Walmart, D2C and every other part of the network.*

183. The statements identified in ¶182 were materially false or misleading when made for the following reasons. Defendant Leach misleadingly stated that Ibotta simply needed "more powder"—his term for larger budgets from clients in this context—to increase Ibotta's revenue,

going so far as to falsely claim that if Ibotta simply "double[d] the budgets and the offer[s]" it had, Ibotta "would nearly double the revenue" it had.  In reality, however, the growth in Ibotta's client budgets at the time and for the remainder of the Class Period did not hinge on such a simple function because of material, undisclosed problems that were occurring at the time, which Defendant Leach knew about.  Specifically, Ibotta's sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company, consistent with FE-1's recollection of personnel-related reorganizations occurring at the Company and FE-2's recollection of a sudden increase in turnover among employees after the IPO.  A substantial part of the existing, increasing turnover and reorganization related to CRO Jensen's sudden departure under suspicious circumstances without a temporary or permanent replacement (which Defendants still had not affirmatively disclosed in connection with their discussion of the Company's revenue problems, leaving Ibotta without a CRO for a crucial sales period).  Moreover, as Interviewee 4 recounted, sales-force turnover ramped up after CRO Jensen's departure.  And still further compounding these problems, Ibotta's remaining client-facing personnel were struggling to expand client budgets and land new clients—consistent with the recollections of FE-1 and FE-5 about repeated, failed sales attempts—which was demonstrated by the amplified pressure Defendants and other senior personnel were exerting on their employees to close deals using any tactics they could, as FE-2 and FE-5 both recalled.

### 6.    November 14, 2024 Quarterly Report (3Q24)

184.    On November 14, 2024, Ibotta filed with the SEC its quarterly report on Form 10-Q for the period ending September 30 30, 2024 ("3Q24 Form 10-Q").  In relevant part, the 3Q24 Form 10-Q contained a risk statement about fraudulent transactions that was substantially identical

to the risk statements about that subject contained in the Offering Documents and the Forms 10-Q

filed for 1Q24 and 2Q24.

185.    The 3Q24 Form 10-Q couched the existing, known problem of rampant fraudulent

transactions in purely hypothetical terms under its discussion of "Risk Factors" affecting Ibotta's

business:

> **Failure to deal effectively with fraudulent or other improper transactions could harm our business.**
>
> *It is possible that third parties may commit fraudulent activities such as improperly claiming referral rewards, account takeover attacks, or submitting counterfeit receipts to improperly offer stack and/or claim rewards or discounts. While we use anti-fraud systems, it is possible that individuals will circumvent them using increasingly sophisticated methods or methods that our anti-fraud systems are not able to counteract. Further, we may not detect any of these unauthorized activities in a timely manner.* The legal measures we take or attempt to take against third parties who succeed in circumventing our anti-fraud systems may be costly and may not be ultimately successful. While we have taken measures to detect and reduce the risk of fraud, these measures need to be continually improved and may not be effective against new and continually evolving forms of fraud or in connection with new offerings. If these measures do not succeed, our business will be negatively impacted.

186.    The statement identified in ¶185 was materially false or misleading for the

following reasons.  At the time it was made, Ibotta was, in fact, already experiencing widespread

problems of fraudulent activity on its platforms, consistent with the statements of FE-4.  For

example, just one attack caused Ibotta roughly $33 million in losses.  Defendant Leach was

personally aware of those problems because he attended regular meetings at which they were

discussed.  Thus, Defendants' presentation of the risk of fraudulent activity on Ibotta's platforms

as purely hypothetical—i.e., that fraudulent activity was only "possible" and "may" occur in the

future—was materially false or misleading because it represented to investors that fraud was not

already occurring on Ibotta's platforms when, in reality, it was.

187.    The 3Q24 Form 10-Q also contained a risk statement about the potential that Ibotta might lose members of its "senior management team or key personnel," which "could significantly harm [its] business."  That risk statement was couched in purely hypothetical terms even though that very risk had come to pass through the loss of CRO Chris Jensen:

> **The loss of Bryan Leach, our Founder, Chief Executive Officer, President, and Chairman of our board of directors, or one or more of our senior management team or key personnel, or our failure to attract new or replacement members of our senior management team or other key personnel in the future, *could* significantly harm our business.**
>
> We depend on the continued services and performance of our Founder, Chief Executive Officer, President, and Chairman of our board of directors, Bryan Leach; members of our senior management team; and other key personnel. Mr. Leach has been responsible for setting our strategic vision, and should he stop working for us for any reason, it is unlikely that we would be able to immediately find a suitable replacement. We do not maintain key man life insurance for Mr. Leach and do not believe any amount of key man insurance would allow us to recover from the harm to our business if Mr. Leach were to leave us for any reason. *Similarly, members of our senior management team and key employees are highly sought after, and others may attempt to encourage these executives to leave us. The loss of one or more of the members of the senior management team or other key personnel for any reason <u>could</u> disrupt our operations, create uncertainty among investors, adversely impact employee retention and morale, and significantly harm our business.*

188.    The statement identified in ¶187 was materially false or misleading for the following reasons.  It presented the risk of the departure of "members of [Ibotta's] senior management team and key employees" as purely hypothetical when, in reality, at the time the statement was made Defendants knew CRO Jensen had left the Company just a few weeks earlier. CRO Jensen's departure came amid, and contributed to additional, increasing turnover among Ibotta's client-facing personnel.  Thus, it was not merely possible that "[t]he loss of one or more of the members of the senior management team or other key personnel for any reason *could* disrupt

-74-

[Ibotta's] operations" and "adversely impact employee retention." That risk had already materialized when the statement was made, as Defendants knew.

## VII.    THE TRUTH GRADUALLY EMERGES

189.    The truth about the nature and extent of Defendants' materially false or misleading statements during the Class Period slowly emerged through several partial corrective events, some of which were themselves accompanied by additional material misrepresentations and omissions that obscured and minimized the extent of Defendants' problems until the end of the Class Period.

### A.    August 13, 2024

190.    On August 13, 2024, after market hours, the Company issued a press release and Form 8-K that reported its financial results for second quarter 2024 ("2Q24"), and held an earnings call. During the earnings call, Ibotta disclosed that its 2Q24 direct-to-consumer redemption revenue had *declined 13% year over year*, and its 2Q24 direct-to-consumer advertising revenue had *declined 27% year over year*. Further, the number of direct-to-consumer redeemers in 2Q24 had *declined 13% year over year*. Ibotta also disclosed that its total direct-to-consumer revenue had declined sequentially (i.e., quarter over quarter) by 2%, as well. Defendant Patel also reported that the Company had seen a "dramatic mix shift in [its] business" away from direct-to-consumer redemption and advertising revenue, with the mix "accelerat[ing]" toward third-party-publisher redemption revenue.

191.    The declines in Ibotta's direct-to-consumer redemption and advertising revenue surprised the market, which responded negatively to the news despite top-line revenue growth. For example, an August 13, 2024 Wells Fargo analyst report stated that the direct-to-consumer redemption and advertising revenue were "*both worse than expected*." Further, the report

observed, "We consider this *a disappointing development* for a new issue . . . .  In the near term, weaker ads and [direct-to-consumer] redemption rev[enue] *more than offset* strength in [third-party] redemption revenue."  The Wells Fargo report further stated that it now saw the "loss of high margin ads revenue as a headwind to [Ibotta's] margins."

192.    Moreover, the truth about the actual dynamic between direct-to-consumer and third-party-publisher redemption revenue began to be disclosed on the same call.  Defendant Patel described direct-to-consumer and third-party-publisher redemption revenue growth as mutually exclusive to an extent because client budgets were a constraint on both.  In other words, as third-party-publisher redemption growth steepens, it cannibalizes opportunities for direct-to-consumer redemption growth.  As Defendant Patel admitted, "Given the outperformance of third-party redeemer growth, *a greater portion of [client] budgets are getting consumed on third-party properties, leaving relatively fewer redemption opportunities for [direct-to-consumer] redeemers,* as offers are distributed across the IPN democratically."

193.    On the foregoing news, Ibotta's stock price fell $15.53, or roughly 26.7%, to close at $42.66 per share on August 14, 2024.  But Ibotta's stock price remained artificially inflated because Defendants continued to materially misrepresent and conceal the full truth about the undisclosed risks and problems plaguing the business, as set forth in §VI.B, *supra*.

**B.    November 13, 2024**

194.    On November 13, 2024, after market hours, the Company issued a press release and Form 8-K filed with the SEC that reported its financial results for third quarter 2024 ("3Q24"), and held an earnings call.  During the earnings call, Ibotta disclosed that its 3Q24 direct-to-consumer redemption revenue had *declined 20% year over year* and its 3Q24 direct-to-

advertising revenue had *declined 27% year over year*. Further, the number of 3Q24 direct-to-consumer redeemers had *declined 8% year over year*.

195. In addition, during the call, Defendant Leach also revealed that Ibotta had "exhaust[ed]" its clients' promotional budgets for 2024, which negatively impacted Ibotta's revenue guidance for fourth quarter 2024. Defendant Leach stated, in relevant part, that Ibotta had "exhaust[ed] 2024 [client] budgets faster than anticipated," which "put[s] short-term downward pressure on our redemption revenue in Q4, resulting in our [reduced] guidance."

196. The market responded negatively to that news. For instance, a November 14, 2024 UBS analyst report stated that it no longer believed Defendants' prior and oft-repeated refrain that growth in redeemers directly leads to growth in client's promotional budgets. Given the disclosure of "exhausting advertiser budgets" in the third quarter, UBS instead reported that "*we've lost confidence that faster [r]edeemer growth begets advertiser budget growth*, at least near-term."

197. Similarly, in a November 14, 2024 analyst report, Wells Fargo stated that it was "increasingly clear that [Ibotta] must do more to demonstrate ad efficacy to unlock [client] budget supply." Wells Fargo also cut its revenue projections for 2025 and 2026 "on lower [direct-to-consumer] and ads" revenue.

198. Moreover, on the earnings call, the truth about the inability of Ibotta's data-tracking technology to provide any usable information in real-time provided began to publicly emerge. For example, on the call Defendant Leach suddenly announced that Ibotta was rolling out "several exciting initiatives" that were "designed to" "improve [its] ability to keep up with the growth in redeemer demand." One of these initiatives was "*improv[ing] the rigor and credibility of [Ibotta's] measurement framework*, allowing [its] clients to track how many incremental sales they

are delivering *in near real time*."  This statement was effectively an admission that Defendants'
prior claims about Ibotta being able to provide useable data to its clients concerning campaign
performance in real time were materially false or misleading.

199.    Moreover, on the same call, Defendant Leach further signaled to the market that
there was a virtually zero-sum dynamic between direct-to-consumer and third-party-publisher
redemption growth.  For example, in response to an analyst question about the dynamic between
direct-to-consumer and third-party-publisher redemption growth given the constraining impact of
exhausted client budgets, Defendant Leach admitted that "if [Ibotta] ha[s] a massive amount of
redeemers on *third-party* gobbling up offers . . . [then] that is the reason why redemption revenue
on [*direct-to-consumer*] is lower.  And because that's all coming out of the same budget, that's
exactly why."

200.    On the foregoing news, Ibotta's stock price fell $9.38, or roughly 12.5%, to close
at $65.55 per share on November 14, 2024.  But Ibotta's stock price remained artificially inflated
because Defendants continued to materially misrepresent and conceal the full truth about the
undisclosed risks and problems plaguing the business, as set forth in §VI.B, *supra*.

**C.    February 26–27, 2025**

201.    The full nature and extent of the truth concerning the material adverse problems
that Ibotta had faced during the Class Period further emerged on (i) February 26, 2025, after market
hours, when the Company issued a press release and Form 8-K filed with the SEC that reported its
financial results for fourth quarter and full fiscal year of 2024, and held an associated earnings call;
and (ii) February 27, 2025, the last day of the Class Period, when Ibotta filed its Annual Report on
Form 10-K for the full year ended December 31, 2024.  In these disclosures, Ibotta reported further

erosion in its direct-to-consumer segment and numerous other adverse facts that finally disclosed the truth about Defendants' prior Class Period misstatements and omissions.

202.    During the earnings call, Ibotta disclosed that its direct-to-consumer redemption revenue for 4Q24 had *declined another 24% year over year*, and that its direct-to-consumer advertising revenue for 4Q24 had *declined another 27% year over year*.

203.    Also during the call, Defendant Leach expressly attributed "[t]he current softness in [Ibotta's] business . . . to the fact that we have not secured enough offer supply from [consumer-packaged-goods] brands."  As he used it, "offer supply" referred to increasing client budgets (so that they could fund more promotional offers) and landing new clients (so that they could generate new revenue from new promotional offers).  Defendant Leach stated that even though "many of [Ibotta's] top clients increased their Ibotta budgets to take advantage of [its] larger audience of redeemers," that had not translated to an "overall increase in [client] spending" for three reasons:

204.    *First*, Defendant Leach stated Ibotta's clients were "increasingly expect[ing] *a greater level of rigor when it comes to measuring*" the performance of their campaigns with Ibotta. He added that Ibotta was "in the process of *overhauling and upgrading [its] approach to both measurement and targeting*," and that "it has become clear that we need to bring to market a more rigorous form of measurement."  As part of the technology overhaul Defendant Leach described, he stated that "[i]n the future, we anticipate that our clients will be able to more easily sign up, fund, set up, measure and optimize campaigns with us, *all without needing the same level of time-intensive back-and-forth with our sellers and account managers*."

205.    *Second*, Defendant Leach belatedly revealed that sales-execution problems related to changes in the Company's "sales organization" had been adversely affecting Ibotta's business. As Defendant Leach stated:

> [W]e fell short of our expectations when it comes to sales execution, plain and simple. As we've been upgrading our sales organization, at times there was an inadequate account coverage and there were account handoffs that could have been crisper. This disrupted our ability to secure offer supply in the short term.

206.    Immediately after making that statement, Defendant Leach finally commented on how Ibotta had hired a new CRO, Chris Riedy, in connection with the Company's sales problems.[10] As Defendant Leach stated, "Chris' onboarding has highlighted additional opportunities to improve our sales operations, sales enablement and account prioritization."

207.    *Third*, Defendant Leach admitted that Ibotta had been "unable to persuade [its] clients to set aside budgets in anticipation of [its] redeemer growth, rather than a full planning cycle after they have seen it."

208.    The market responded negatively to these disclosures.  For example, a February 27, 2025 Wells Fargo report emphasized how Ibotta's client and "[p]artner budget constraints continue[d] to restrict revenue growth," and that in the face of acknowledged problems Ibotta management was now embarking on a "*full reset*" of their business approach.

209.    For the first time since the IPO, Ibotta also disclosed that it had been subjected to fraudulent activity by Ibotta users.  Specifically, in its February 27, 2025 Annual Report on Form 10-K for the year ended December 31, 2024 ("FY24 Form 10-K"), Ibotta materially changed its

---

[10]    Although the Company announced the hiring of Riedy in a press release on December 23, 2024, that disclosure was made in a vacuum while the market was still blind to Ibotta's existing sales-execution problems.

risk statement about user fraud to finally disclose that fraud problems were not purely hypothetical,

but had in fact already occurred:

> **Failure to deal effectively with fraudulent or other improper transactions could materially adversely affect our business, financial condition, results of operations, and prospects.**
>
> _Third parties have_, and in the future could, _commit fraudulent activities such as improperly claiming rewards, account takeover attacks, or submitting counterfeit receipts_ to improperly offer stack and/or claim rewards or discounts. While we use anti-fraud systems, _individuals have_ and could in the future _circumvent them_ using increasingly sophisticated methods or methods that our anti-fraud systems are not able to counteract or detect in a timely manner. The legal measures we could take or attempt to take against third parties who succeed in circumventing our anti-fraud systems may be costly and may not be ultimately successful. While we have taken measures to detect and reduce the risk of fraud, these measures need to be continually improved and may not be effective against new and continually evolving forms of fraud or in connection with new offerings. If these measures do not succeed, our business, financial condition, results of operations, and prospects could be materially adversely affected.

210.    The following redline compares the text of Ibotta's risk statements about its

problem of user fraud between its Prospectus and FY24 Form 10-K.  The redline was created by

using as the original text the relevant risk statement from the Prospectus (which is identical to its

subsequent iterations in Ibotta's Forms 10-Q for 1Q24, 2Q24, and 3Q24), and using as the new

text the relevant risk statement from the FY24 Form 10-K:

> ***Failure to deal effectively with fraudulent or other improper transactions could ~~harm~~*** *materially adversely affect* ***our business,*** *financial condition, results of operations, and prospects.*
>
> ~~It is possible that third~~ Third parties ~~may~~ have, and in the future could, commit fraudulent activities such as improperly claiming ~~referral~~ rewards, account takeover attacks, or submitting counterfeit receipts to improperly offer stack and/or claim rewards or discounts. While we use anti-fraud systems, ~~it is possible that~~ individuals ~~will~~ have and could in the future circumvent them using increasingly sophisticated methods or methods that our anti-fraud systems are not able to counteract ~~Further, we may not~~ or detect ~~any of these unauthorized activities~~ in a timely manner. The legal measures we could take or attempt to take against third parties who succeed in circumventing our anti-fraud systems may be costly and may not be ultimately successful. While we have taken measures to detect and reduce the risk of fraud, these measures need to be continually improved and may not be effective against new and continually evolving forms of fraud or in connection with new offerings. If these measures do not succeed, our business ~~will be negatively impacted.~~, financial condition, results of operations, and prospects could be materially adversely affected.

211.    On the foregoing news, Ibotta's stock price fell $29.08, or roughly 46.1%, to close at $34.01 per share on February 27, 2025.  Ibotta's stock price continued to fall the next day, to close at $33.39 per share (or another 1.8%) on February 28, 2025.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

212.    Although Plaintiff states that scienter is not an element of any claim brought under §§11, 12(a)(2), or 15 of the Securities Act (i.e., Counts I, II, and III), this §VIII is included for purposes of Plaintiff's and the Class's claims that are brought under §§10(b), 20(a), and 20A of the Exchange Act (i.e., Counts IV, V, and VI).

213.    As alleged herein, but solely with respect to Counts IV, V, and VI, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions about growth in redeemers begetting growth in client budgets and thus revenue, the exhaustion of Ibotta client budgets, and interrelated, compounding problems with Ibotta's sales force and client-facing personnel, *inter alia*, were materially false or misleading when made.  In

addition to the allegations set forth above, these particularized factual allegations also include the following:

214.    The sudden departure of CRO Jensen shortly after the IPO under suspicious circumstances is indicative of scienter.  The suspiciousness of CRO Jensen's abrupt departure is borne out by its timing just *three months after the IPO*, after he had worked at Ibotta for *eight years*.  Further, his departure preceded the Company's 2Q24 earnings call—when the Company reported disappointing financial results that caused its share price to drop 26.7%—by a mere three weeks.  Moreover, Defendants swept Jensen's departure under the rug despite the topic of Ibotta's revenue problems being central at subsequent earnings calls, and did not announce a replacement until the end of 2024.

215.    The sudden departure of Defendant Patel, who was the Company's CFO during the Class Period, is indicative of scienter.  Shortly after the Class Period, on March 14, 2025, Defendant Patel abruptly resigned from his position as the Company's CFO.  That occurred a mere two weeks after Ibotta reported shockingly poor financial results for fourth quarter and fiscal year 2024, and announced watershed changes to its business.  The highly suspicious timing and circumstances of Defendant Patel's departure further support scienter.

216.    Defendants Leach, Lehrman, and Doshi's insider selling during the Class Period is indicative of scienter.  As set forth in §V.E, *supra*, Defendants Leach, Lehrman, and Doshi sold over $74 million of Ibotta common stock directly in the Offering at the Company's artificially inflated IPO price of $88 per share.  Further, Defendant Lehrman sold an additional $35,551,462 of Ibotta common stock on the open market over the rest of the Class Period at artificially inflated prices.  His sales represented significant portions of his Ibotta holdings in both absolute terms and

-83-

as percentages of his holdings. Further, Defendant Lehrman's post-IPO sales were suspiciously timed, as they occurred shortly before the market was able to learn the full nature and extent of the truth concerning the material adverse problems that Ibotta had faced during the Class Period. Indeed, in his single largest sale after the IPO—in which he unloaded 44% of his remaining Ibotta common stock on December 12, 2024—he was able to capitalize on the artificial inflation in Ibotta common stock by selling at roughly $73.55 per share (resulting in over $12 million in proceeds), which was dramatically higher than the $33.39 per share price that Ibotta would plummet to just 10 weeks later on February 28, 2025. Similarly, Defendant Doshi's open-market sale of 13,437 shares of Ibotta common stock on December 3, 2024, at an average price of roughly $73.66 per share (resulting in nearly $1 million in proceeds), was also highly suspicious, as it occurred only about 11 weeks before the adverse disclosures of February 26–27, 2025 that caused Ibotta's shares to plummet to $33.39 per share.

217. The critical importance of the subjects of Defendants' materially false or misleading statements (identified in §VI.B, *supra*) to Ibotta's business, growth, and core operations throughout the Class Period are further indicative of scienter. At all relevant times, Ibotta's business and growth were a function of its clients' budgets, i.e., how much money clients were willing to pay Ibotta for promotions. Client budgets, in turn, were a function of Ibotta's ability to continue to sell its services, which Defendants knew had been materially compromised by the material adverse facts that had been concealed from investors in the Offering Documents and in Defendants' subsequent false or misleading statements. Specifically, consistent with the statements made by various FEs and persons familiar with the matters, Defendants knew, *inter alia*, that Ibotta's clients were depleting their 2024 budgets at an unsustainable pace, Ibotta's CRO

-84-

left under suspicious circumstances shortly after the IPO, and turnover in Ibotta's sales force and client-facing personnel was skyrocketing as their ability to expand client budgets or obtain new clients was plummeting.  Thus, Defendants' contemporaneous, repeated statements to the contrary—in which they knowingly or with deliberate recklessness peddled a materially misleading narrative to investors that growth in client budgets (and thus Ibotta's revenue) was sure to follow growth in redeemers—are indicative of scienter.

218.    Similarly, the critical importance of the subjects of Defendants' materially false or misleading statements (identified in §VI.B, *supra*) to Ibotta's business, growth, and core operations throughout the Class Period are further indicative of scienter as it relates to the Company's statements in its quarterly reports about the supposedly purely hypothetical risks that customer fraud on Ibotta's platforms and the departure of key personnel from the Company's senior-management team presented to Ibotta's business.  At all relevant times, Defendants knew that customer fraud was widespread on Ibotta's platforms and caused the Company losses, but misleadingly disclosed that risk in purely hypothetical terms.  Likewise, as of July 19, 2024, Defendants knew that the sudden departure of CRO Jensen was contributing to increasing turnover in Ibotta's sales force, which was harming the business, but misleadingly disclosed the risk that the adverse effect of losing personnel from the senior-management team "could" have was purely hypothetical.  Accordingly, that Defendants couched their risk statements in purely hypothetical terms when the very risks about which they purported to warn investors were already materializing suggests they were made knowingly or with deliberate recklessness as to their capacity to mislead, which is indicative of scienter.

## IX.    LOSS CAUSATION

219.    Although Plaintiff states that loss causation is not an element of any claim brought under §§11, 12(a)(2), or 15 of the Securities Act (i.e., Counts I, II, and III), this §IX is included for purposes of Plaintiff's and the Class's claims that are brought under §§10(b), 20(a), and 20A of the Exchange Act (i.e., Counts IV, V, and VI).

220.    As alleged herein, but solely with respect to Counts IV, V, and VI, Defendants engaged in a scheme of wrongful conduct that directly and proximately caused the economic losses suffered by Plaintiff and members of the Class.  Defendants' material misstatements and omissions, as alleged herein, caused the price of Ibotta common stock to be artificially inflated, and maintained its artificial inflation, throughout the Class Period.  Defendants' course of material misrepresentations and omissions concealed from the public the true state of Ibotta's business, which consisted, in relevant part, of the adverse material facts alleged herein.

221.    During the Class Period, Plaintiff and members of the Class purchased or acquired shares of Ibotta common stock at artificially inflated prices.  But for Defendants' material misrepresentations and omissions, Plaintiff and members of the Class would not have purchased or acquired Ibotta stock at such artificially inflated prices.

222.    As Defendants' scheme of material misrepresentations and omissions (as alleged solely with respect to Counts IV, V, and VI) was gradually revealed to the market through partial corrective events, the price of Ibotta stock declined substantially.  The corrective impact of the initial partial corrective events alleged herein (i.e., those on August 13 and November 13, 2024), however, was mitigated by Defendants' continued course of material misrepresentations and

omissions, which continued to conceal the full truth from the market until the final corrective event occurred (i.e., on February 26–27, 2025).

223.   Defendants' material misrepresentations and omissions, as alleged herein, misrepresented and concealed the true adverse material facts from the market during the Class Period, misleading investors about the true state of Ibotta's business and the problems it was facing.  Prior to the end of the Class Period, Plaintiffs and the Class were unaware of the false or misleading nature of Defendants' Class Period statements identified in §VI, *supra*.

224.   As alleged in §VII, *supra*, the truth concerning the nature and extent of the matters that Defendants materially misrepresented and/or failed to disclose (thereby rendering their affirmative statements materially misleading) were gradually revealed to investors through a series of partial corrective events and/or materializations of undisclosed risks.

225.   The market reacted swiftly and negatively to each of these disclosures, causing significant losses for investors.

## X.    PRESUMPTION OF RELIANCE

226.   Although Plaintiff states that reliance is not an element of any claim brought under §§11, 12(a)(2), or 15 of the Securities Act (i.e., Counts I, II, and III), the following section is included for purposes of Plaintiff's and the Class's claims that are brought under §§10(b), 20(a), and 20A of the Exchange Act (i.e., Counts IV, V, and VI).

227.   Plaintiff will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

-87-

(b)     the omissions and misrepresentations were material;

(c)     Ibotta common stock is traded in an efficient market;

(d)     Ibotta common stock was liquid and traded with moderate-to-heavy volume during the Class Period;

(e)     Ibotta common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(f)     as a regulated issuer, Ibotta filed periodic public reports with the SEC and/or the NYSE;

(g)     Ibotta regularly communicated with public investors via established market-communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(h)     Ibotta was covered by numerous securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms;

(i)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(j)     Plaintiff and members of the Class purchased, acquired, and/or sold Ibotta common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

228.    As a result of the foregoing, the market for Ibotta's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock.   Under these circumstances, the market for Ibotta's common stock was efficient during the Class Period and, therefore, investors' purchases and acquisitions of Ibotta's common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.  Based on the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance on the integrity of the market.

229.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in part, grounded in Defendants' material misstatements and/or omissions, which concealed throughout the Class Period the undisclosed information set forth herein, including in §VI, *supra*.

230.    Because this action involves, in part, Defendants' failure to disclose and omission of material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld were material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS-CAUTION DOCTRINE

231.     The statutory safe harbor or bespeaks-caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements alleged herein, nor does it apply to any material omissions pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be materially false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

232.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Ibotta who knew that such statement was false when made.

## XII. CLASS ACTION ALLEGATIONS

233.     Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased or otherwise

acquired Ibotta common stock between April 18, 2024 and February 27, 2025, both dates inclusive, including in, pursuant to, and/or traceable to the Offering, and were damaged thereby.

234.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Ibotta, members of Ibotta's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Ibotta.

235.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ibotta common stock was actively traded on the NYSE, a national securities exchange.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the Class.  Millions of Ibotta shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Ibotta or its transfer agent and may be notified of the pendency of this Action by mail using a form of notice similar to that customarily used in securities class actions.

236.     Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws as alleged herein.  Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

237.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the members of the Class are:

      (a)     whether Defendants violated the Securities Act;

      (b)     whether Defendants violated the Exchange Act;

      (c)     whether Defendants' statements to the investing public during the Class Period were materially false or misleading when made;

      (d)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to be stated in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      (e)     whether Defendants acted knowingly or recklessly in issuing materially false or misleading statements;

      (f)     whether the price of Ibotta common stock was artificially inflated due to Defendants' misconduct as alleged herein; and

      (g)     the extent of damage sustained by Class members and the appropriate measure of damages.

238.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I
### For Violations of §11 of the Securities Act
### (Against All Defendants)

239.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–155 and 231–238 as if fully set forth herein.

240.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This is a non-fraud cause of action.  Plaintiff does not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

241.    The Offering Documents are inaccurate and misleading, containing untrue statements of material facts, omitting facts necessary to make the statements made therein not misleading, and omitting to state material facts required to be stated therein.

242.    The Company is the registrant of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Ibotta is liable under §11 of the Securities Act to Plaintiff and the Class.

243.    The Individual Defendants each signed the Offering Documents and/or were identified, with their consent, as director designees in the Offering Documents, becoming Directors on Ibotta's Board upon the SEC declaring the Offering Documents effective, and caused the Offering Documents to be issued.  As such, each is strictly liable for the materially inaccurate

statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and to ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the Offering Documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Documents and should have known of the material facts necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

244.    The Underwriter Defendants each served as underwriters in connection with the Offering. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents, and the failure of these documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They had a duty to ensure that such statements were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the material facts necessary to make the statements made therein

not misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

245.    Defendants acted negligently in preparing the Offering Documents.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, without omission of any material facts, and not misleading.  In alleging the foregoing, Plaintiff specifically disclaims any allegation of fraud.

246.    By reasons of the conduct herein alleged, each Defendant named in this Count violated §11 of the Securities Act.

247.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements.  Rather, each such statement concerned existing facts.  Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

248.    Plaintiff sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Offering Documents.

249.    This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

250.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**For Violations of §12(a)(2) of the Securities Act**
**(Against All Defendants)**

251.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–155 and 231–238 as if fully set forth herein.

252.    By means of the defective Prospectus, Defendants promoted, solicited, and sold Ibotta securities to Plaintiff and other members of the Class.

253.    The Prospectus for the IPO contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff, and the other members of the Class who purchased Ibotta common stock pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true, and that there was no omission to state a material fact required to be stated, in order to make the statements contained therein not misleading.   Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

254.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Ibotta securities.

255.    By reason of the conduct alleged herein, Defendants violated §12(a)(2), 15 U.S.C. §77l(a)(2), of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Ibotta common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold Ibotta common stock issued pursuant to the

Prospectus have the right to rescind and recover the consideration paid for their shares and hereby tender their Ibotta common stock to Defendants sued herein.  Class members who have sold their Ibotta common stock seek damages to the extent permitted by law.

**COUNT III**
**For Violations of §15 of the Securities Act**
**(Against the Individual Defendants)**

256.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–155 and 231–238 as if fully set forth herein.

257.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class against each of the Individual Defendants.

258.    The Defendants named in this Count were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised the same over the Company to cause it to engage in the conduct complained of herein.  Similarly, each Defendant named in this Count not only controlled those subject to liability as primary violators of §11 of the Securities Act alleged in Count I above, but they also directly participated in controlling Ibotta by having signed or authorized the signing of the Offering Documents and authorizing the issuance of Ibotta common stock to Plaintiff and members of the Class.

259.    As control persons of Ibotta, each of the Defendants named in this Count are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as Ibotta for its violations of §11 of the Securities Act.

## XIV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT IV
### For Violations of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against the Exchange Act Defendants)

260.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–238 as if fully set forth herein.

261.    This Count is asserted on behalf of all members of the Class against the Exchange Act Defendants (i.e., Defendants Ibotta, Leach, Lehrman, and Patel) for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

262.    The Exchange Act Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) caused Plaintiff and the other members of the Class to purchase Ibotta shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

263.    During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264.    The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's

securities in an effort to maintain artificially high market prices for Ibotta common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

265.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Ibotta as specified herein.

266.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Ibotta's value, performance, and continued substantial growth, which included the making of, or participation in the making of, false statements of material facts and omitting to state material facts necessary in order to make the statements made about Ibotta and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Ibotta common stock.

267.    As described above, the Exchange Act Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's results and growth prospects, thereby artificially inflating the price of its securities. As demonstrated by the Exchange Act Defendants'

omissions and misstatements of the Company's business strategy, the Exchange Act Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

268.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Ibotta's common stock was artificially inflated.  In ignorance of the fact that market prices of Ibotta's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which Ibotta common stock trades, and/or in the absence of material adverse information that was known to, or recklessly disregarded by, the Exchange Act Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired Ibotta common stock at artificially high prices and were, or will be, damaged thereby.

269.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased, or otherwise acquired, their Ibotta securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

270.    By virtue of the foregoing, the Exchange Act Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

271.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

272.    This action was filed within two years of the discovery of the fraud and within five years of each Plaintiff's purchase of securities, giving rise to the cause of action.

**COUNT V**
**For Violations of §20(a) of the Exchange Act**
**(Against Defendants Leach and Patel)**

273.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–238 as if fully set forth herein.

274.    Defendants Leach and Patel acted as controlling persons of Ibotta within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their high-level positions, agency, ownership, contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Leach and Patel had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Defendants Leach and Patel were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to, and/or shortly after, these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

275.    In particular, each of Defendants Leach and Patel had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

276.    As set forth above, the Exchange Act Defendants each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

277.    By virtue of their positions as controlling persons, Defendants Leach and Patel are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants Leach and Patel's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

278.    This action was filed within two years of the discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT VI
### For Violations of §20A of the Exchange Act
### (Against Defendant Lehrman)

279.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–238 as if fully set forth herein.

280.    This Count is brought against Defendant Lehrman under §20A of the Exchange Act, 15 U.S.C. §78t-1.

281.    Defendant Lehrman knew and recklessly disregarded, or should have known, that he had received material, adverse, non-public information and that he owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Ibotta to keep this information confidential.

282.     Nevertheless, while in possession of material, non-public, adverse information, Defendant Lehrman sold 646,650 shares of Ibotta common stock during the Class Period.

283.     Plaintiff and unnamed Class members purchased shares contemporaneously with Defendant Lehrman's insider sales.  For instance, as shown in Plaintiff's previously filed PSLRA Certification (*see* Dkt. No. 18-4) incorporated herein by reference, Plaintiff purchased shares of Ibotta common stock contemporaneously with Defendant Lehrman's sales of Ibotta common stock on multiple occasions during the Class Period.

284.     By virtue of the foregoing, Defendant Lehrman, in connection with the purchase or sales of securities, by the use of the means or instrumentalities of interstate commerce, or of the mail, or a facility of a national securities exchange, directly or indirectly:

      (a)     employed devices, schemes, or artifices to defraud;

      (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

285.     By virtue of the foregoing, Defendant Lehrman directly or indirectly violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

286.     By virtue of the foregoing, Defendant Lehrman is liable to Plaintiff and the Class for his insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

287.    When the material adverse information was eventually revealed, Ibotta's stock price declined and investors suffered economic loss, i.e., damages.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Exchange Act Class and the Securities Act Class, prays for relief and judgement as follows:

A.    Declaring that this Action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as a representative of the Class, and designating Plaintiff's counsel as class counsel for the Class;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proved at trial, including pre- and post-judgment interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this Action, including attorneys' fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## XVI.    DEMAND FOR TRIAL BY JURY

Under Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  October 15, 2025

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ William C. Fredericks

William C. Fredericks
Thomas L. Laughlin, IV
Matthew A. Peller
Marc J. Greco
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
mpeller@scott-scott.com
mgreco@scott-scott.com

*Lead Counsel for Lead Plaintiff Mark Tcherkezian and the Proposed Class*

Rusty E. Glenn
SHUMAN, GLENN & STECKER
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 356-7849
rusty@shumanlawfirm.com

*Local Counsel for Lead Plaintiff Mark Tcherkezian*