# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

MARK TCHERKEZIAN, Individually and on
Behalf of All Others Similarly Situated,

     Plaintiff,

v.

IBOTTA, INC.,
BRYAN LEACH,
SUNIT PATEL,
STEPHEN BAILEY,
AMANDA BALDWIN,
AMIT N. DOSHI,
THOMAS LEHRMAN,
VALARIE SHEPPARD,
LARRY W. SONSINI,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
BOFA SECURITIES, INC.,
EVERCORE GROUP L.L.C.,
UBS SECURITIES LLC,
WELLS FARGO SECURITIES, LLC,
CITIZENS JMP SECURITIES, LLC,
NEEDHAM & COMPANY, LLC, and
RAYMOND JAMES & ASSOCIATES, INC.,

     Defendants.

Civil Action No. 25-cv-01213-NYW-SBP
*Consolidated with Civil Action No. 25-cv-01615-NYW-SBP*

ORAL ARGUMENT REQUESTED

---

# DEFENDANTS' MOTION TO DISMISS

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................3

    A.    Factual Background .................................................................................3
    B.    Procedural History ..................................................................................6
    C.    The Complaint .........................................................................................6

LEGAL STANDARDS ........................................................................................................8

ARGUMENT .....................................................................................................................10

I.     The Court Should Dismiss the Securities Act Claims ................................... 10

    A.    Plaintiff fails to state a Section 11 claim ..............................................10

        1.    Plaintiff does not adequately plead traceability .......................10
        2.    Plaintiff does not adequately plead that the challenged statements in the Offering Materials were materially false or misleading when made .................................................................................................14

    B.    Plaintiff fails to state a Section 12(a)(2) claim .....................................25
    C.    Plaintiff fails to state a Section 15 claim ..............................................25

II.    The Court Should Dismiss the Exchange Act Claims ................................... 25

    A.    Plaintiff fails to state a Section 10(b) claim..........................................25

        1.    Plaintiff does not adequately plead that the challenged statements are actionable and/or materially false or misleading ................................26
        2.    Plaintiff does not plead the required "strong inference" of scienter .........33

    B.    Plaintiff fails to state a Section 20A claim............................................38
    C.    Plaintiff fails to state a Section 20(a) claim ..........................................40
    D.    Plaintiff fails to allege scheme liability ................................................40

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ..................................................................33

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007) ....................................................29, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .....................................................................................8

*Carpenter v. Oscar Health, Inc.*,
2025 WL 722729 (S.D.N.Y. Mar. 6, 2025) .........................................23, 24

*Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
2024 WL 4375775 (N.D. Cal. Oct. 2, 2024)................................................34

*City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*,
468 F. Supp. 3d 1048 (E.D. Wis. 2020)......................................................28

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)........................................................................27

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ....................................................................9

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)........................................................................25

*Copland v. Grumet*,
88 F. Supp. 2d 326 (D.N.J. 1999) ...............................................................40

*Coronel v. Quanta Cap. Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...............................................19

*Cupat v. Palantir Techs., Inc.*,
2025 WL 1141534 (D. Colo. Apr. 4, 2025)............................10, 11, 13, 25, 34

*Exkae Ltd. v. Domo, Inc.*,
2020 WL 7352735 (D. Utah Dec. 15, 2020)................................9, 21, 26, 30, 31

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ..............................................................21, 29

*Hampton v. root9B Techs., Inc.*,
    897 F.3d 1291 (10th Cir. 2018) ...................................................................8

*Head v. NetManage, Inc.*,
    1998 WL 917794 (N.D. Cal. Dec. 30, 1998)........................................35, 36

*Hubbard v. BankAtlantic Corp., Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) ......................................................18

*IAC/InterActiveCorp Sec. Litig.*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010).....................................................17, 18

*In re AnaptysBio, Inc.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ...........................................38

*In re Ariad Pharms., Inc. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016) ......................................................................11

*In re AST Rsch. Sec. Litig.*,
    887 F. Supp. 231 (C.D. Cal. 1995) .............................................................40

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002).........................................................................17

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ...................................................................11

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
    586 F. Supp. 3d 199 (E.D.N.Y. 2022) .......................................................35

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ......................................18, 21

*In re Crocs, Inc. Sec. Litig.*,
    774 F. Supp. 2d 1122 (D. Colo. 2011).................................................28, 36

*In re Cypress Semiconductor Sec. Litig.*,
    864 F. Supp. 957 (N.D. Cal. 1994) .............................................................40

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) .......................................................39

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & ERISA Litig.*,
    503 F. Supp. 2d 25 (D.D.C. 2007)........................................................39, 40

*In re Fusion-io, Inc. Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ................................................30

*In re Gold Res. Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) ...................................................10, 38

*In re iRobot Corp. Sec. Litig.*,
    527 F. Supp. 3d 124 (D. Mass. 2021) ........................................36, 37

*In re Level 3 Comm'cns, Inc. Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ........................................9, 29, 35, 40

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
    2021 WL 5530949 (D. Or. Nov. 24, 2021)...............................17, 18, 21

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)..............................................32

*In re Molson Coors Beverage Co. Sec. Litig.*,
    2020 WL 13499995 (D. Colo. Dec. 2, 2020)..........................35, 37, 38

*In re Molycorp, Inc. Sec. Litig.*,
    2015 WL 1540523 (D. Colo. Mar. 31, 2015) ..................................39

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)......................................................25

*In re Numerex Corp. Sec. Litig.*,
    913 F. Supp. 391 (E.D. Pa. 1996) ................................................33

*In re Overstock Sec. Litig.*,
    119 F.4th 787 (10th Cir. 2024) ..............................................14, 39

*In re Plug Power, Inc. Sec. Litig.*,
    2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)............................34, 35

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)........................................................23

*In re Teva Sec. Litig.*,
    512 F. Supp. 3d 321 (D. Conn. 2021)............................................40

*In re TVIX Sec. Litig.,*
    25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) .....................................23

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................................39

*In re Zagg, Inc. Sec. Litig.*,
   797 F.3d 1194 (10th Cir. 2015) .......................................................................9

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ......................................................................29

*Jurinsky v. Arapahoe Cnty. Dep't of Hum. Servs.*,
   2023 WL 6249099 (D. Colo. Sept. 26, 2023) ..................................................11

*Krim v. pcOrder.com, Inc.*,
   402 F.3d 489 (5th Cir. 2005) ....................................................................10, 13

*Lorusso v. Boulder Brands, Inc.*,
   2017 WL 4365180 (D. Colo. Mar. 1, 2017) ....................................................27

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ................................................................................24, 25

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) .............................................................35

*McDonald v. Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) ..................................................................26, 27

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017) ............................................................25

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings,*
   *Inc.*, 2022 WL 377415 (N.D. Okla. Jan. 7, 2022) ...........................................33

*Ohio Pub. Emps. Retirement Sys. v. Discovery, Inc.*,
   2024 WL 4647131 (2d Cir. Nov. 1, 2024) .......................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*,
   575 U.S. 175 (2015) ...................................................................................9, 30

*Pirani v. Slack Techs., Inc.*,
   127 F.4th 1183 (9th Cir. 2025) ..................................................................13, 25

*Primo v. Pac. Biosciences of Calif., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) ..........................................................20

*Pyramid Holdings, Inc. v. Inverness Med. Innov., Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009) ............................................................................21

*Richfield v. PolarityTE, Inc.*,
    2023 WL 3010208 (D. Utah Apr. 19, 2023)....................................................................32

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...........................................................................................18

*Rumbaugh v. USANA Health Scis., Inc.*,
    2018 WL 5044240 (D. Utah Oct. 17, 2018) ...................................................................36

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011)............................................................................36

*Ryan v. FIGS, Inc.*,
    2024 WL 187001 (C.D. Cal. Jan. 17, 2024) ..................................................................38

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) .........................................................................30

*Slack Techs., LLC v. Pirani*,
    598 U.S. 759 (2023)...........................................................................................10, 11, 12

*Slater v. A.G. Edwards & Sons, Inc.*,
    719 F.3d 1190 (10th Cir. 2013) .............................................................................8, 17, 24

*Smallen v. The W. Union Co.*,
    950 F.3d 1297 (10th Cir. 2020) ..............................................................................3, 9, 11

*Smith v. PureCycle Techs., Inc.*,
    2024 WL 5186586 (S.D.N.Y. Dec. 20, 2024) ...............................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................10, 33

*United Food & Comm. Workers Union Loc. 880 Pension Fund v. Chesapeake
Energy Corp.*, 774 F.3d 1229 (10th Cir. 2014)....................................................17, 21, 25

*United Food & Comm. Workers Union Loc. 464A v. Pilgrim's Pride Corp.*,
    2022 WL 684169, at *4 (D. Colo. Mar. 8, 2022) .................................................28, 29, 31

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ...........................................................................37

*Woolgar v. Kingstone Cos., Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)...........................................................................37

### STATUTES, RULES, AND REGULATIONS

17 C.F.R.
   § 229.105(a) .................................................................................................................24
   § 229.303(b)(2)(iii) .......................................................................................................24
   § 239.144.......................................................................................................................12
   § 240.10b-5 .....................................................................................................................9

15 U.S.C.
   § 77k(a) ...........................................................................................................................8
   § 77*l*(a)(2) ...............................................................................................................8, 25
   § 78j(b) ............................................................................................................................9
   § 78t-1(a)........................................................................................................................39
   § 78u-4(b).......................................................................................................................10
   § 78u-5(c).......................................................................................................................30

Federal Rules of Civil Procedure
   9(b)...............................................................................................................................1, 9
   12(b)(6) .........................................................................................................................1, 8

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), defendants Ibotta, Inc. ("Ibotta" or the "Company");

Bryan Leach, Sunit Patel, Stephen Bailey, Amanda Baldwin, Amit N. Doshi, Thomas Lehrman,

Valarie Sheppard, and Larry W. Sonsini ("Individual Defendants"); and Goldman Sachs & Co.

LLC, Citigroup Global Markets Inc., BofA Securities, Inc., Evercore Group L.L.C., UBS

Securities LLC, Wells Fargo Securities, LLC, Citizens JMP Securities, LLC, Needham &

Company, LLC, and Raymond James & Associates, Inc. ("Underwriter Defendants" and, with

Ibotta and the Individual Defendants, "Defendants") respectfully submit this memorandum of law

in support of their motion to dismiss, for failure to state a claim, the Consolidated Amended Class

Action Complaint for Violations of the Federal Securities Laws and Jury Demand [ECF No. 37]

("Complaint" or "Compl.") filed by lead plaintiff Mark Tcherkezian ("Plaintiff").

## CERTIFICATE OF CONFERRAL

Before filing this motion, Defendants' counsel conferred in good faith with Plaintiff's

counsel on December 8 and 9, 2025.  Plaintiff opposes the relief requested in this motion.

## INTRODUCTION

Since its humble beginnings operating out of the basement of a fire station in Lower

Downtown Denver over a dozen years ago, Ibotta has delivered on its mission to "Make Every

Purchase Rewarding."  Ibotta partners with thousands of consumer-packaged goods ("CPG")

brands to offer digital discounts on groceries and other everyday necessities to American

consumers.  What began as a popular direct-to-consumer app has evolved into the Ibotta

Performance Network—a wide-reaching platform that allows CPG brands to deliver digital

discounts to consumers via a network of publishers, including household names like Walmart and

Dollar General. The result? Over $2 billion of cash back in the pockets of consumers; and for CPG brands, a digitized, performance marketing solution that significantly improves upon the antiquated, paper couponing approach.

In April 2024, Ibotta entered the next phase of its corporate lifecycle: ringing the bell at the New York Stock Exchange in the largest technology initial public offering in Colorado history ("Offering"). The Company made robust disclosures in connection with the Offering and in post-Offering statements, including statements about its platform and technology, its anti-fraud measures, its revenue sources, the risks of losing key personnel, and multiple factors that may impact client budgets in the future. Unanticipated business hurdles and changes in the marketplace led to volatility in the Company's stock price thereafter. Plaintiff now attempts to spin the ordinary ups-and-downs that newly public companies often face into a contrived tale of alleged fraud and deception. But his conclusory assertions, hindsight-based observations, and unreliable statements from anonymous sources are nowhere near sufficient to sustain his claims.

Plaintiff's Securities Act claims (Counts I–III) fail for at least three reasons. First, Plaintiff does not and cannot plead that he bought any shares in or traceable to the Offering. Second, Plaintiff fails to allege adequately any materially false or misleading statement. Indeed, the Offering Materials (as defined below) disclose the very risks that Plaintiff claims were concealed. Third, Plaintiff's confidential-witness allegations are conclusory statements made by a few ex-employees and a tiny subset of Ibotta customers. These vague and anonymous statements are unreliable in time and context, and, in any event, are entirely consistent with the statements in Ibotta's Offering Materials.

Plaintiff's Exchange Act claims (Counts IV–VI) also fail. The federal securities laws

impose a stringent pleading standard on such claims, requiring particularized facts showing both that the statements were false or misleading and that Defendants acted with fraudulent intent (*i.e.*, scienter). Plaintiff does not meet this demanding standard. Each statement Plaintiff challenges is a non-actionable opinion, not materially false or misleading, and/or protected under the safe harbor for forward-looking statements. While that alone requires dismissal, Plaintiff has also insufficiently alleged scienter. Lacking any indicia of intent to deceive, Plaintiff relies on generalized assertions about stock sales, what the Individual Defendants "must have known," and the "core operations" doctrine. This cannot carry the day under the PSLRA's pleading standards. Finally, the Section 20A claim against Mr. Lehrman fails because Plaintiff has not alleged adequately that Mr. Lehrman possessed material, nonpublic information or that Plaintiff ever purchased contemporaneously with any of Mr. Lehrman's sales. For all these reasons, and others set forth below, the Court should grant the motion and dismiss all claims with prejudice.

## BACKGROUND

### A.  Factual Background

***Ibotta and its business.*** CPG brands have always looked for the best ways to entice consumers to buy their products. *See* Ex. 1 ("Prospectus") at 116.[1] Historically, paper coupons and newspaper inserts were a principal tactic, and they remain in use today. *Id.* Consumers cut out or clip these coupons or inserts and provide them "at checkout in exchange for a discount on qualifying products," and, in turn, the retailer physically ships them to "coupon clearinghouses"

---

[1] When deciding a motion to dismiss, the Court may "consider documents the [C]omplaint incorporates by reference" and "matters of which [the] [C]ourt may take judicial notice," including public Securities and Exchange Commission ("SEC") filings. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 & n.4 (10th Cir. 2020) (quotation marks omitted).

for processing. *Id.* The clearinghouses "tally everything and oversee a flow of remittance payments from thousands of CPG brands to hundreds of retailers, making each retailer whole for the value of the discounts provided, in some cases weeks or months after the coupons have been redeemed." *Id.* This system has "several obvious drawbacks," including declining newspaper circulation, environmental harms, and low redemption rates. *Id.* This century-old system of newspapers and clearinghouses also prevents CPG brands from assessing the performance of their promotions or adjusting their parameters while the promotion is still in flight. *Id.*

Ibotta's technology offers CPG brands a dramatically more efficient and effective solution than the legacy paper-coupon system. *See id.* at 7–10. Ibotta works with CPG brands to collect digital promotions and shares those promotions with consumers through its proprietary technology platform, known as the Ibotta Performance Network ("IPN"). *See* Ex. 2 (Feb. 27, 2025 Form 10-K) at 7–8. The IPN enables Ibotta to publish promotions on its own Ibotta-branded platforms, known as Ibotta's direct-to-consumer ("D2C") platforms, which include the Ibotta mobile app, website, and web-browser extension. Ex. 1 at 7. The IPN also enables "third-party publishers"— *e.g.*, retailers like Walmart and Dollar General—to share Ibotta's digital promotions on the retailers' own apps and websites to power their own loyalty programs. *Id.* at 7–10.

In essence, the IPN is "air traffic control" that "enable[s] offers to be matched, distributed, and redeemed across multiple large third-party publishers in a coordinated fashion." *Id.* at 137. Ibotta generates substantial value for both CPG brands and consumers who redeem offers through the IPN (*i.e.*, "redeemers"). To redeemers, the value is obvious: more than $2 billion (and counting) in Ibotta's cash-back rewards. Ex. 2 at 15. And to CPG brands, Ibotta offers "an at-scale success-based marketing solution," *id.* at 7, that promotes their products "in a way that can

be directly measured out to a sale and tied back to a known consumer." Ex. 1 at 5. In contrast to the weeks' or even months' long delay in submitting paper coupons to clearinghouses, Ibotta offers "real-time campaign tracking" tools, which the Prospectus defines as tools that "allow[] clients to monitor the success of their campaigns" and "provid[e] visibility into" various metrics "*while the campaign is still ongoing*." *Id.* at 137 (emphasis added).[2]

Ibotta's revenue is driven primarily from redemptions—*i.e.*, when a consumer redeems an offer, on either Ibotta's D2C properties or third-party publisher properties. *See* Ex. 1 at 90–91. When a redemption occurs, Ibotta earns a fee paid by the company offering the promotion. *See id.* Thus, Ibotta's "[a]bility to grow redeemers" is key to its financial performance; by expanding its "consumer base" and "reach[ing] a growing audience of consumers who [might] become redeemers," Ibotta can generate more redemptions and thus earn more revenue. *Id.* at 92. In addition, Ibotta's "[a]bility to source offers" is "critical to the ongoing success of [its] platform." *Id.* To meet the demand for redemptions (and to earn revenue from such redemptions), Ibotta must constantly replenish and grow the supply of offers to be redeemed from CPG brands. *See id.* As the Prospectus explained, Ibotta's ability to secure more offer supply (*i.e.*, CPG brands spending on promotions) and more offer demand (*i.e.*, consumers interested in redeeming offers) are both key factors affecting Ibotta's "current and future financial performance." *Id.*

**The Offering.** After more than a dozen years as a private company, Ibotta went public on April 18, 2024. Compl. ¶ 2. The Offering price was $88 per share. *Id.* The Company sold 2,500,000 newly issued shares, and certain existing stockholders collectively sold 4,060,700 shares

---

[2] A "campaign" refers to action that an Ibotta client takes to promote their products on the IPN, such as by offering a cash back reward. *See* Ex. 1 at 90–91. For example, a client might run a "campaign" for a month offering $1.50 back on certain featured products. *See id.*

(to the Underwriter Defendants, at the Offering price), for a total of 6,560,700 shares issued pursuant to the registration statement on Form S-1 ("Registration Statement"). *Id.* ¶¶ 2, 71.

***Post-Offering developments.*** Ibotta delivered revenue above its previous guidance in Q2 and Q3 of 2024. Ex. 3 (Q2 2024 Earnings Call Transcript) at 4, 7; Ex. 4 (Q3 2024 Earnings Call Transcript) at 4, 7. Nonetheless, Ibotta's earnings and growth did not meet the market's expectations. *See* Compl. ¶¶ 190–91, 194–95, 201–02. A stock-price drop followed each of the quarterly earnings reports in the first few quarters after the Offering. *Id.* ¶¶ 193, 200, 211. Ibotta also made changes to its sales organization, including hiring a new Chief Revenue Officer, enhancing "client analytics," improving the training of sales representatives, and reducing the "friction" inherent in transferring client accounts between representatives. *See* Ex. 5 (Q4 2024 Earnings Call Transcript) at 10–11.

### B.    Procedural History

Matt Fortune filed the initial complaint in this action on April 17, 2025. ECF No. 1. On June 16, 2025, Plaintiff Mark Tcherkezian moved for appointment as lead plaintiff and to consolidate this action with *Valentine v. Ibotta, Inc., et al.*, No. 1:25-cv-01615. ECF No. 18. In support, Plaintiff filed a "Certification" and a "Loss Analysis," which represent that he purchased Ibotta stock several times between October 9, 2024 and January 17, 2025 and sold Ibotta stock several times between November 5, 2024 and February 18, 2025. *See* ECF No. 18-3 (Certification) at 3–5; ECF No. 18-4 (Loss Analysis) at 2–4; *see also* Compl. ¶ 20 (incorporating Certification and Loss Analysis filings by reference), ¶ 283 (incorporating Certification by reference).

### C.    The Complaint

Plaintiff filed the operative Complaint on October 15, 2025. ECF No. 37. He brings claims

under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act").  The Securities Act claims allege that the final prospectus filed with the Offering (the "Prospectus" and, with the Registration Statement, the "Offering Materials") contained materially false or misleading statements and omissions about (1) Ibotta's ability to offer its clients "real-time" data; (2) Ibotta's anti-fraud systems; and (3) the risk that Ibotta's efforts to grow its third-party publisher business could cause fewer consumers to use its D2C tools, Compl. ¶¶ 5–8, 127–55, 239–59.  The Exchange Act claims, in addition to challenging the Offering Materials, allege that Ibotta made materially false or misleading statements *after* the Offering about (1) the connection between growth in redeemers and client budgets; (2) the risk posed by consumer fraud on Ibotta's platform; and (3) risks associated with potential departures of key personnel, *id.* ¶¶ 10–11, 156–88, 260–87.

Plaintiff relies on statements obtained from interviews that Plaintiff or individuals acting on his behalf purportedly conducted with five "former employees" of Ibotta ("FEs").  *Id.* ¶ 76.  According to the Complaint, these anonymous former employees are:

(1)     FE-1, "a Decision Scientist on [the] Consumer Brand Packaging Analytics team from November 2021 to February 2025," *id.* ¶ 77;

(2)     FE-2, "an Account Manager … from July 2022 to July 2025," *id.* ¶ 80;

(3)     FE-3, "a Technical Manager of B2B Enterprise Partnerships … from February 2023 to April 2024," *id.* ¶ 82;

(4)     FE-4, "a Fraud Operations Agent … from June 2019 to April 2024," *id.* ¶ 96; and

(5)     FE-5, "an Account Executive in [the] sales department from September 2022 to May 2024," *id.* ¶ 112.

The Complaint also includes statements purportedly "made by various current and former Ibotta partners and clients" in interviews published on AlphaSense, "a market-intelligence platform" that

sells "research and various other types of market-relevant information," including paid-for "interviews with industry professionals familiar with a given company." *Id.* ¶¶ 84–85. Plaintiff does not allege that he or his counsel spoke to any of the anonymous AlphaSense "interviewees" or independently investigated or even attempted to corroborate their claims. Plaintiff provides no information on who conducted the interviews, the context in which they took place, what else the witnesses said, or whether AlphaSense provided the full transcript of their interviews.

## LEGAL STANDARDS

At the pleading stage, the Court must accept as true "all well-pleaded facts" but need not credit "conclusory allegations." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018) (quotation marks omitted). The Court may disregard "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To plead a claim under Sections 11 and 12(a)(2) of the Securities Act, a plaintiff must allege "material misstatements or omissions in a stock offering's registration statement or prospectus." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013); *see* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). For either type of claim, a statement is material only if "a reasonable investor would consider it important in determining whether to buy or sell stock," and courts "do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." *Slater*, 719 F.3d at 1197 (quotation marks omitted).

Plaintiff must also plead facts establishing that the challenged statements were materially false or misleading *when made*. The test "is not whether in retrospect an investor might have wanted to know the omitted information, but whether additional material information was necessary at the time to make a statement reflect the true state of affairs." *Slater*, 719 F.3d at 1201.

This "is no small task," and "conclusory assertions" and hindsight are insufficient. *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 194 (2015).

Section 10(b) of the Exchange Act and SEC Rule 10b-5 "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Smallen*, 950 F.3d at 1304 (quotation marks omitted); *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To state a Section 10(b) claim, a plaintiff must plead facts establishing that (1) "the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading"; (2) "the statement complained of was made in connection with the purchase or sale of securities"; (3) "the defendant acted with scienter, that is, with intent to defraud or recklessness"; (4) "the plaintiff relied on the misleading statements"; and (5) "the plaintiff suffered damages as a result of his reliance." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1200 (10th Cir. 2015) (emphasis and quotation marks omitted).

"A plaintiff suing under Section 10(b) … bears a heavy burden at the pleading stage." *In re Level 3 Comm'cns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). Federal Rule of Civil Procedure 9(b) requires pleading fraud "with particularity." Fed. R. Civ. P. 9(b). In addition, the PSLRA—which Congress enacted in "a bipartisan effort to curb abuse in private securities lawsuits"—imposes a heightened pleading standard "for securities fraud actions in general, and for scienter allegations in particular." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quotation marks omitted); *see Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *8 (D. Utah Dec. 15, 2020) (PSLRA standard is "the most stringent pleading requirement in American civil law" (quotation marks omitted)). A complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  As to scienter, a plaintiff must allege "a mental state embracing intent to deceive, manipulate, or defraud," *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1109 (10th Cir. 2015) (quotation marks omitted), and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A).  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Gold Res. Corp.*, 776 F.3d at 1109 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

## ARGUMENT

### I.    The Court Should Dismiss the Securities Act Claims

#### A.    Plaintiff fails to state a Section 11 claim

##### 1.    *Plaintiff does not adequately plead traceability*

Section 11 liability "runs with registered shares alone."  *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 769 (2023).  Because the Securities Act "is concerned with the initial distribution of securities," Section 11's "standing provisions limit putative plaintiffs to the narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement."  *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005) (quotation marks omitted).  Thus, to have statutory standing under Section 11, Plaintiff must allege either that he purchased stock directly in the Offering or that his shares are directly "traceable to the particular registration statement alleged to be false or misleading."  *Slack*, 598 U.S. at 768; *see Cupat v. Palantir Techs., Inc.*, 2025 WL 1141534, at *17 (D. Colo. Apr. 4, 2025) (discussing

"*Slack*'s express directive that a Section 11 plaintiff must plead traceability").[3]

Plaintiff does not allege that he purchased Ibotta stock directly in the Offering. The certifications attached to his lead-plaintiff motion—which are incorporated by reference in his complaint, Compl. ¶¶ 20, 283—confirm that he did not purchase any Ibotta stock until October 9, 2024—more than five months after the Offering. *See* ECF No. 18-3 at 3; ECF No. 18-4 at 2.[4]

Nor does Plaintiff plead facts sufficient to establish "that he purchased shares traceable to [Ibotta's] allegedly defective registration statement." *Slack*, 598 U.S. at 770. Instead, he offers only naked assertions that he represents a class of "persons and entities that purchased" Ibotta stock, "including in, pursuant to, and/or traceable to" the Offering and that the class supposedly bought Ibotta stock "pursuant or traceable to the Offering Documents." Compl. ¶¶ 2, 47, 233. These are the "exact sort" of "bare allegations" that *Twombly* and other Supreme Court precedents "direct[] courts not to consider at the pleading stage." *Cupat*, 2025 WL 1141534, at *15; *see, e.g.*, *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) (observing that "almost by definition, a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element" (quoting *Twombly*, 550 U.S. at 555)); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (finding allegation that plaintiffs purchased stock "directly traceable" to offering insufficient to "allow us to draw a reasonable inference about anything because it is devoid of factual content"). Allowing plaintiffs

---

[3] For all claims Plaintiff seeks to bring as the sole representative of a supposed "Securities Act Class," *see* Compl. ¶¶ 2, 47, 233, he must establish his own *individual* standing, *see Jurinsky v. Arapahoe Cnty. Dep't of Hum. Servs.*, 2023 WL 6249099, at *2 (D. Colo. Sept. 26, 2023), *aff'd*, 2024 WL 4432618 (10th Cir. Oct. 7, 2024).

[4] Because the Complaint incorporates the certifications by reference, *see* Compl. ¶¶ 20, 283, the Court may consider them at the pleading stage, *see Smallen*, 950 F.3d at 1305.

to do nothing more than simply assert that their shares are traceable would fly in the face of *Twombly* and *Iqbal* and gut the traceability element that the Supreme Court recently confirmed is "require[d]" for Section 11 claims. *Slack*, 598 U.S. at 770.

Making matters worse for Plaintiff, he cannot cure his deficient pleading. By October 2024, when he began purchasing Ibotta stock, the market contained not only *registered* shares from the Offering, *see* Ex. 1 at 17, but also *unregistered* shares sold outside the Offering, and other shares not traceable to the Offering. For example, as the Complaint itself alleges (and as public filings confirm), Mr. Lehrman and his affiliated entities sold unregistered shares on the open market beginning in September 2024—and sold far more unregistered shares than the total number of shares Plaintiff purchased.[5] *See* Compl. ¶ 125; Ex. 6 (Compilation of Forms 144) at 50–51, 63, 66; Ex. 7 (Compilation of Forms 4) at 13, 23–27.[6] Moreover, Ibotta's public filings disclose additional sales of unregistered shares during the Class Period by an entity affiliated with Mr. Doshi, *see* Ex. 6 at 37; Ex. 8 (Amit Doshi's Forms 4) at 5–7, as well as sales of shares registered under a separate registration statement on Form S-8, filed the same day as the Offering, and *not* under the Registration Statement on Form S-1 that Ibotta filed in connection with the Offering, *see* Ex. 6 at 2, 57, 29; Ex. 7 at 3, 5, 7, 9, 11, 15–16, 30, 33, 32.[7] Finally, after the 180-day post-

---

[5] According to Plaintiff's Certification and Loss Analysis, he purchased 14,800 shares of Ibotta stock between October 9, 2024 and January 17, 2025. *See* ECF No. 18-3 (Certification) at 3–5; ECF No. 18-4 (Loss Analysis) at 2–4; *see also* Compl. ¶¶ 20, 283. Mr. Lehrman, on the other hand, sold 89,167 shares pursuant to Rule 144 and outside the Registration Statement on Form S-1 for the Offering before Plaintiff made his first purchase. *See* Ex. 6 at 50–51, 63, 66.

[6] Form 144 is a notice of a proposed sale of securities. A company insider must file a Form 144 before selling securities acquired in unregistered, private offerings, under the exemption from the Securities Act registration requirements provided by Rule 144. 17 C.F.R. § 239.144. In addition, an officer or director must file a Form 4 to reflect any changes in beneficial ownership. *Id.* § 240.16a-3. This confirms that a sale noticed on Form 144 did, in fact, occur.

[7] Form S-8 is a registration statement used to register securities offered through employee

Offering lock-up period expired on October 15, 2024, a large pool of unregistered shares held by pre-Offering investors was released from trading restrictions. *See* Ex. 1 at 187–88. Plaintiff's allegations do not "exclude th[e] possibility" that he bought non-traceable shares in this commingled market, which included shares not registered in the Offering. *Cupat*, 2025 WL 1141534, at *17.

Plaintiff cannot overcome this deficiency by relying on a "probabilistic tracing theory" to establish statutory standing—that is, he cannot simply allege a high likelihood that he purchased registered shares. *Id.* at *16. Courts "have directly rejected pleading-by-probability, as opposed to actually pleading traceability through chain of title." *Id.* at *16–17 (rejecting "probabilistic tracing theory" even though "the probability [plaintiff] purchased at least one registered share [was] so high as to constitute a legal certainty"); *see Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1190 (9th Cir. 2025) (rejecting "theory of statistical tracing," on remand from Supreme Court, and finding insufficient allegations that plaintiff "would have had a very high probability of purchasing at least some registered shares"); *Krim*, 402 F.3d at 494–97 (rejecting "statistical tracing" theory that "would impermissibly expand [Section 11's] standing requirement" to include "*every* aftermarket purchaser," contrary to statute's "language and intent"). Because Plaintiff does not plead traceability—and cannot rely on "probabilistic tracing"—he has not established statutory standing, squarely foreclosing his Section 11 claims.

---

benefit plans, such as stock option plans and employee stock purchase plans. When a company issues such shares to employees—for example, upon exercise of a stock option—that issued share is registered under the Form S-8. Thus, any shares registered under the Form S-8 were necessarily not issued pursuant to the Registration Statement on Form S-1. *See* Ex. 11 (Form S-8).

2.    ***Plaintiff does not adequately plead that the challenged statements in the Offering Materials were materially false or misleading when made***

Traceability aside, Plaintiff's Section 11 claims fail because he does not adequately allege falsity. He challenges statements in the Offering Materials concerning (1) Ibotta's real-time campaign tracking, *see* Compl. ¶¶ 129, 131, 133; (2) fraud on Ibotta's platform, *see id.* ¶¶ 136, 138; and (3) Ibotta's shift in revenues away from its D2C properties and towards its third-party publishers, *see id.* ¶ 151. But he does not allege facts supporting a plausible inference that any of these statements were materially false or misleading when made. On the contrary, each category of statements has an "obvious alternative explanation" inconsistent with falsity. *Twombly*, 550 U.S. at 567; *see In re Overstock Sec. Litig.*, 119 F.4th 787, 806 (10th Cir. 2024) (affirming dismissal because "circumstantial evidence does not support an inference of wrongdoing" when it "is as consistent with an obvious alternative explanation").

***Statements about "real-time" technology.*** Plaintiff alleges that certain statements about the "real-time" capabilities of Ibotta's technology, Compl. ¶¶ 129, 131, 133, were materially false or misleading because "there was a delay between the underlying activity (*e.g.*, a consumer redemption) and that activity being reflected in Ibotta's data metrics" and because tracking "the performance of client campaigns … required manual synthesis by Ibotta to render it in a format usable to Ibotta's clients," *id.* ¶¶ 130, 132, 134. These statements were not false or material. Plaintiff suggests that Ibotta's statements about its "real-time" measurement capabilities were false or misleading because Ibotta did not deliver instantaneous feedback to its clients on campaign performance. *Id.* ¶ 132. However, investors reviewing Ibotta's Offering Materials would not have understood "real time" to mean instantaneous, but rather (as the Prospectus plainly states), the ability to provide visibility into certain campaign metrics "*while the [client's] campaign is still*

14

*ongoing.*" *Id.* (emphasis added).  Plaintiff ignores the plain language in the Offering Materials, which makes crystal clear what is meant by "real-time" in this context.  As Ibotta explained in its Offering Materials, its technology represented a significant improvement over paper couponing, the performance of which "often could not be measured by CPG brands in real-time, *leaving them unable to optimize programs mid-flight.*"  Ex. 1 at 5 (emphasis added).[8]

Critically, Plaintiff's allegations confirm that Ibotta was capable of providing campaign performance data to clients "while the campaign [was] still ongoing," just as Ibotta represented in its Offering Materials.  Compl. ¶ 131.  Even if Plaintiff's allegations from anonymous former employees ("FEs") and interview excerpts from anonymous individuals from the AlphaSense website are considered, *see infra* pp. 17–18, these allegations are of no help to Plaintiff.  FE-1, FE-2, and FE-3 described purported delays in Ibotta's tracking processes, but none suggested that Ibotta could not provide clients with mid-campaign updates.  *See* Compl. ¶¶ 78–83.  Indeed, FE-3 acknowledged that his role involved "creat[ing] dashboards for clients that wanted to know the number or amount of redemptions in a campaign."  *Id.* ¶ 83.  Plaintiff's summaries from AlphaSense interviews fare no better.  Interviewee 2 conceded that Ibotta updated its dashboards "daily," *id.* ¶ 90, and Interviewee 3 acknowledged that Ibotta provided mid-campaign performance data, *id.* ¶ 92 (stating that Ibotta provided "monthly update[s] on how the campaign was doing").

According to the Complaint, Interviewee 1's concerns related to the inability "to make real-

---

[8] *See also id.* at 123 (explaining that Ibotta's technology allows CPG brands to "monitor the efficiency and effectiveness of their spend through a dashboard that presents key performance … *while their campaign is live*" (emphasis added)); *id.* at 130 ("We provide campaign performance analysis *throughout the campaign* and post-campaign via the Ibotta Partner Portal … arming our clients with the information they need to measure the *ongoing efficacy of their campaigns.*" (emphases added)); *id.* at 136 ("CPG brands and publishers can interact *on a daily basis* with our technology via carefully designed, easy-to-use portals." (emphasis added)).

time adjustments" to campaigns while they were ongoing. *Id.* ¶ 87 ("We want to make real-time adjustments …. If the redemptions aren't what we were anticipating them being … I'd love to be able to swap it real time, but you can't."). But the extent to which CPG brands can adjust promotions while they are ongoing is distinct from how quickly Ibotta provides campaign-tracking data to those brands. *Modifying* a campaign is not the same as *monitoring* it, and the challenged statements say nothing about the former. *See id.* ¶¶ 129, 131, 133.

Plaintiff also argues that the "real-time" statements were false or misleading because certain raw data "required manual synthesis by Ibotta to render it in a format usable to Ibotta's clients." *Id.* ¶¶ 130, 132. Contrary to Plaintiff's allegations, Ibotta never suggested that its tracking technology was fully automatic or that all conceivable reports, recap decks, or analyses would be available instantaneously to clients, without any involvement of Ibotta personnel. *See id.* ¶¶ 129, 131, 133. Thus, FE-3's statements that Ibotta's infrastructure required engineers to "synthesize or otherwise personally sort or interact with the raw data to extract relevant data" do not contradict any challenged statement. *See id.* ¶ 83. Although Interviewee 1 complained of receiving certain summary reports "on a delay," they also conceded that Ibotta provided data to clients while a campaign was "in flight." *Id.* ¶¶ 87, 88 (alterations and quotations omitted). Specifically, Interviewee 1 stated that "Ibotta *also* has reporting that comes two to four weeks after the program is over"—not that Ibotta exclusively provides reporting after the fact. *Id.* ¶ 87 (emphasis added).

Plaintiff's allegations about Ibotta's real-time capabilities, Compl. ¶¶ 130, 132, 134, also fail because they are immaterial. Plaintiff suggests that the Offering Materials convey that Ibotta would provide feedback *instantaneously*. But to potential investors, the critical concern was whether CPG companies could monitor campaigns "mid-flight," while they were still in

16

progress—not whether particular metrics or reports were available instantaneously. Ex. 1 at 5; *see id.* at 3 ("Our client tools allow CPG brands to set up campaigns, monitor redemption and budget levels, and analyze overall campaign performance – all in a single, convenient interface."). Otherwise stated, the difference between providing campaign metrics "instantaneously" and providing metrics mid-campaign—and as quickly as daily, as one of Plaintiff's witnesses confirmed—would not have been material to investors. As the Prospectus explained, a core aspect of Ibotta's value proposition was its ability to provide mid-campaign insights—something traditional paper and digital couponing could not do. *See id.* at 5; *see United Food & Comm. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1239 (10th Cir. 2014) (challenged disclosures immaterial when viewed in context of other disclosures).

A further problem for Plaintiff's falsity claims is that the confidential witness allegations are insufficiently reliable to support an inference that the challenged "real-time" statements were false or misleading *when made*. *See Slater*, 719 F.3d at 1201. Plaintiff excerpts certain statements and purports to summarize the interviews, but he does not claim to have contacted the interviewees or independently corroborated their statements. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) (explaining that, when plaintiffs cite "anonymously-provided information" in Section 10(b) context, courts consider, among other things, "the basis offered for the informant's knowledge" and "the existence of other information corroborating the informant's allegations"); *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *7–8 (D. Or. Nov. 24, 2021) (finding anonymous consumer complaints insufficiently reliable to support falsity); *see also IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (dismissing Section 11 claims where confidential witness allegations lacked any "facts that might corroborate the

17

statements" (quotation marks omitted)); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016) (allegation of "second-hand statement" insufficient for Section 11 claim). The Court does not know the context of these interviews or who conducted them. And three of the AlphaSense interviewees were outsiders who worked for Ibotta's clients, not for Ibotta itself. Compl. ¶¶ 86, 89, 91. The anecdotal "discontent" of just three individuals out of more than 800 clients "is hardly evidence that" Ibotta "was beset with problems" and sheds no light on the truthfulness of statements in the Offering Materials. *IAC/InterActiveCorp.*, 695 F. Supp. 2d at 119 (quotation marks omitted); *cf. Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("handful of incidents" of mismanagement did not support inference that company was "in trouble").

Many of the confidential witnesses' allegations are also unmoored in time, or too vague regarding their timeframe, to plead falsity plausibly. *See LexinFintech Holdings*, 2021 WL 5530949, at *19 (anonymous consumer complaints did not support Section 11 claims, in part because allegations were "undated"); *Hubbard v. BankAtlantic Corp., Inc.*, 625 F. Supp. 2d 1267, 1286 (S.D. Fla. 2008) (disregarding confidential witness allegation that "ha[d] no temporal context" and could have applied "before, during, or after the Class Period"). None of the AlphaSense interviewees provided a relevant timeframe for their allegations, and Plaintiff provides no context as to the timing for FE-1's statements about developing "performance models and related metrics," Compl. ¶ 79, or for FE-3's statements that Ibotta's raw data required manual synthesis, *id.* ¶ 83. Because it is equally plausible that any alleged deficiencies in Ibotta's service were remedied before the Offering, or arose after the Offering, the allegations are insufficient to state a claim. *See Twombly*, 550 U.S. at 567–68 (holding that no claim has been stated where pleaded facts are equally consistent with legal behavior).

Plaintiff's attempt to allege falsity based on Defendant Leach's post-Offering statements about the Company's rollout of "several exciting initiatives"—including "*improving the rigor and credibility* of Ibotta's measurement framework, allowing its clients to track *how many incremental sales* they are delivering in near real time" is also unavailing.  Compl. ¶ 198 (emphases added).  Mr. Leach's statements, made on a November 13, 2024, earnings call, refer to later improvements in the speed and accuracy of measuring incremental sales, which the Company rolled out several months after the Offering.  *Id.*  They say nothing about the Company's measurement capabilities at the Offering, nor suggest that it was incapable of providing performance metrics to clients while campaigns were ongoing.  New and improved methods and metrics introduced long after the Offering cannot support an allegation of falsity.  *See Ohio Pub. Emps. Retirement Sys. v. Discovery, Inc.*, 2024 WL 4647131, at *2–3 (2d Cir. Nov. 1, 2024) (holding that adoption of "new methodology for counting subscribers" after merger did not render false or misleading "*pre*-merger subscription numbers" in offering documents); *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *12–13 (S.D.N.Y. Jan. 26, 2009) (holding that upward revision to loss estimate in offering documents two months after offering did not render estimate false or misleading).

***Statements about user fraud.***  Plaintiff also challenges statements in the Offering Materials that Ibotta's "sophisticated anti-fraud systems work to prevent third parties from committing fraudulent activities" and "reduc[e] both the risks and the number of instances of fraud."  Compl. ¶¶ 136–37.  According to Plaintiff, Ibotta's anti-fraud measures were "incapable of identifying counterfeit receipts, which led to significant losses."  *Id.* ¶ 137.  But as Plaintiff admits, Ibotta maintained an alert system, along with a dedicated team of six fraud operations agents, to identify fraudulent activity.  *Id.* ¶¶ 96, 99.  Plaintiff also concedes that FE-4 and other fraud operations

agents were responsible for reviewing potentially counterfeit receipts.  *Id.* ¶ 99.  Far from being

"incapable of identifying" fraud, *id.* ¶ 137, Ibotta had systems and personnel set up to do just that.

Moreover, Ibotta did not assert that its anti-fraud systems were successful 100% of the

time; rather, it stated that those systems "reduc[ed] both the risks and the number of instances of

fraud."  *Id.* ¶ 136.  That Ibotta's system required some discretion from management as to which

cases of suspected fraud to pursue and may have occasionally involved manual review by fraud

operations agents, *id.* ¶¶ 95–101, does not remotely render the challenged statements false or

misleading.  Nor does the fact that certain members of FE-4's fraud operations team were laid off

*after* the Offering support an inference of falsity.  *See id.* ¶ 103; *Primo v. Pac. Biosciences of Cal.,

Inc.*, 940 F. Supp. 2d 1105, 1119 (N.D. Cal. 2013) (granting motion to dismiss, in part because

layoffs after IPO did not "show anything about the company's intentions at the time of the IPO").

The Prospectus contains risk factors directly warning of possible fraud.  Plaintiff concedes

this but alleges that Ibotta's statements that fraud was "possible" and "may" occur were materially

false or misleading because "Ibotta was, in fact, already experiencing widespread problems of

fraudulent activity."  Compl. ¶¶ 138–39.  These risk factors were not false or misleading because

the Prospectus candidly disclosed what Plaintiff complains it omitted: that Ibotta was experiencing

fraud on its platforms.  Specifically, the Prospectus disclosed that Ibotta's "anti-fraud systems"

were aimed at "*reducing* both the risks and the number of instances of fraud," indicating that

certain instances of fraud were already occurring on Ibotta's platform at the time of the Offering.

Compl. ¶ 136 (quoting Ex. 1 at 137) (emphasis added).  The Prospectus also explained that the

Company calculates its "[c]ost of revenue," based, in part, on "certain user award costs net of

breakage," and that "[u]ser award costs also include user awards that are cashed out and

subsequently identified as fraudulent." Ex. 1 at 101. Similarly, in explaining how the Company reflects user redemption liability on its balance sheet, the Prospectus stated that "[d]eactivated accounts due to fraudulent activity are also recognized as breakage." *Id.* at F-16; *see United Food*, 774 F.3d at 1243 (statements not materially misleading under Section 11 because "the risk was obviously inherent" in registration statement).[9]

FE-4's allegations about fraud on Ibotta's platforms do not establish falsity. Several of FE-4's allegations are conclusions or subjective statements of opinion, which cannot establish, or even support, falsity.[10] Courts regularly discredit allegations that amount to subjective beliefs, not objectively verifiable assertions.[11] Further, FE-4's allegations are vague and unmoored to a specific time period. *See* Compl. ¶¶ 99–102; *LexinFintech Holdings*, 2021 WL 5530949, at *19. At best, FE-4 recalled supposed fraud attacks that occurred at some point "in 2023" or "around the

---

[9] Ibotta's disclosures regarding the future risk of fraudulent activity are also plainly protected by the "bespeaks caution" doctrine, which applies when "'forward-looking representations contained enough cautionary language … to protect the defendant against claims of securities fraud.'" *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997); *see* Ex. 1 at 40–41 (warning that third parties "may commit fraudulent activities" and "circumvent" Ibotta's anti-fraud systems, which would "negatively impact[]" business); *id.* at 41 (warning that anti-fraud measures "may be costly and may not be ultimately successful" or "effective against new and continually evolving forms of fraud"); *id.* at 74–75 (warning of "substantial risks and uncertainties" associated with "forward-looking statements").

[10] For example, FE-4 stated that "user fraud was rampant at Ibotta," Compl. ¶ 97; that "numerous types of fraudulent activity … plagued Ibotta," *id.* ¶ 98; and that fraud operations agents "perceived … huge financial losses from the fraud," *id.* ¶ 102.

[11] *See Exkae*, 2020 WL 7352735, at *6 (opinions of confidential witnesses "as to why [company] did not meet the forecasted billing numbers" did not support inference that statements were misleading under Section 11); *Coty*, 2016 WL 1271065, at *6 (confidential witness's statements that sales were "struggling" due to "significant increase" in competitor products did not support Section 11 claim (quotation marks omitted)); *Pyramid Holdings, Inc. v. Inverness Med. Innov., Inc.*, 638 F. Supp. 2d 120, 127 (D. Mass. 2009) (confidential witnesses' "[s]ubjective generalizations" about what caused decreased "productivity," "major problems with product quality," and "costly failures, delays, and problems" did not support falsity under Section 11 (quotation marks omitted)).

holidays in either 2022 or 2023," but Plaintiff alleges no details about the attacks, how they occurred, or whether they were material given the scale of Ibotta's business.  Compl. ¶ 100.

**Statements about Ibotta's revenue-mix shift.**  Another risk disclosed in the Prospectus was the possibility that Ibotta's "efforts to encourage the growth of loyalty programs on third-party publishers' apps and websites may cause fewer consumers to use [Ibotta's] D2C properties, leading to a loss of revenue."  Compl. ¶ 151; *see* Ex. 1 at 26.  Plaintiff challenges that statement as materially false or misleading, alleging that it framed as hypothetical a risk (loss of D2C revenue) that "Ibotta was, in fact, already experiencing as a result of its increased focus on its third-party-publisher segment."  Compl. ¶ 152.  According to Plaintiff, there was necessarily a zero-sum relationship between D2C revenue and third-party publisher ("TPP") revenue, whereby any growth in TPP revenue "actively cannibaliz[ed]" D2C revenue.  *Id.* ¶ 145.  To support that claim, Plaintiff points to a graph purportedly showing a "deceleration in growth" of Ibotta's D2C revenue before and after the IPO.  *Id.* ¶¶ 150–51.  He also points to statements made by Defendants Patel and Leach about Ibotta's Q2 2024 financial results, months after the Offering, which he says reflect those Defendants' prior recognition of this supposed zero-sum "dynamic."  *Id.* ¶¶ 146–49.

Plaintiff's falsity theory fails.  First, far from being misleading, the Prospectus's disclosure that growth on third-party publishers could "cause fewer consumers to use [Ibotta's] D2C properties, leading to a loss of revenue" was accurately framed as a potential risk, rather than a certainty.  Ex. 1 at 25–26.  After all, Ibotta's D2C redemption revenue had just *increased* 27% in the prior year, even while its TPP business grew at an even more rapid pace.  *See id.* at 90.  Plaintiff's suggested disclosure—that D2C revenue "was certain to suffer," Compl. ¶ 145—would have been flatly inconsistent with the prior year's data.  Nor does the fact that D2C revenue

declined in subsequent quarters render the Prospectus misleading.  *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (rejecting Section 11 claim because registration statement "warn[ed] of the exact risk that later materialized" (quotation marks omitted)).

Second, Plaintiff cannot rely on Defendants Leach's and Patel's post-Offering statements to establish the alleged falsity of the Prospectus.  *See Carpenter v. Oscar Health, Inc.*, 2025 WL 722729, at *6 (S.D.N.Y. Mar. 6, 2025) (executive's statements months after IPO did not support falsity); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) (Section 11 claim cannot be based on hindsight).  Defendant Patel, for example, stated on August 13, 2024 that, at that time, a relatively "greater portion of [clients'] budgets are getting consumed on third-party properties" and that "leav[es] relatively fewer redemption opportunities for D2C redeemers." Compl. ¶ 146. Plaintiff claims that this statement about the zero-sum nature of client budgets reveals the inherently cannibalistic relationship between the D2C and TPP segments.  *Id.* ¶ 145.  But the Complaint tellingly omits Defendant Patel's very next statement, which provides critical context: "Ultimately, however, advertiser budgets follow audiences.  And thus, we expect client budgets to grow in proportion to the growth in redeemers network wide as we've seen over the last couple of years." Ex. 3 at 8.  In other words, while any individual client budget may be fixed in the short term, meaning increased redemptions in one area (TPP) trade-off with redemption opportunities in another (D2C), the existence of more redeemers is what leads clients to allocate larger budgets in the future—and that trend is what Ibotta observed historically.[12]  Plaintiff's cherry-picked, post-offering statements do not remotely support a claim of falsity as to the Offering Materials.

---

[12] Defendant Leach explained the same concept on the May 30, 2024, earnings call.  *See* Compl. ¶ 158 ("The more we add redeemers, that's the key thing because the redeemers are what attract those brand dollars and we've always seen throughout the history of the company that as

Finally, and in any event, any supposed "cannibalistic" relationship between D2C and TPP was immaterial. As explained, the Company is paid on a fee-per-redemption basis regardless of where the redemption occurs, and its overall redemption revenue was increasing. *See* Ex. 1 at 90. In that context, investors would not have "consider[ed] it important," *Slater*, 719 F.3d at 1197, whether the proportion of that revenue attributable to TPP properties was increasing or decreasing, and additional disclosures would not have shed meaningful light on Ibotta's financial future.

Plaintiff alternatively alleges that Ibotta had a freestanding duty under Regulation S-K[13] to disclose "that any growth in Ibotta's third-party-publisher segment would come at the direct expense of its [D2C] segment, and cause [D2C] revenue to rapidly decelerate." Compl. ¶ 153. This theory fails, too. As to Item 303, as set out above, Ibotta fully explained the "uncertainties" concerning the relationship between its D2C and TPP revenues, and Plaintiff identifies no contemporaneous facts showing any "trend" already had started beyond what Ibotta disclosed. *See supra* pp. 22–23. And as to both Item 303 and Item 105, Plaintiff's "failure to plead any actionable misstatements or omissions" is fatal to his claim. *Carpenter*, 2025 WL 722729, at *7; *see Slater*, 719 F.3d at 1203 (holding that plaintiff failed to plead Regulation S-K violation "as an alternative basis for § 11 liability" because prospectus "painted a materially complete picture").[14]

---

you build that scale … those investments are more and more attractive and get made in larger and larger amounts.").

[13] "Item 303 of Regulation S-K requires disclosure in offering documents of, among other things … any 'known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" *Slater*, 719 F.3d at 1197 (quoting 17 C.F.R. § 229.303(b)(2)(iii)). Item 105 requires that offering documents contain "under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).

[14] "[I]n addition to proscribing lies and half-truths, [Section 11] also creates liability for failure to speak on a subject at all." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601

### B.     Plaintiff fails to state a Section 12(a)(2) claim

Section 12(a)(2) provides essentially the same cause of action as Section 11 but applies "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *see* 15 U.S.C. § 77*l*(a)(2); *United Food*, 774 F.3d at 1233. Here, as often, the Section 12(a)(2) claims are premised on the same statements challenged under Section 11. *See* Compl. ¶¶ 251–55. Because Plaintiff has not alleged that any of those statements were materially false or misleading, *see supra* § I.A.2., his Section 12(a)(2) claims fail too, *see City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182–84 (2d Cir. 2014).

Moreover, because Section 12(a)(2) "imposes the same traceability requirement" as Section 11, *Pirani*, 127 F.4th at 1192, Plaintiff's failure to plead traceability is equally fatal to his Section 12(a)(2) claims, *see Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1135–37 (D. Colo. 2017) (dismissing Section 12(a)(2) claim).

### C.     Plaintiff fails to state a Section 15 claim

Because Plaintiff has no viable Section 11 or 12(a)(2) claims, *see supra* §§ I.A., I.B., his Section 15 control-person claim fails. *See* Compl. ¶¶ 257–59; *Cupat*, 2025 WL 1141534, at *19.

## II.     The Court Should Dismiss the Exchange Act Claims

### A.     Plaintiff fails to state a Section 10(b) claim

In support of his Section 10(b) claim, Plaintiff challenges the same statements that are the

---

U.S. 257, 264 (2024). But Plaintiff does not allege a "pure omission"—*i.e.*, that Ibotta "sa[id] nothing" about the revenue-mix shift. *Id.* at 263. Rather, he alleges that Ibotta's disclosures were insufficient and misleading, *e.g.*, Compl. ¶¶ 154–55—and that claim fails, as discussed above, *see supra* pp. 22–24.

subject of his Section 11 claim (which fail for the same reasons, and others set forth below) and additional post-Offering statements regarding: (1) Ibotta's ability to grow client budgets by increasing its redeemer base, Compl. ¶¶ 158, 160, 165, 167, 169, 176, 178, 180, 182; (2) the risk of fraudulent transactions on Ibotta's platform, *id.* ¶¶ 163, 172, 185; and (3) the risks of losing key personnel, *id.* ¶¶ 174, 187. These allegations do not withstand the rigorous pleading requirements applicable to Section 10(b) claims.

1. ***Plaintiff does not adequately plead that the challenged statements are actionable and/or materially false or misleading***

***Statements in the Offering Materials.*** Plaintiff incorporates by reference his allegations relating to the challenged statements in the Offering Materials. Because he fails to plead these statements were false under Section 11, *see supra* § I.A.2., he necessarily also fails under the heightened pleading standard applicable to Section 10(b), *see Exkae*, 2020 WL 7352735, at *8.

***Post-Offering statements about growth in redeemers and client budgets.*** Plaintiff challenges statements that, if Ibotta increased the number of consumers redeeming promotions, clients' budgets would also increase. *See* Compl. ¶¶ 158, 160, 165, 167, 169, 176, 178, 180, 182. Plaintiff alleges that, in reality, increasing the number of redeemers did not necessarily increase client budgets because (1) it could have the opposite effect of exhausting client budgets for particular promotions; and (2) Ibotta was experiencing significant sales team turnover. *See id.* ¶¶ 159, 161, 166, 168, 170, 179, 181, 183. These allegations fail to establish falsity.

As an initial matter, statements containing "accurate recitations of [Ibotta's] historical successes" are not actionable. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). For example, Plaintiff challenges Defendant Leach's statement during an earnings call that "we've always seen *throughout the history of the company* that as you build that scale, while

maintaining the efficiency, those investments are more and more attractive and get made in larger and larger amounts." Compl. ¶ 158 (emphasis added).[15] But "[i]t is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *McDonald*, 287 F.3d at 998; *see Lorusso v. Boulder Brands, Inc.*, 2017 WL 4365180, at *13 (D. Colo. Mar. 1, 2017) (recommending dismissal because historical statements about customer-service issues were not actionable).

Moreover, Defendants did not state that the number of redeemers was the *sole* variable in determining the overall growth or decline in client budgets and, in turn, Company revenue. To the contrary, Ibotta disclosed that "budget pressures or unspent budgets at the end of a CPG brand's fiscal year may lead to unexpected reduced or increased spending on our network" and that, in the past, "certain macroeconomic factors" have "made it difficult for [Ibotta's] clients to keep their product on shelves and led to decreased promotions." Ex. 1 at 29. The Prospectus also cited "CPG consolidation" as another factor that can "result in a decrease in or cessation of engagement with Ibotta." *Id.*; *cf. City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014) (statement that decision to initiate clinical trial "was based on" results of study was not false or misleading, in part because defendants considered results "as one factor in their decision").

Plaintiff also does not allege with sufficient particularity that client budgets were, in fact, finite or incapable of supporting growth on both D2C and TPP properties as of the time of any challenged statement. FE-2 vaguely recalls only a "'concern of going through [client] budgets too quickly'" after the Offering, with no further details about which or how many clients were

---

[15] *See* Compl. ¶ 169 ("The thing we've seen over the last 12 years consistently is that advertisers want to capitalize on large and growing audiences."), ¶ 178 ("[W]e have 12 years of history of watching it follow the growth in our network.").

exhausting budgets, or the impact on Ibotta.  Compl. ¶ 109; *see In re Crocs, Inc. Sec. Litig.*, 774

F. Supp. 2d 1122, 1140 (D. Colo. 2011) ("[T]he PSLRA requires a plaintiff to [plead] specific

facts that support the allegations about the misleading nature of the defendant's statements.

Generalized or conclusory allegations of fraud will not be sufficient." (quotation marks omitted)),

*aff'd sub nom. Sanchez v. Crocs, Inc.*, 667 F. App'x 710 (10th Cir. 2016); *see Shafer v. Lightning

Emotors, Inc.*, 2024 WL 691458, at *10–11 (D. Colo. Feb. 20, 2024) (statements on "robust supply

chain" were not false absent allegations as to "what specific supply chain issues, if any, there may

have been" and "which suppliers may be at issue").  Generalized allegations from FE-1, FE-2, and

FE-5 that a demanding work environment and a push to increase sales and revenue were making

it difficult for salespeople to increase client budgets and attract new clients, Compl. ¶¶ 107, 110–

11, 113, do not establish anything specific about the supposed exhaustion of client budgets, much

less the relative impact of adding more redeemers when considered alongside other countervailing

factors and potential headwinds, *see Shafer*, 2024 WL 691458, at *10–11; *City of Birmingham

Ret. & Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1058 (E.D. Wis. 2020) (rejecting

claim that, because company "pressured [distributors] to buy more inventory and hit high sales

targets," company "must have been hiding declining sales by stuffing distributors with inventory").

Plaintiff relies on FE-1's "recollection of personnel-related reorganizations" to allege that

the Company's sales team was suffering from turnover.  Compl. ¶¶ 108, 159.  But those allegations

do not contradict Defendants' assertions about factors affecting revenue growth, nor do they

establish with particularity that Ibotta's belief that client budgets would eventually grow to catch

up with short-term increases in redeemers was unfounded.  *See, e.g.*, *Shafer*, 2024 WL 691458, at

*10–11; *United Food & Comm. Workers Union Loc. 464A v. Pilgrim's Pride Corp.*, 2022 WL

684169, at *4 (D. Colo. Mar. 8, 2022) (pointing to "lack of particularized allegations" about bid-rigging scheme's "actual impact" as one basis for dismissal).

Plaintiff's allegations fail for the additional reason that several of the challenged statements are inactionable as a matter of law. For example, statements focusing on Ibotta's goal of increasing redeemers and the scope of its network to attract top clients and expand client budgets are incapable of verification.[16] *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1248–49 (10th Cir. 2022) (explaining that courts "distinguish[] between statements that are material and those that are mere puffing" and thus "not capable of objective verification" (quotation marks omitted)); *Grossman*, 120 F.3d at 1121–22 (finding similar statements "the sort of soft, puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism"). Similarly, "general, forward-looking expressions of confidence" regarding the Company's progress are inactionable puffery.[17] *Level 3*, 667 F.3d at 1340.

The PSLRA's safe harbor, which exempts "public companies … from liability for certain forward-looking statements" that are "accompanied by meaningful cautionary statements," also

---

[16] *See* Compl. ¶ 158 (noting that growing redeemers is "the key thing because the redeemers are what attract those brand dollars" and that "as long as we do our part in growing redeemers and those addressable audiences … we'll have plenty of interest from the advertiser side" (emphasis omitted)), ¶ 160 ("[W]hat we're focused on is spinning that flywheel by growing redeemers primarily across the network …. [T]he main way we do that is by growing within the substantial headroom we have at the current publishers."), ¶ 178 ("[W]e have confidence in the supply side of our business because, as I said, we have 12 years of history of watching it follow the growth in our network. And we've had a lot of conversations with our top clients to the effect of we're excited."), ¶ 182 (stating that doubling budgets and redemption offers "today at Walmart" would "nearly double the revenue that we have today" and that "[y]ou don't even need new brand partners…. [y]ou just need more powder to keep the offers live longer, and they will be gobbled up extremely quickly on Walmart, D2C and every other part of the network").

[17] *See* Compl. ¶ 165 (stating that "advertiser budgets follow audiences"), ¶ 167 (stating "that [clients] will allocate the kind of budget to take advantage of not only the third-party growth but also the exciting audience that we have on D2C").

protects several of the statements.[18]  *See Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F.

Supp. 2d 662, 676 (D. Colo. 2007) (quoting 15 U.S.C. § 78u-5(c) (2006)).  These challenged

statements followed cautionary language by Ibotta's Head of Investor Relations, which satisfies

the PSLRA's safe harbor requirements.[19]  *See, e.g.*, *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485

F. Supp. 3d 1113, 1123 (N.D. Cal. 2020) (approving of similar cautionary language); *In re Fusion-

io, Inc. Sec. Litig.*, 2015 WL 661869, at *13 (N.D. Cal. Feb. 12, 2015) (same).

    Finally, several challenged statements are opinions,[20] which are actionable only if Plaintiff

can show they were "subjectively false, d[id] not fairly align with the information in the issuer's

possession at the time, or the speaker did not conduct a meaningful inquiry."  *Exkae*, 2020 WL

7352735, at *6 (citing *Omnicare*, 575 U.S. at 189, 199).  Plaintiff attempts to clear this hurdle by

alleging that "clients were already depleting their 2024 budgets at an unsustainable pace" and that

"the sales team was diminishing as a result of increasing turnover and ongoing reorganizations."

Compl. ¶ 168.  But, as explained above, *see supra* pp. 27–28, Plaintiff does not plead adequately

that these statements were "subjectively false" when made or that these opinions "[did] not fairly

align with" the information Defendants had.  *Exkae*, 2020 WL 7352735, at *6.  Plaintiff's

---

    [18] *See* Compl. ¶ 165 ("[W]e expect client budgets to grow in proportion to the growth in redeemers network-wide as we've seen over the last couple of years."), ¶ 168 ("We do think that as overall audience size grows, so too go advertiser investment levels.… We're confident that [clients] will allocate the kind of budget to take advantage of not only the third-party growth but also the exciting audience that we have on D2C.").

    [19] *See* Ex. 3 at 4 (stating that Ibotta's statements "are subject to inherent risks, uncertainties and changes and reflect our current expectations and information currently available to us.  And our actual results could differ materially" and instructing investors to "refer to the risk factors in our recent SEC filings" for more information); Ex. 4 at 4 (same).

    [20] *See* Compl. ¶ 167 ("We do think that as overall audience size grows, so too go advertiser investment levels."), ¶ 176 ("We believe this downward pressure is temporary because we continue to see extremely high rates of client retention, indicating our clients are happy with the quality of what we are delivering.").

conclusory allegations regarding Defendants' knowledge at the time, *see* Compl. ¶¶ 167–68, 176–77, cannot replace what Plaintiff lacks: particularized allegations demonstrating that Defendants disbelieved these opinions. *See Pilgrim's Pride*, 2022 WL 684169, at *5. Plaintiff alleges no facts indicating that "clients [were] [un]happy with the quality of what [Ibotta was] delivering."[21] Compl. ¶ 176. And Plaintiff does not attempt to plead that Defendants failed to conduct a meaningful inquiry supporting their opinions. *See Exkae*, 2020 WL 7352735, at *6. In summary, Plaintiff fails to allege the falsity of the challenged statements about growth in redeemers and client budgets, and, in any event, many of those statements are not actionable as a matter of law.

*Post-Offering statements about user fraud.* Plaintiff alleges statements in the "Risk Factors" section of Ibotta's 2024 Form 10-Qs concerning the risks associated with fraud on Ibotta's platforms, *see* Compl. ¶¶ 163, 172, 185, were materially false or misleading because they "represented to investors that fraud was not already occurring on Ibotta's platforms when, in reality, it was," *id.* ¶¶ 164, 173, 186. These statements were similar to the ones in the Offering Materials and therefore were not materially false or misleading for the same reasons. *See supra* § I.A.2. Ibotta never said fraud was not occurring, only that it had measures to *reduce* the risk.

Plaintiff refers to a "very large counterfeit-receipt attack," Compl. ¶ 100, but that vague, unsubstantiated, allegation has an obvious timing problem. FE-4 recalls only the year and "rough[]" amount of this alleged attack, "or perhaps another fraud attack that occurred around the holidays in either 2022 or 2023." *Id.* The alleged attack thus predates the Class Period by at least four months, and Plaintiff offers no plausible allegations of ongoing user fraud during the Class

---

[21] To the extent Plaintiff relies upon Interviewees 1 through 3 for support, there are no allegations that any Exchange Act Defendant was aware of those interviewees' complaints at the time of the challenged statements.

Period, much less specifics about the extent of it.[22]  *See Richfield v. PolarityTE, Inc.*, 2023 WL 3010208, at *8 (D. Utah Apr. 19, 2023) (holding that plaintiffs had not "met their burden to plead specific facts" showing that pharmaceutical company lacked assay it claimed to have "at the time the challenged statements were made"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014) (rejecting confidential witness allegations about spring 2012 testing issue that revealed "nothing" about testing conducted in March 2013), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). FE-4 left the Company in April 2024, at the very start of the Class Period, Compl. ¶ 96—and thus cannot speak to post-Offering conditions, *see Shafer*, 2024 WL 691458, at *11 n.4 (finding confidential witness's allegations "too remote" to "demonstrate contemporaneous knowledge").

**Post-Offering statements about risks of personnel departures.**  Plaintiff alleges that certain post-Offering statements about the risks associated with senior-level departures (including operational disruptions, "uncertainty among investors," and adverse impacts to "employee retention and morale"), Compl. ¶¶ 174, 187, were materially misleading because such risks had already materialized when Chief Revenue Officer ("CRO") Jensen left the Company "just a few weeks earlier" on July 19, 2024, *id.* ¶¶ 116, 175, 188.

However, the confidential witness allegations are insufficient to show that this supposed omission was material, or that any risk materialized (and therefore was required to be disclosed) soon after, or directly as a result  of, Mr. Jensen's departure.[23]  Interviewee 4 purportedly stated

---

[22] The Complaint does not specify how FE-4 obtained this information, the types of products involved, when the "attacks" occurred, or any other specific details.

[23] The Company disclosed Mr. Jensen's departure within a reasonable time at the next opportunity: in its August 14, 2024 Form 10-Q.  *See* Ex. 10 (Aug. 14, 2024 Form 10-Q) at 100 (referring to Mr. Jensen as "former" CRO); *Smith v. PureCycle Techs., Inc.*, 2024 WL 5186586, at *11 (S.D.N.Y. Dec. 20, 2024) (finding no "duty to disclose immediately" where company "warned investors" of risks in prior filings and "timely disclosed" in next Form 10-Q).

that Mr. Jensen "left for weird reasons and the whole[] sales org imploded," and "[t]he entire sales force just left last year after the CRO was gone." *Id.* ¶ 114. But Interviewee 4 cannot attest reliably to this because he left the Company in April 2024, *before* Mr. Jensen's departure. *See Shafer*, 2024 WL 691458, at *10. Plaintiff pleads no other facts showing that the departure resulted in any immediate adverse consequences, and there is no suggestion that Mr. Jensen "brought any peculiarly valuable technical or business expertise." *In re Numerex Corp. Sec. Litig.*, 913 F. Supp. 391, 401–02 (E.D. Pa. 1996) (finding CEO's resignation two months after IPO immaterial).

### 2. *Plaintiff does not plead the required "strong inference" of scienter*

Plaintiff's Section 10(b) claims also fail because he does not plead a strong inference of scienter. That inference "must be more than 'reasonable' or 'permissible'—it must be cogent and compelling." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016) (quoting *Tellabs*, 551 U.S. at 324). The scienter allegations, whether viewed individually or collectively, do not remotely support a cogent and compelling inference of fraudulent intent.

*Insider stock sales.* Plaintiff attempts to plead scienter based on stock sales by Individual Defendants Leach, Doshi, and Lehrman, alleging they sold more than $74 million in Ibotta common stock in the Offering. *See* Compl. ¶¶ 121–23. He also points to Mr. Lehrman's and Mr. Doshi's post-Offering sales, which occurred roughly ten weeks before the alleged corrective disclosures on February 26 and 27, 2025. *See id.* ¶¶ 124–26.

But Plaintiff has pleaded nothing "[u]nusual or suspicious" about the alleged stock sales that could contribute to a scienter inference. *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415, at *20 (N.D. Okla. Jan. 7, 2022), *aff'd*, 79 F.4th 1209 (10th Cir. 2023). As to timing, all alleged sales occurred either in the Offering or

within a year of it. Under similar circumstances, courts have found it "unsurprising that shareholders with access to a public market for the first time would trade at a high volume" and have concluded that trades temporally close to an initial public offering are not suspicious. *Cupat*, 2025 WL 1141534, at *10 (collecting cases); *see, e.g.*, *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2024 WL 4375775, at *3 (N.D. Cal. Oct. 2, 2024) ("[G]iven their timing—shortly after Amplitude's IPO and Q3 earnings—the stock sales were not suspicious."). Indeed, these Defendants' trades are "entirely consistent with the trading activity one would expect of executives [and directors] who had access to liquidity for the first time after building a company" for, in this case, thirteen years. *Cupat*, 2025 WL 1141534, at *11.

Further, the vast majority of the sales during the Class Period occurred weeks or months before any alleged corrective disclosure. *Compare* Compl. ¶¶ 190–93 (Aug. 13, 2024 corrective disclosure), *and id.* ¶¶ 194–201 (Nov. 13, 2024 corrective disclosure), *and id.* ¶¶ 201–11 (Feb. 26–27, 2025 corrective disclosure), *with id.* ¶ 216 (citing stock sales ten or more weeks before the Feb. 26–27, 2025 corrective disclosure as supposedly indicative of scienter), *and id.* ¶ 125 (citing stock sales on Sept. 3, 5, 9, and 11, 2024; Nov. 19, 22, 25, and 28, 2024; and Dec. 3 and 12, 2024).[24] The gaps between these trades and the alleged corrective disclosures negate scienter. *See In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *14 (S.D.N.Y. Sept. 29, 2022) (finding that sales six weeks before alleged corrective disclosure did not support scienter and noting that "courts have routinely declined to find trading on such a timeline inherently suspicious").

Plaintiff also fails to plead that the percentages of stock sold support a strong inference of

---

[24] Plaintiff cites stock sales that purportedly occurred on November 28, 2024. This appears to be in error, as Defendant Lehrman's Form 4 filed on December 2, 2024, discloses only sales on November 27 and 29, 2024. See Ex. 7 at 19.

scienter.  Sales of a minority percentage of an insider's shares are not inherently suspicious—especially given the timing of the sales vis-à-vis the Offering.  Defendants Leach and Doshi each retained the vast majority of their holdings—Mr. Leach sold roughly 8% of his holdings at the time of the IPO itself and none since, and Mr. Doshi sold roughly 22% of his holdings.  *See* Ex. 8 at 1–13; Ex. 9 (Bryan Leach's Forms 4) at 1–5; *see also Level 3*, 667 F.3d at 1346 (finding plaintiffs failed to plead scienter, in part because "defendants engaging in these sales … retained a substantial percentage of their Level 3 holdings").  Thus, they absorbed the same losses as public shareholders when the price declined.

Moreover, Mr. Lehrman and Mr. Doshi were outside directors of the Company, not executives.  Plaintiff alleges no basis to infer either traded on the belief that disclosures were forthcoming that would drive down the stock price.  The Complaint does not allege they made or participated in any post-Offering statement, or any other basis to infer they traded on material, nonpublic information.[25]  All they allegedly did was sign the registration statement.  *See In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 222 (E.D.N.Y. 2022) (no scienter as to director defendants who signed registration statement where plaintiffs cited "nothing more concrete" to support that director defendants "knew about the contradictory data"); *see also Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 153–54 (D. Conn. 2007) (outside director's trading, while substantial, did not give rise to inference of scienter where he was not alleged to have made statements at issue).  Thus, their stock sales cannot contribute to scienter as to the Company or other Individual Defendants.  *See Head v. NetManage, Inc.*, 1998 WL 917794, at *5 (N.D. Cal.

---

[25]  Because Mr. Doshi is not a defendant to the Section 10(b) claims, "it is hard to see how his stock sales" could possibly permit an inference of motive for any other Defendant.  *In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *7 (D. Colo. Dec. 2, 2020).

Dec. 30, 1998) (holding that defendant's sale of "all of his … shares" during class period did not establish scienter when he was "not alleged to have personally made any of the false statements and was an outside director"); *see also Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011) (holding that outside director's stock sale did not support strong inference of scienter, in part because complaint did "not attribute a single alleged misstatement" to him or allege that he "exerted any control over [company's] public statements").

***Confidential witness allegations.*** Plaintiff also fails to establish scienter through confidential witnesses. *See Crocs*, 774 F. Supp. 2d at 1149 (dismissing Exchange Act claims, in part because "[g]eneral allegations of this nature are not sufficient to impute knowledge to the Individual Defendants and are not sufficient to establish scienter"). Plaintiff does not allege direct interactions between any confidential witness and an Individual Defendant, which courts have found necessary to support a strong inference of scienter. *See Rumbaugh v. USANA Health Scis., Inc.*, 2018 WL 5044240, at *9 (D. Utah Oct. 17, 2018) (disregarding confidential witness allegations where "[i]n the few instances in which a CW alleged some connection to an individual defendant, the CW … failed to provide a sufficiently particularized account of what the defendants must have known"). FE-2 does not allege any direct interactions with Individual Defendants, Compl. ¶¶ 80–81, 109–11; FE-1 and FE-4 allege they attended unspecified and undated meetings with Mr. Leach without reporting on the meeting's purpose, *see id.* ¶¶ 79, 96; FE-3 alleges only reporting to "C-suite and Vice-President-and-above-level personnel," *id.* ¶ 82, without identifying any Individual Defendant; and FE-5 alleges only that they attended virtual sales team meetings, sometimes attended by non-defendant CRO Jensen, *id.* ¶ 112. None of the AlphaSense interviewees alleged any interactions with any Individual Defendant. *See In re iRobot Corp. Sec.*

*Litig.*, 527 F. Supp. 3d 124, 142 (D. Mass. 2021) (finding confidential witnesses lacked "clear basis of knowledge" in part because they "never alleged to have even spoken to any" individual defendant"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (similar).

To the extent Plaintiff alleges scienter based on Defendants' "insight into client budget use," Compl. ¶ 177, Plaintiff offers no particularized allegations to establish that Defendants knew client budgets were being depleted. Plaintiff relies upon "FE-3's recollection" to make this point, *id.*, but Plaintiff does not explain how FE-3—who oversaw "the structuring and integration of data between Ibotta and its clients," *id*. ¶ 82—would have known particularized details about client budgets much less what the Individual Defendants knew or believed. *See Shafer*, 2024 WL 691458, at *9 ("[T]he complaint must support the probability that the CWs possessed the information alleged by disclosing their positions within the company."); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020) (dismissing Exchange Act claims in part because "the Complaint does not actually allege that the CWs were in positions in which they had particular knowledge about the Company's commercial liability lines").

***Officer departures.*** Plaintiff alleges that Mr. Jensen's and Mr. Patel's departures support scienter. Compl. ¶¶ 214–15. But departures must be "numerous, uncharacteristic or … suspicious" to contribute to a scienter inference. *Coors*, 2020 WL 13499995, at *11. The Complaint cites only the timing of Mr. Jensen's departure *three months* after the Offering and Mr. Patel's departure nearly a year after the Offering and two weeks after the Company announced its financial results for Q4 2024. Compl. ¶¶ 214–15. Nothing about that timing, in itself, is suspicious. *See Coors*, 2020 WL 13499995, at *11 (finding "temporal proximity" insufficient); *Ryan v. FIGS, Inc.*, 2024 WL 187001, at *12 (C.D. Cal. Jan. 17, 2024) (declining to "speculate as

to the reasons behind a change of leadership positions within a large corporation").  Even if the Court could infer the departures had some connection to Ibotta's performance, that is a far cry from inferring a connection to fraud.

*"Core operations" doctrine.*  Plaintiff also attempts to plead scienter based on a "core operations" theory, which "refers to instances where the nature of the alleged fraud was of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Coors*, 2020 WL 13499995, at *8 (alterations and quotation marks omitted); *see* Compl. ¶¶ 217–18.  The Tenth Circuit has "declined to accept a 'core operations' inference … absent particularized facts showing what executives actually knew." *Coors*, 2020 WL 13499995, at *8 (alterations and quotation marks omitted).  Plaintiff pleads no such facts here.

Plaintiff's allegations about "[t]he critical importance of the subjects of Defendants' materially false or misleading statements," Compl. ¶¶ 217–18, are generic and thus insufficient. *See Gold Res. Corp.*, 776 F.3d at 1114 (affirming dismissal in part because "core operations" allegations were not accompanied by "other particularized facts indicating that a key operation of the company was losing money, the [defendants] knew that fact, and they falsely reported a profit for it" (alteration and quotation marks omitted)).  Plaintiff's allegations, at best, "support a mere inference of the defendants' knowledge of all core operations, not scienter." *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *14 (S.D. Cal. Sept. 20, 2021) (alteration and quotation marks omitted).

## B.    Plaintiff fails to state a Section 20A claim

Plaintiff alleges that Mr. Lehrman is liable under Section 20A because he sold Ibotta stock during the Class Period.  *See* Compl. ¶¶ 279–87.  Section 20A provides that insiders who trade stock "while in possession of material, nonpublic information" are liable to any person who traded

contemporaneously with the insider. *Overstock*, 119 F.4th at 807 (quoting 15 U.S.C. § 78t-1(a)). To survive dismissal, a plaintiff must allege (1) that the defendant traded on material, nonpublic information; and (2) that the plaintiff traded "contemporaneously with the … sale … that is the subject of such violation." 15 U.S.C. § 78t-1(a). Here, Plaintiff has done neither.

*First*, Plaintiff makes no allegations about what supposed material, nonpublic information Mr. Lehrman—an outside director—allegedly possessed at the time he traded. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1181 (C.D. Cal. 2007) (dismissing Section 20A claim when complaint did not allege sufficient facts to show possession of material, nonpublic information). Plaintiff's conclusory allegation that Mr. Lehrman traded "while in possession of material, non-public, adverse information" is insufficient. Compl. ¶ 282; *see Wet Seal*, 518 F. Supp. 2d at 1181. And such knowledge cannot be inferred: an outside director's "status as [member] of the board" is insufficient to plead possession of material, nonpublic information. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 627–28, 632–33 & n.64 (S.D. Tex. 2003) (dismissing Section 20A claim against outside directors). Thus, the Section 20A claim "necessarily" fails. *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *30 (D. Colo. Mar. 31, 2015).

*Second*, Plaintiff has not pleaded that he traded "contemporaneously" with Mr. Lehrman. *Overstock*, 119 F.4th at 807. Section 20A's contemporaneity requirement—which courts have interpreted "quite strictly" because it is a proxy for privity between seller and buyer—ensures that Section 20A claims are available only "to those plaintiffs who may have actually traded with the alleged insider." *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & ERISA Litig.*, 503 F. Supp. 2d 25, 46 (D.D.C. 2007) (citations and quotation marks omitted).[26] Plaintiff makes only a conclusory

---

[26] Although courts differ on this issue, several have required Section 20A plaintiffs to

allegation to that effect.  Compl. ¶ 283.  While he purports to draw support from his certifications, *see id.*, those filings contain no alleged purchases he made on dates on which Mr. Lehrman sold— and thus confirm that he *did not* trade contemporaneously with Mr. Lehrman.  *Compare* ECF Nos. 18-3, 18-4, *with* Compl. ¶ 125.  Because Plaintiff is the sole claimant and class representative and lacks standing, the claim against Mr. Lehrman must be dismissed.    *See In re Cypress Semiconductor Sec. Litig.*, 864 F. Supp. 957, 960 (N.D. Cal. 1994) (dismissing Section 20A claim where plaintiff conceded he could not adequately allege contemporaneity).

### C.    Plaintiff fails to state a Section 20(a) claim

With no viable underlying Section 10(b) claim, *see supra* § II.A., Plaintiff's Section 20(a) "control person" claim also fails.  *See* Compl. ¶¶ 273–78; *Level 3*, 667 F.3d at 1347.

### D.    Plaintiff fails to allege scheme liability

To the extent Plaintiff means to assert a scheme liability claim under Rule 10b-5(a) and (c) with conclusory references to a "scheme," *see*, *e.g.*, Compl. ¶ 262, he falls well short.  *See In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 336 (D. Conn. 2021) ("[C]ourts must … ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric.")

### CONCLUSION

The Court should dismiss the Complaint in full, with prejudice.  To the extent Plaintiff seeks leave to amend, the Court should deny such relief.

---

allege, at a minimum, that they bought stock *on the same day* as the alleged insider sale.  *See, e.g.*, *Fed. Nat'l Mortg. Ass'n*, 503 F. Supp. 2d at 47–48; *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999); *In re AST Rsch. Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995).  Section 20A itself does not state what temporal gap (if any) is permitted without losing standing, and courts in this district have not answered the question definitively.

Respectfully submitted,

**KING & SPALDING LLP**

*/s/ Cliff Stricklin*
Cliff Stricklin
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Telephone: (720) 535-2327
Fax: (720) 535-2400
Email: cstricklin@kslaw.com

Mark Kirsch
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Telephone: (212) 790-5329
Email: mkirsch@kslaw.com

*Attorneys for Underwriter Defendants*

**WILMER CUTLER PICKERING
    HALE AND DORR LLP**

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno
Anjan Sahni
Tamar Kaplan-Marans
Charles C. Bridge
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
E-mail: Michael.Bongiorno@wilmerhale.com
E-mail: Anjan.Sahni@wilmerhale.com
E-mail: Tamar.Kaplan-Marans@wilmerhale.com
E-mail: Charles.Bridge@wilmerhale.com

Emily K. O'Hara
60 State Street
Boston, MA 02109
Telephone: (617) 526-6366
Fax: (617) 526-5000
E-mail: Emily.OHara@wilmerhale.com

*Attorneys for Ibotta, Inc., Bryan Leach, Sunit
Patel, Stephen Bailey, Amanda Baldwin, Amit N.
Doshi, Thomas Lehrman, Valarie Sheppard, and
Larry W. Sonsini*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 15th day of December 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Michael G. Bongiorno*

## CERTIFICATE REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to this Court's Standing Order Regarding the Use of Generative Artificial Intelligence ("AI") in Court Filings, the undersigned counsel certify that generative artificial intelligence was not used to draft this filing.

*/s/ Michael G. Bongiorno*

*/s/ Anjan Sahni*

*/s/ Tamar Kaplan-Marans*

*/s/ Charles Bridge*

*/s/ Emily O'Hara*