**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 25-cv-01213-NYW-SBP
*Consolidated with Civil Action No. 25-cv-01615-NYW-SBP*

MARK TCHERKEZIAN, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

IBOTTA, INC.,
BRYAN LEACH,
SUNIT PATEL,
STEPHEN BAILEY,
AMANDA BALDWIN,
AMIT N. DOSHI,
THOMAS LEHRMAN,
VALARIE SHEPPARD,
LARRY W. SONSINI,
GOLDMAN SACHS & CO. LLC,
CITIGROUP GLOBAL MARKETS INC.,
BOFA SECURITIES, INC.,
EVERCORE GROUP L.L.C.,
UBS SECURITIES LLC,
WELLS FARGO SECURITIES, LLC,
CITIZENS JMP SECURITIES, LLC,
NEEDHAM & COMPANY, LLC, and
RAYMOND JAMES & ASSOCIATES, INC,

      Defendants.

---

## ORDER

---

This matter is before the Court on Defendants' Motion to Dismiss, [Doc. 41], and the Request for Judicial Notice in Support of Defendants' Motion to Dismiss (the "Motion for Judicial Notice"), [Doc. 43]. The Court held oral argument on the Motion to Dismiss on June 30, 2026. [Doc. 51; Doc. 52]. For the following reasons, the Motion to Dismiss is **GRANTED** and the Motion for Judicial Notice is **DENIED as moot**.

**BACKGROUND**

The following facts are taken from the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws and Jury Demand ("the Amended Complaint"), [Doc. 37], and are taken as true for purposes of this Order.

***The Parties.***  Defendant Bryan Leach ("Mr. Leach") founded Defendant Ibotta, Inc. ("Ibotta") in 2011.  [*Id.* at ¶ 22].  Plaintiff Mark Tcherkezian ("Plaintiff" or "Mr. Tcherkezian") brings this lawsuit against 18 Defendants "on behalf of a class consisting of all persons and entities that purchased or otherwise acquired shares of Ibotta common stock between April 18, 2024 and February 27, 2025, both dates inclusive (the 'Class Period')."  [*Id.* at ¶ 2].  Plaintiff's claims "arise[] out of material misrepresentations and omissions contained in defective Offering Documents issued in connection with Ibotta's April 2024 IPO," as well as certain Defendants' "subsequent, post-IPO materially false or misleading statements made during the Class Period."  [*Id.* at ¶ 4].

In addition to Mr. Leach and Ibotta, Plaintiff asserts claims against Sunit Patel ("Mr. Patel"), Ibotta's former Chief Financial Officer, [*id.* at ¶ 23], and six Ibotta directors: Stephen Bailey, Amanda Baldwin, Amit Doshi ("Mr. Doshi"), Thomas Lehrman ("Mr. Lehrman"), Valarie Sheppard, and Larry Sonsini (collectively with Mr. Leach, the "Individual Defendants"), [*id.* at ¶¶ 24–29].  Mr. Tcherkezian also raises claims against nine entities that served as underwriters in Ibotta's IPO:  Goldman Sachs & Co. LLC; Citigroup Global Markets Inc.; BofA Securities, Inc.; Evercore Group L.L.C.; UBS Securities LLC; Wells Fargo Securities, LLC; Citizens JMP Securities, LLC; Needham & Company, LLC; Raymond James & Associates, Inc.  [*Id.* at ¶¶ 32–40].

***Ibotta's Business, Generally.***  Ibotta is "a digital-promotions company that allows

its clients (largely consumer-packaged-goods brands) to deliver digital promotions to consumers through Ibotta's marquee product, a digital network called the Ibotta Performance Network ('IPN')." [*Id.* at ¶ 5]. Ibotta began as a direct-to-consumer mobile app, and the IPN was introduced in 2020. [*Id.* at ¶¶ 50–51]. The IPN is an "[artificial intelligence]-enabled technology platform" that allows "[consumer-packaged-goods] brands to deliver digital promotions to consumers via a network of publishers, in a coordinated fashion and on a fee-per-sale basis." [*Id.* at ¶ 52 (alterations in original and footnote omitted)]. The IPN includes Ibotta's own platforms and "various third-party-publisher properties," such as Walmart, Dollar General, and Kroger, which "host[] Ibotta-sourced offers on [their own] digital properties." [*Id.* at ¶¶ 54–55]. "Using data collected from the IPN—such as whether and when a consumer purchased a product on promotion—Ibotta's clients can monitor the performance of their promotions on an ongoing basis." [*Id.* at ¶ 59].

Ibotta tracks its growth using "several key performance metrics": (1) the number of "redemptions," or "verified purchase[s] of an item qualifying for an offer by a client on the IPN," (2) the number of "redeemers," or "consumer[s] who ha[ve] redeemed at least one digital offer within the quarter," (3) redemptions per redeemer, and (4) redemption revenue per redemption. [*Id.* at ¶¶ 61–62]. Ibotta generates revenue through (1) fees charged for each redemption and (2) client advertisements on Ibotta's direct-to-consumer platforms. [*Id.* at ¶¶ 63–64]. Advertising revenue is "exclusively derived from [Ibotta's] direct-to-consumer platform," rather than its third-party-publisher segment. [*Id.* at ¶ 65]. "Throughout the Class Period, Defendants presented Ibotta's growth in number of redeemers as the driver of growth in the Company's revenue." [*Id.* at ¶ 66]. But after the

IPO, Ibotta's third-party-publisher revenue "cannibalized direct-to-consumer revenue," which caused advertising revenue to "plummet[]."  [*Id.* at ¶ 69].

***Defendants' Alleged Misstatements.***[1]    Mr. Tcherkezian alleges that Ibotta's Offering Documents[2] contain three categories of materially false or misleading statements or omissions:   (1) statements "about the real-time nature of Ibotta's technology"; (2) statements about "the non-existence of fraudulent transactions on Ibotta's platforms"; and (3) statements about "Ibotta's watershed changes to its business model."  [*Id.* at ¶ 127].

First, Plaintiff alleges that the Offering Documents "repeatedly claimed that Ibotta's data-measurement technology . . . was capable of tracking consumer behavior in real time," which would permit clients "to track the performance of their promotional campaigns . . . in real time."  [*Id.* at ¶ 128]; *see also* [*id.* at ¶¶ 129, 131, 133].  Plaintiff claims that these statements were materially false or misleading because, at the time the statements were made, consumer redemption data was not available in "real time."  *See, e.g.*, [*id.* at ¶¶ 130, 132].   Second, the Prospectus referenced Ibotta's "sophisticated anti-fraud systems" and touted that the systems "work to prevent third parties from committing fraudulent activities such as improperly claiming referral discounts or submitting counterfeit receipts to improperly claim cash back rewards."  [*Id.* at ¶ 136]; *see also* [*id.* at ¶ 138].  Plaintiff claims that these statements were false or misleading because Ibotta's anti-fraud measures were not capable of detecting fraud in the way Ibotta claimed and

---

[1] Mr. Tcherkezian alleges the existence of approximately 21 allegedly false or misleading statements.  The Court has reviewed each allegation but provides only a summary of the statements here.

[2] "Offering Documents" refers to the Prospectus and the Registration Statement.  [Doc. 37 at ¶ 2].

misleadingly framed the risk of fraud as hypothetical.  *See, e.g.*, [*id.* at ¶¶ 137–39].  And third, although Defendants knew that "knew that Ibotta's trajectory of increased reliance on the third-party publishers would actively cannibalize direct-to-consumer revenue (both redemptions and advertising)," they presented this risk as "purely hypothetical" in the Offering Documents, despite the fact that Ibotta's direct-to-consumer growth was already slowing down.  [*Id.* at ¶¶ 145, 151–52].

Mr. Tcherkezian also alleges that, during the Class Period, certain Defendants made repeated false or misleading statements about Ibotta's growth in redeemers, client budgets, and fraud risks "to maintain the artificial inflation in Ibotta's stock price as long as possible."  [*Id.* at ¶¶ 156–57]; *see also* [*id.* at ¶¶ 158–88].

***Post-IPO Events.***  Ibotta launched its IPO on April 18, 2024.  [*Id.* at ¶ 71].  A few days after the IPO, three named Defendants—Mr. Leach, Mr. Lehrman, and Mr. Doshi— sold tens of millions of dollars' worth of Ibotta stock.  [*Id.* at ¶ 122].  Mr. Lehrman and Mr. Doshi continued to sell Ibotta common stock throughout the Class Period.  [*Id.* at ¶¶ 124– 26].  Then, about three months after the IPO, Ibotta's Chief Revenue Officer, Chris Jensen ("Mr. Jensen"), abruptly departed from the company.  [*Id.* at ¶¶ 115–16].  Ibotta did not announce Mr. Jensen's departure and did not name a new chief revenue officer until December 23, 2024.  [*Id.* at ¶¶ 118–19].

After Mr. Jensen's departure, "many sales personnel followed."  [*Id.* at ¶ 120].  One employee reported "a sharp and sudden increase in turnover among employees after the IPO," estimating a 75% "turnover rate."  [*Id.* at ¶ 111]; *see also, e.g.*, [*id.* at ¶ 166 ("[T]he sales team was diminishing as a result of increasing turnover and ongoing reorganizations at the Company. . . .  A substantial part of the existing, increasing turnover

5

and reorganization related to CRO Jensen's sudden departure under suspicious circumstances . . . without a temporary or permanent replacement.")].

In August 2024, Ibotta disclosed that its second quarter 2024 direct-to-consumer redemption revenue had declined 13% year-over-year, its second quarter 2024 direct-to-consumer advertising revenue had declined 27% year-over-year, and the number of direct-to-consumer redeemers in second quarter 2024 had declined 13% year-over-year. [*Id.* at ¶ 190]. Ibotta's stock price then fell 26.7%. [*Id.* at ¶ 193]. Ibotta disclosed additional declines in revenue in November 2024, [*id.* at ¶ 194], and Ibotta's stock price fell another 12.5%, [*id.* at ¶ 200]. Ibotta reported additional revenue reductions in February 2025, [*id.* at ¶¶ 201–02], and also reported, for the first time, that it had experienced fraudulent activity from Ibotta users, [*id.* at ¶ 209]. Ibotta's stock price fell another 46.1%. [*Id.* at ¶ 211]. On March 14, 2025, Mr. Patel "abruptly resigned from his position as the Company's CFO." [*Id.* at ¶ 215].

This lawsuit was filed on April 17, 2025. [Doc. 1]. On June 16, 2025, Mr. Tcherkezian moved to consolidate this case with *Valentine v. Ibotta, Inc.*, No. 25-cv-01615-NYW-SBP (D. Colo.), to appoint him as Lead Plaintiff in the consolidated action, and to appoint Lead Counsel. [Doc. 18]. This Court granted those requests on July 31, 2025. [Doc. 27].

Mr. Tcherkezian filed the Amended Complaint on October 15, 2025, raising six claims against various Defendants. [Doc. 37]. First, he asserts three claims under the Securities Act of 1933 (the "Securities Act Claims"): (1) one claim alleging a violation of Section 11, asserted against all Defendants ("Count One"), [*id.* at ¶¶ 239–50]; (2) a claim alleging a violation of Section 12(a)(2), asserted against all Defendants ("Count Two"),

6

[*id.* at ¶¶ 251–55]; and (3) a claim alleging a violation of Section 15, asserted against the Individual Defendants ("Count Three"), [*id.* at ¶¶ 256–59]. He also brings three claims under the Securities Exchange Act of 1934 (the "Exchange Act Claims"): (4) one claim alleging a violation of Section 10(b) of the Exchange Act and Rule 10b-5, asserted against Ibotta, Mr. Leach, and Mr. Patel ("Count Four"), [*id.* at ¶¶ 260–72];[3] (5) another claim alleging a violation of Section 20(a), asserted against Mr. Leach and Mr. Patel ("Count Five"), [*id.* at ¶¶ 273–78]; and (6) one claim alleging a violation of Section 20A, asserted against Mr. Lehrman ("Count Six"), [*id.* at ¶¶ 279–87]. Defendants move to dismiss all of Plaintiff's claims with prejudice. [Doc. 41].

## LEGAL STANDARDS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

---

[3] The Amended Complaint states that Count Four is also asserted against Mr. Lehrman. [Doc. 37 at ¶ 261]. In his Response, Plaintiff clarifies that although "Lehrman is . . . cited as an 'Exchange Act Defendant' in the [Amended] Complaint, that is only for the §20A claim," i.e., Count Six. [Doc. 45 at 21 n.3]. The Court accepts Plaintiff's clarification and construes Count Four as asserted against Ibotta, Mr. Leach, and Mr. Patel.

## ANALYSIS

### I.    Securities Act Claims

#### A.    Count One:  Section 11

Section 11 provides, in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [certain enumerated parties connected to the registration statement].

15 U.S.C. § 77k(a).  "To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023).  So, to state a claim under Section 11, the plaintiff must "plead . . . that he purchased shares traceable to the allegedly defective registration statement."  *Id.* at 770.

Defendants move to dismiss Count One on the basis that Plaintiff fails to plausibly allege traceability.  [Doc. 41 at 18–21].[4]  This "statutory standing" challenge is reviewed using Rule 12(b)(6) standards rather than jurisdictional ones.  *See In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 755 & n.7 (1st Cir. 2016); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109 (9th Cir. 2013) ("[F]ailure to allege statutory standing results in failure to state a claim on which relief can be granted, not the absence of subject matter jurisdiction.").

---

[4] When the Court refers to filings on the docket, the Court cites to the docket number and page numbers generated by the CM/ECF system, as opposed to the page numbers assigned by the Parties.

Plaintiff alleges that he brings this action on "behalf of a class consisting of all persons and entities that purchased or otherwise acquired Ibotta common stock between April 18, 2024 and February 27, 2025, both dates inclusive, including in, pursuant to, and/or traceable to the Offering, and were damaged thereby." [Doc. 37 at ¶ 233]; *see also* [*id.* at ¶ 2]. In Plaintiff's view, this allegation is sufficient to plausibly allege statutory standing. *See* [Doc. 45 at 43–44]. In support, he relies on a single case from the Western District of Oklahoma in which the court determined that "[a]s a general rule, statutory standing is sufficiently pled where the plaintiff alleges that he purchased stock 'in' the offering or 'pursuant to' the offering, or that his purchase is 'traceable to' the subject offering." *Northumberland Cnty. Ret. Sys. v. Kenworthy*, No. 11-cv-00520-D, 2013 WL 5230000, at *6 (W.D. Okla. Sept. 16, 2013); *see also* [Doc. 45 at 43–44]. Defendants disagree, arguing that Plaintiff's allegation is "the exact sort of bare allegation[] that *Twombly* and other Supreme Court precedents direct courts not to consider at the pleading stage." [Doc. 41 at 19 (cleaned up)].

Neither the Tenth Circuit nor the Supreme Court have specified what type of allegations are necessary to plausibly plead traceability for purposes of a Section 11 claim, but there is sufficient binding precedent establishing that "'a formulaic recitation of the elements of a cause of action' will not suffice" to state a claim. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "[A] plaintiff must offer sufficient *factual allegations* to 'raise a right to relief above the speculative level,'" *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555) (emphasis added), and "naked assertions devoid of further factual enhancement" do not meet this requirement, *VDARE Found. v.*

9

*City of Colorado Springs*, 11 F.4th 1151, 1173 (10th Cir. 2021) (cleaned up).  A court "need not accept conclusory allegations without supporting factual averments."  *Id.* at 1159 (quotation omitted).

In the Section 11 context, the First Circuit rejected an argument similar to the one Plaintiff raises here, finding that the "contention that general allegations of traceability, without more, are sufficient at the pleading stage" was "difficult to square with" the pleading standards articulated in *Twombly* and *Iqbal*.  *Ariad Pharms.*, 842 F.3d at 756.  It concluded that "a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element" and is insufficient, without more, to plausibly allege traceability.  *Id.*  Recently, another court in this District followed the *Ariad Pharmaceuticals* decision and concluded that "bare allegations to the effect that [p]laintiffs purchased securities traceable to or pursuant to the allegedly defective registration statement are insufficient."  *Cupat v. Palantir Techs., Inc.*, No. 22-cv-02384-GPG-SBP, 2025 WL 1141534, at *15 (D. Colo. Apr. 4, 2025), *appeal docketed sub nom.*, *Cal. Pub. Emps.' Ret. Sys. v. Palantir Techs. Inc.*, No. 25-1178 (10th Cir. May 6, 2025).

Plaintiff argues that neither *Slack* nor *Cupat* require him to provide more specific traceability allegations because those cases "involved 'direct listings,' where issuers go public without using underwriters, and shares of existing shareholders are sold directly to the public," whereas this case involves a traditional IPO.  [Doc. 45 at 44].  But nothing in *Slack* or *Cupat* cabins those decisions' applicability to direct-listing cases alone. Moreover, this Court remains bound by *Twombly*, which makes clear that a complaint must include "enough *facts* to state a claim to relief that is plausible on its face."  550 U.S.

at 570 (emphasis added).  Those facts are missing here.  *See generally* [Doc. 37].  The conclusory allegation that Plaintiff brings this lawsuit "on behalf of a class" of persons who "purchased or otherwise acquired common stock . . . pursuant to[] and/or traceable to the Offering," *see* [*id.* at ¶ 233], *without any supporting factual averments*, is insufficient to plausibly allege that Plaintiff's shares are traceable to the Offering, *see Cupat*, 2025 WL 1141534, at *15 (finding similar allegations were "conclusory," "logically equivalent to the allegation 'Plaintiffs have statutory standing,'" and "the exact sort [of allegations] that binding Supreme Court precedent directs courts not to consider at the pleading stage"); *Ariad Pharms.*, 842 F.3d at 756; *VDARE*, 11 F.4th at 1173.

The Court respectfully agrees with Defendants that the Amended Complaint contains insufficient factual allegations to plausibly allege that Plaintiff's shares are traceable to the Offering.  Because traceability is an essential element of a Section 11 claim, *Slack*, 598 U.S. at 768; *Ariad Pharms.*, 842 F.3d at 756, Plaintiff has not stated a Section 11 claim under Rule 12(b)(6).

Defendants also argue that Plaintiff "cannot cure his deficient pleading," so Count One should be dismissed with prejudice.  [Doc. 41 at 20, 48].  At oral argument, Plaintiff "request[ed] leave to amend" and argued that he could "add allegations [and] additional facts about the lock-up period in question."  [Doc. 52 at 23:13–18]; *see also* [Doc. 45 at 45 n.14 ("[I]f the Court grants the Motion in whole or in part, Plaintiff requests leave to amend.")].  Consistent with its standard practice, the Court declines to grant leave to amend without a formal written motion requesting that relief.  *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").  Indeed, "[a] district court may deny leave

11

to amend when a plaintiff fails to file a written motion and instead merely suggests she should be allowed to amend if the court concludes her pleadings are infirm." *Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020) (quotation omitted).

On the other hand, the Court declines to rule that Plaintiff's pleading deficiency is incurable, as Defendants request. The Court cannot determine whether amendment would be futile without knowing the new factual allegations Plaintiff would or could present. *Cf.* D.C.COLO.LCivR 15.1(b) (requiring a party seeking leave to amend to attach a red-lined version of the proposed new pleading). Accordingly, the Motion to Dismiss is **GRANTED** as to Count One, and Count One is **DISMISSED without prejudice** under Rule 12(b)(6).

### B.    Count Two:  Section 12(a)(2)

Defendants also move to dismiss Count Two based on Plaintiff's failure to adequately alleged traceability. [Doc. 41 at 33]. "Section 12(a)(2) of the Securities Act provides essentially the same cause of action as § 11, but applies it to persons who use material misstatements or omissions in 'a prospectus or oral communication' in an offer or sale of a security." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1156–57 (D. Colo. 2012) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). "[S]ection 12(a)(2) imposes the same traceability requirement as section 11." *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1192 (9th Cir. 2025). Because Plaintiff has not adequately alleged facts plausibly establishing traceability, his Section 12(a)(2) claim fails for the same reason his Section 11 claim does. Accordingly, the Motion to Dismiss is **GRANTED** with respect to Count Two, which is **DISMISSED without prejudice**.

### C.    Count Three:  Section 15

"Sections 11 and 12(a)(2) [of the Securities Act] impose primary liability for materially false or misleading statements in offering materials, while Section 15 imposes derivative control-person liability."  *Wong v. Hesai Grp.*, 821 F. Supp. 3d 445, 459 (S.D.N.Y. 2026); *see also* 15 U.S.C. § 77*o*.  "Liability under Section 15 is derivative, so where a plaintiff fails to allege a Section 11 or 12 claim that will survive dismissal and, therefore, fails to state a primary violation, the plaintiff's control person allegation must also be dismissed."  *Gaynor v. Miller*, 273 F. Supp. 3d 848, 871–72 (E.D. Tenn. 2017); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 760 (S.D.N.Y. 2012) ("A claim under Section 15 . . . can only succeed if a plaintiff can first demonstrate liability under Section 11 or Section 12.").  Because Plaintiff has not stated a plausible claim under Sections 11 or 12, he cannot state a plausible claim under Section 15.  Accordingly, the Motion to Dismiss is **GRANTED** as to Count Three.  Count Three is **DISMISSED without prejudice**.  *Cupat*, 2025 WL 1141534, at *19.

## II.    Exchange Act Claims

### A.    Count Four:  Section 10(b) and Rule 10b-5

Count Four is asserted against Ibotta, Mr. Leach, and Mr. Patel.  [Doc. 37 at ¶ 261]; *supra* note 3.  Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  The statute creates "a right of action to purchasers or sellers of securities injured by its violation."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007).  To state a claim under Section 10(b) and Rule 10b-5, the

plaintiff must allege:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (quotation omitted). Defendants argue that Mr. Tcherkezian's Section 10 claim should be dismissed because, among other reasons, his allegations are insufficient to plead a "strong inference" of scienter. [Doc. 41 at 41–46].[5]

"Scienter is a mental state embracing [1] intent to deceive, manipulate, or defraud," or [2] recklessness." *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1258–59 (10th Cir. 2022) (cleaned up). "Recklessness is conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quotation omitted). For claims based on the alleged omission of a material fact,

---

[5] Defendants also move to dismiss this claim, and others, on the basis that the challenged statements were not materially false or misleading. *See* [Doc. 41 at 34–41]. In the Court's view, many of Defendants' arguments ask the Court to view the allegations in *Defendants'* favor, which the Court cannot do when reviewing a motion under Rule 12(b)(6). *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1261 (10th Cir. 2022) (recognizing that although the PSLRA imposes heightened pleading requirements, courts "must first apply general pleading standards when evaluating the underlying factual allegations" and must construe allegations in the plaintiff's favor). Because the Court finds the element of scienter to be dispositive, it need not reach whether Plaintiff has sufficiently alleged the existence of a false or misleading statement. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1112 (10th Cir. 2015) (declining to reach whether the plaintiff "ha[d] met the high standard of the PSLRA for pleading with particularity the existence of some materially misleading statements or omissions" and instead affirming dismissal for failure to adequately plead scienter).

the plaintiff must allege facts establishing "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1200–01 (10th Cir. 2015) (quotation omitted). Allegations establishing negligence or gross negligence are insufficient; recklessness is "something akin to conscious disregard." *Level 3 Commc'ns*, 667 F.3d at 1343 n.12 (quotation omitted).

Count Four is governed by the Private Securities Litigation Reform Act ("PSLRA"), "which imposes a heightened standard for pleading the element of scienter." *Smallen v. W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020). This "heavy burden" requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind in violating the securities laws." *Id.* (cleaned up). "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc.*, 551 U.S. at 323–24. The inference "'need not be irrefutable, i.e., of the "smoking-gun" genre,' [but] it 'must be more than merely plausible or reasonable.'" *Smallen*, 950 F.3d at 1305 (quoting *Tellabs, Inc.*, 551 U.S. at 324). The Court considers Plaintiff's allegations in their its entirety and must decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 323.

In addition, a plaintiff asserting a claim under Section 10 "must, '*with respect to each act or omission alleged* . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Level 3 Commc'ns*,

15

667 F.3d at 1333 (alteration in original and emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)).  In other words, the complaint "must allege facts supporting a strong inference of scienter for *each defendant* with respect to *each violation*."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis added) (quotation omitted); *see also Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) ("[T]o allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement.").  The Parties do not frame their arguments in this way, instead grouping the scienter allegations into various categories.  *See* [Doc. 41 at 41–46; Doc. 45 at 37–43].  Following "the principle of party presentation," the Court will follow the Parties' approach and will not sua sponte attempt to ascertain the connection between each alleged misstatement, each defendant, and the potential corresponding applicable scienter allegations. *Lingam v. Dish Network Corp.*, 167 F.4th 1094, 1107 (10th Cir. 2026) (quotation omitted).

Plaintiff directs the Court to several categories of allegations that he argues establish a strong inference of scienter when considered together.  [Doc. 45 at 37–43].  Specifically, he relies on the following:  (1) Mr. Leach's and Mr. Patel's "knowledge of and access to contrary facts," [*id.* at 37–39 (emphasis omitted and capitalization altered)]; (2) Mr. Leach's and Mr. Patel's "admissions at the end of the Class Period," [*id.* at 39–40]; (3) officer departures, [*id.* at 40–41]; and (4) Defendants' stock sales, [*id.* at 41–42].  Consistent with Tenth Circuit authority, the Court discusses each category of allegations individually before ultimately evaluating all of Plaintiff's allegations holistically.  *Smallen*, 950 F.3d at 1306; *Zagg, Inc.*, 797 F.3d at 1203.

### 1.    Access to Contrary Information

Plaintiff argues that that Mr. Leach and Mr. Patel had access to information that was contrary to their public statements, which is indicative of scienter.  [Doc. 45 at 37]. At the outset, the Court notes that the Tenth Circuit recently stated that "it would make little sense to draw a strong inference of scienter from access to information."  *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1217 (10th Cir. 2023).  "If access alone were enough, a strong inference of scienter would exist for high-level executives whenever they make a public statement contradicting something in the company's files."  *Id.*   Therefore, a plaintiff must "allege facts with particularity showing not only the executive's access to contradictory information but also the executive's fraudulent intent or reckless disregard of accessible information."  *Id.*; *see also City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) ("[A]llegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud.").  With this in mind, the Court turns to Plaintiff's arguments.

***Meeting Attendance.***  First, Mr. Tcherkezian argues that Mr. Leach "had access to" information suggesting that "all the challenged statements" were materially inaccurate. [Doc. 45 at 37–38].  Specifically, he states that Mr. Leach "attended regular meetings . . . where [Ibotta] discussed its data-technology tools that underpinned its promotional campaign management products, as well as Ibotta's anti-fraud practices and policies and instances of user fraud."  [*Id.* at 38 (citing Doc. 37 at ¶¶ 77–79, 82–83, 96–97)].

Plaintiff's global reference to "all of the challenged statements" does not materially assist the Court in assessing the strength of his scienter allegations. *See Mizzaro*, 544 F.3d at 1238. Moreover, the Court observes that some of the cited allegations refer to the meeting attendance of upper-level management generally, not Mr. Leach specifically. *See, e.g.*, [Doc. 37 at ¶ 77 ("FE-1 frequently attended meetings with management where they discussed data-analytics and data-measurement projects in relation to client development and efforts to increase sales revenue."); *id.* at ¶ 82 ("FE-3 attended twice-weekly meetings attended by C-suite and Vice-President-and-above-level personnel, at which attendees discussed matters pertaining to client data requests and other aspects of FE-3's department's data structuring and integration work.")]. These generalized allegations do not plausibly establish any particular knowledge on the part of Mr. Leach. *Cf. TDC Lending LLC v. Priv. Cap. Grp., Inc.*, 340 F. Supp. 3d 1218, 1227 (D. Utah 2018) (recognizing that group pleading is "incompatible with the purpose of the PSLRA").

Focusing on the allegations specific to Mr. Leach, Plaintiff alleges that, at one meeting, "Defendant Leach declared that 'ad-spend is dead' and 'we're not doing that anymore,'" [Doc. 37 at ¶ 79], and that "FE-4 attended weekly departmental roundtable meetings every Tuesday, which Defendant Leach frequently attended, at which FE-4's team presented updates (frequently as long as 30 minutes) on fraud attacks and losses," [*id.* at ¶ 96]. Although Plaintiff then goes on to allege the "numerous types of fraudulent activity that plagued Ibotta," *see* [*id.* at ¶¶ 98–101], he does not allege what specific "updates . . . on fraud attacks and losses" that Mr. Leach was allegedly privy to, *see* [*id.* at ¶ 96]; *see also Ellington v. Paragon 28, Inc.*, No. 24-cv-02712-PAB-TPO, 2026 WL 811109, at *8 (D. Colo. Mar. 24, 2026) ("While plaintiff alleges that inventory management

18

issues were discussed in the call, plaintiff does not allege any details of what Mr. DaCosta was told or if he was informed of the full extent of Paragon's inventory tracking issues. . . . Thus, the Court cannot determine from these allegations what specific knowledge Mr. DaCosta had regarding the inventory issues."); *cf. Meitav Dash*, 79 F.4th at 1216 ("[I]t's not enough for the plaintiffs to allege briefings to a speaker on the underlying data or the speaker's access to internal reports."). Furthermore, Plaintiff does not tie Mr. Leach's statement about "ad-spend" to any alleged misstatement or omission. *See* [Doc. 45 at 37–38]. Without specific allegations setting out what exactly Mr. Leach knew, the Court finds that these allegations do not meaningfully contribute to an inference of scienter, given that "mere attendance at meetings does not contribute to an inference of scienter." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016); *see also RJ&CS SC Holdings, LLC v. Dr. Randy E. Woodward DC, PC*, No. 2:23-cv-000127-DBB-DAO, 2023 WL 5646158, at *8 (D. Utah Aug. 31, 2023) (general allegations that defendants "were aware" of information were insufficient to meet the PSLRA heightened pleading standard).

Similarly, Mr. Tcherkezian also asserts that "[o]ne can . . . strongly infer" that Mr. Leach was aware of Mr. Jensen's departure from the company, the departures of Ibotta sales personnel, and "the related sales force problems." [Doc. 45 at 38]. This argument is not tied to any particular statement or omission. *See* [*id.*]. And again, the allegations cited in support do not reference Mr. Leach specifically, so as to plausibly establish his knowledge. *See* [Doc. 37 at ¶¶ 110–13]. To the extent Plaintiff suggests that Mr. Leach had such knowledge due to his position at the company, the Tenth Circuit has "rejected the notion that knowledge may be imputed solely from an individual's position within a

19

company." *Zagg, Inc.*, 797 F.3d at 1205 (quotation omitted).

**Concealment of Mr. Jensen's Exit.** Mr. Tcherkezian also asserts that Defendants "deliberately decided to try to hide Jensen's departure as CRO by not even mentioning it until a month after he left," which he says is "highly suspicious conduct indicating a desire to hide even bigger problems." [Doc. 45 at 38]. However, references to "Defendants" collectively, without specific allegations attributable to any particular Defendant, "do[] little to move the ball on scienter." *Cupat*, 2025 WL 1141534, at *8; *see also TDC Lending LLC*, 340 F. Supp. 3d at 1227. Moreover, Plaintiff does not connect the alleged concealment of Mr. Jensen's departure to any specific allegations of fraud, *see* [Doc. 37 at ¶¶ 118–20; Doc. 45 at 38–39], or allege that any specific Defendants knew or should have known that a delay in disclosure of Mr. Jensen's departure "present[ed] a danger of misleading buyers or sellers," *Zagg, Inc.*, 797 F.3d at 1201 (quotation omitted). Plaintiff's speculative insistence that the alleged concealment is indicative of fraud does not support a "cogent and compelling" inference of scienter. *Tellabs, Inc.*, 551 U.S. at 324.

**Misleading Statements about Growth.** Finally, Mr. Tcherkezian also contends that scienter can be established through a review of Mr. Leach's and Mr. Patel's alleged misleading statements and corresponding behavior. Specifically, he contends that Mr. Leach and Mr. Patel made misleading statements "about growth in redeemers and client-budget demand throughout the Class Period." [Doc. 45 at 39]. He argues that these executives "repeatedly emphasized to analysts and investors that those factors were the primary drivers of Ibotta's growth" and "selectively disclosed cherry-picked positive news about clients that intended to expand their budgets, without qualifying their statements

20

with the contrary, material, adverse and then-existing information they had." [*Id.* (cleaned

up)]. Plaintiff argues that this behavior shows that Mr. Leach and Mr. Patel acted "with at

least reckless disregard" of the danger of misleading investors. [*Id.* (quotation omitted)].

In support of this argument, Plaintiff relies on the Tenth Circuit's decision in

*Pluralsight*. *See* [*id.*]. In *Pluralsight*, the Tenth Circuit's scienter analysis was limited to

one alleged misstatement, made by the defendant company's CFO, that the company

"ha[d] about 250 quota-bearing sales representatives" in January 2019. 45 F.4th at 1259

("[T]he district court correctly determined [that] Plaintiffs adequately alleged one

misleading statement of material fact . . . . Our scienter analysis thus focuses on this one

statement."). The Tenth Circuit concluded that the plaintiffs' allegations, considered

holistically, were sufficient to establish a strong inference of the CFO's scienter. *See id.*

at 1260–69. First, the CFO made remarks in July 2019 and January 2020 suggesting

that he knew in January 2019 that his prior statement was false. *Id.* at 1260–61 ("[The

CFO] never claimed he was unaware of the problem—rather, he provided a justification

for his misrepresentations: 'We were still hitting our numbers.'"). Second, the CFO had

assured investors that he had reviewed and closely monitored the company's sales force

numbers. *Id.* at 1263. In reviewing this category of allegations, the Tenth Circuit noted

that the company's number of sales representatives was "a *single objectively verifiable*

*data point* that [the company] considered part of its key business metric, that [the CFO]

repeatedly represented he monitored, and that he regularly reported to investors and

analysts," and concluded that "[u]nder [those] circumstances, it [was] reasonable to infer"

that the CFO knew the company did not have 250 sales representatives when he said it

did. *Id.* at 1264 (emphasis added). Third, the CFO made statements to investors that the

size of the company's sales force "was at the core of [its] business model," and he knew investors relied on those representations. *Id.*

The Tenth Circuit concluded that these allegations—which contained facts suggesting that the CFO *knew* that his statements were false at the time they were made—along with allegations of suspicious trading, *id.* at 1264–67, were sufficient to establish a compelling inference of scienter, *id.* at 1267–69. As another district court has described it, "*Pluralsight* . . . is a case about subsequent statements revealing the existence of a problem, the reasons for not disclosing the problem at an earlier time, and the approximate time that the problem was likely to have been known." *El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 709 F. Supp. 3d 1296, 1346 (D. Colo. 2023).

The allegations in this case do not rise to the level of those in *Pluralsight*. First, Plaintiff's assertion that Mr. Leach and Mr. Patel "repeatedly emphasized to analysts and investors that [growth in redeemers and client-budget demand] were the primary drivers of Ibotta's growth," [Doc. 45 at 39 (cleaned up)], is not supported by citations to the Amended Complaint, *see* [*id.*]. Second, Plaintiff's contention that Mr. Leach and Mr. Patel "selectively disclosed cherry-picked positive news about clients that intended to expand their budgets" is not supported by the allegations cited in support. [*Id.* (citing Doc. 37 at ¶¶ 169–70)]. In those paragraphs, Plaintiff alleges that Mr. Leach and Mr. Patel made the following misleading statements on an August 13, 2024 earnings call:

- Mr. Leach: "First, we expand budgets within the CPG universe. The thing we've seen over the last 12 years consistently is that advertisers want to capitalize on large and growing audiences. And so as the overall redeemer audience on our network grows, so too is the interest in getting out in front of the audience very high. . ."

22

- Mr. Patel: "[W]e are seeing interest pick up a lot with our clients just here in this month. So over time, we've not had that issue that audiences have grown. We've generally been able to grow our budgets with our clients without much of a problem."

[Doc. 37 at ¶ 169].[6] The general assertions about past experiences and "seeing [client] interest pick up" do not plausibly fit within Plaintiff's framing of the statements—i.e., that through these statements, Mr. Patel and Mr. Leach "selectively disclosed cherry-picked positive news about clients that intended to expand their budgets." [Doc. 45 at 39].

The Court views the allegations highlighted by Plaintiff more akin to those presented in *Anderson*. In *Anderson*, the defendant made several positive statements about an ongoing project, including that the company "continue[d] to see progress," "continue[d] to improve its unit-cost performance as planned," was "doing reasonably well in meeting [its] plan," and was "seeing improvement on all of the component parts for the . . . project." 827 F.3d at 1247. At the time executives made those statements, "a recovery plan was already underway to bring the delivery schedule up to date with initial forecasts for the . . . project." *Id.* at 1247–48. The plaintiffs argued that the existence of the recovery plan demonstrated that the executives "knew that their subsequent representations about the . . . project were false or misleading." *Id.* at 1247.

The Tenth Circuit disagreed. After comparing the parties' "dual explanations for [the] overly optimistic reports on the status of the" project, the Tenth Circuit concluded that the plaintiffs' theory "presupposes that [the] executives knew that the recovery plan could not accomplish the plan's stated objectives," but there was "nothing in the complaint

---

[6] Because these allegations are the only allegations Plaintiff cites in support for this assertion, *see* [Doc. 45 at 39 (citing Doc. 37 at ¶¶ 169–70)], the Court limits its analysis to these alleged statements.

to support that logical leap." *Id.* at 1248. Rather, the Tenth Circuit concluded that the "stronger inference [was] that the . . . executives thought that they had identified a better way of doing things," and found the defendants' "innocent inference" to be "more cogent and compelling than the plaintiffs' scienter inference." *Id.* (quotation omitted).

Indeed, in reviewing Plaintiff's allegations, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc.*, 551 U.S. at 324. The statements highlighted by Plaintiff here are more generalized outlook statements, like *Anderson*, as opposed to statements concerning an "objectively verifiable data point," like *Pluralsight*. *See In re MGP Ingredients, Inc. Sec. Litig.*, No. 20-cv-02090-DDC-JPO, 2021 WL 3885655, at *14 (D. Kan. Aug. 31, 2021) (finding statements that lacked "concrete certainly" did not "manifest anything more than . . . corporate optimism"). The innocent explanation here is that despite whatever struggles Ibotta faced with client growth and/or budget exhaustion, Mr. Leach and Mr. Patel were "overly optimistic" about the company's growth going forward based on Ibotta's past experience "grow[ing] [its] budgets with [its] clients without much of a problem." [Doc. 37 at ¶ 169]; *see also Smallen*, 950 F.3d at 1312 (finding allegations of scienter insufficient where the allegations "demonstrate[d] the Individual Defendants were too optimistic about Western Union's compliance systems and failed to give adequate weight to certain red flags, such as pending government investigations, at the time they made their alleged misstatements"); *Lingam*, 167 F.4th at 1111 ("The DISH Executives' awareness of the 2020 validation test's limited nature does not impeach their hope to launch service in Las Vegas by the end of 3Q 2021. It falls far short of establishing intent to deceive, manipulate, or defraud investors."); *MGP Ingredients*, 2021 WL

3885655, at *13 (the fact that growth strategy failed does not mean that the defendants "*knew* all along that the plan would fail").

***Core Operations Doctrine.*** Plaintiff alleges in the Amended Complaint that "[t]he critical importance of the subjects of Defendants' materially false or misleading statements . . . to Ibotta's business, growth, and core operations throughout the Class Period are further indicative of scienter." [Doc. 37 at ¶¶ 217–18]. Defendants construe this as an attempt to establish scienter using the "core operations" doctrine. [Doc. 41 at 46]. This doctrine encompasses "the principle that it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers." *Bouzaglo v. Inspirato Inc.*, No. 23-cv-00438-RMR-SBP, 2025 WL 3241763, at *5 (D. Colo. Sept. 29, 2025) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781 (9th Cir. 2008)). It applies "where the nature of the alleged fraud was of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *In re Molson Coors Beverage Co. Sec. Litig.*, No. 19-cv-00455-DME-MEH, 2020 WL 13499995, at *8 (D. Colo. Dec. 2, 2020) (cleaned up).

Plaintiff argues that "given [Mr. Leach's and Mr. Patel's] prominent positions at the Company, their repeated statements to investors, and that Ibotta had only one 'core operation'—its digital promotions—'it would be "absurd" to suggest' they did not know about the true problems afflicting the Company . . . that contradicted their statements." [Doc. 45 at 43 (quoting *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016))].[7] However, the Court "cannot infer scienter based only on a defendant's

---

[7] The Parties both address the core operations doctrine as a standalone factor that might be indicative of scienter. *See* [Doc. 41 at 46; Doc. 45 at 43]. Because the core operations doctrine requires additional particularized facts aside from mere reliance on the

position in a company or involvement with a particular project." *Anderson*, 827 F.3d at

1245. "[A]dditional particularized facts are necessary for an inference of scienter." *Id.* If

"a complaint relies on allegations that management had an important role in the company

but does not contain additional detailed allegations about the defendants' actual exposure

to information, it will usually fall short of the PSLRA standards." *S. Ferry LP*, 542 F.3d at

784.

Plaintiff does not direct the Court to *any* allegations showing Mr. Patel's specific

knowledge of any problems plaguing Ibotta, *see* [Doc. 45], and based on the Court's

review of the Amended Complaint, there are no such particularized allegations with

respect to Mr. Patel, *see* [Doc. 37]; *see also RJ&CS SC Holdings*, 2023 WL 5646158, at

*8 (general allegations that defendant is aware of information are insufficient).

As for Mr. Leach, the Amended Complaint alleges:

- During one meeting FE-1 attended, Mr. Leach "declared that 'ad-spend is dead' and 'we're not doing that anymore.'" [Doc. 37at ¶ 79].[8]

- "FE-4 attended weekly departmental roundtable meetings every Tuesday, which Defendant Leach frequently attended, at which FE-4's team presented updates (frequently as long as 30 minutes) on fraud attacks and losses. FE-4 described how user fraud was rampant at Ibotta and management at the highest levels of the Company, including Defendant Leach, knew it." [*Id.* at ¶¶ 96–97].

- "Defendant Leach was personally aware of [problems with fraudulent activity] because he attended regular meetings at which they were discussed." [*Id.* at ¶ 139]; *see also* [*id.* at ¶¶ 164, 173, 186 (same)].

---

defendant's position at the company, *Anderson*, 827 F.3d at 1245, and because Plaintiff relies upon the core operations doctrine to argue that Mr. Leach and Mr. Patel "[knew] about the true problems afflicting the Company," [Doc. 45 at 43], the Court finds it appropriate to address this doctrine in addressing Plaintiff's argument about these executives' knowledge of contrary facts.

[8] As mentioned above, other allegations that speak generically of high-level employees do not establish that *Mr. Leach* was at those meetings or had knowledge of the specific matters discussed therein. *See, e.g.*, [Doc. 37 at ¶¶ 77, 82, 113].

These allegations could potentially lend *some* support to an inference of scienter, at least with respect to any misleading statements Mr. Leach made about fraudulent activity from Ibotta users.  But the Tenth Circuit has stated that "mere attendance at meetings does not contribute to an inference of scienter." *Anderson*, 827 F.3d at 1246; *see also MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) ("[N]othing in the defendants' routine attendance at finance meetings serves to suggest a 'cogent' and 'compelling' inference of scienter.").  And Plaintiff's allegations do not identify what specific information Mr. Leach was privy to; in other words, there are no "particularized facts showing what [Mr. Leach] *actually* knew." *Molson Coors Beverage Co.*, 2020 WL 13499995, at *8.

### 2.    Admissions at the End of the Class Period

Next, Plaintiff focuses on "Defendants' admissions at the end of the Class Period." [Doc. 45 at 39–40].  Specifically, Plaintiff relies on (1) Mr. Leach's statement during a February 2025 earnings call that Ibotta was "in the process of overhauling and upgrading [its] approach to both measurement and targeting," [Doc. 37 at ¶ 204]; (2) Mr. Leach's statement that Ibotta was "upgrading [its] sales organization" due to "inadequate account coverage," [*id.* at ¶ 205]; and (3) Ibotta rewriting its risk statement about user fraud in February 2025, [*id.* at ¶ 209].  *See* [Doc. 45 at 40].  Mr. Tcherkezian asserts that these statements "confirm a strong inference of scienter" because they "confirmed the magnitude of the problems [Defendants] had previously concealed." [*Id.* at 39–40].

The Tenth Circuit has recognized, however, that "the implementation of [a new] policy . . . [is] at most an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the

alleged omissions occurred." *Zagg, Inc.*, 797 F.3d at 1205; *cf. El Paso Firemen & Policemen's Pension Fund*, 709 F. Supp. 3d at 1346 (concluding that statements that identified deficiencies in company's business but "[did] not reveal anything about when the deficiencies were known . . . or the reasons for the alleged false and misleading prior statements" did not contribute to scienter).  Mr. Tcherkezian does not explain how the implementation of a new policy or acknowledgment of prior shortcomings demonstrates that Mr. Leach knew or should have known—at the time of his earlier statements—that his statements presented a danger of misleading buyers.  *See* [Doc. 45].  Furthermore, unlike Pluralsight, the alleged hindsight statements do not support an inference that Mr. Leach knew his statements were false at the time they were made.  *Compare Pluralsight*, 45 F.4th at 1260 ("[The CFO] never claimed he was unaware of the problem—rather, he provided a justification for his misrepresentations:  'We were still hitting our numbers.'"), *with* [Doc. 37 at ¶ 205 ("[W]e fell short of our expectations when it comes to sales execution, plain and simple.  As we've been upgrading our sales organization, at times there was an inadequate account coverage and there were account handoffs that could have been crisper." (emphasis omitted))].  "[F]raud by hindsight" does "not constitute securities fraud," and self-remediation does not support an inference of scienter. *Rumbaugh v. USANA Health Scis., Inc.*, No. 2:17-cv-00106, 2018 WL 5044240, at *9 (D. Utah Oct. 17, 2018); *see also Level 3 Commc'ns*, 667 F.3d at 1347 (concluding that the defendants' "hindsight review of the integration process" contributed "nothing to an inference of scienter").

### 3.    Officer Departures

Mr. Tcherkezian also asserts that Mr. Jensen's and Mr. Patel's departures from

28

Ibotta were suspicious, such that they support a strong inference of scienter.  [Doc. 45 at 40–41].  "Executive departures can strengthen an inference of scienter if they are numerous, uncharacteristic or accompanied by suspicious circumstances."  *Molson Coors Beverage Co.*, 2020 WL 13499995, at *11.  However, "[t]emporal proximity alone is not suspicious."  *El Paso Firemen & Policemen's Pension Fund*, 709 F. Supp. 3d at 1347.

As a preliminary matter, Mr. Jensen is not a named Defendant in this case.  [Doc. 37 at 1].  "When an executive is a non-party and when there are no allegations connecting them to the alleged fraud, courts do not give their resignations any weight."  *Ellington*, 2026 WL 811109, at *16; *see also*, *e.g.*, *Molson Coors Beverage Co.*, 2020 WL 13499995, at *11 ("None of these executives are named as defendants and there are no allegations connecting them to the alleged fraud.  The Court gives these departures no weight."). Throughout the Amended Complaint, Plaintiff repeatedly refers to Mr. Jensen in terms of his departure from Ibotta; from the Court's review, there are no clear allegations suggesting that Mr. Jensen *himself* engaged in any fraudulent activity.  *See, e.g.*, [Doc. 37 at ¶¶ 105, 115–20, 157, 168, 175].  It is thus unclear to the Court whether Mr. Jensen's departure should be given any weight at all.

Furthermore, Mr. Tcherkezian alleges that Mr. Jensen resigned "a few weeks before Ibotta's scheduled earnings call for the second quarter of 2024" and "just three months after the IPO."  [Doc. 37 at ¶¶ 117, 214].  He also alleges that Mr. Patel resigned "[s]hortly after the Class Period, on March 14, 2025."  [*Id.* at ¶ 215].  But Plaintiff does not meaningfully explain *why* the timing of either departure is suspicious.  *See* [Doc. 45 at 40–41]; *see also Molson Coors Beverage Co.*, 2020 WL 13499995, at *11 ("Plaintiffs fail

to explain why this [executive's] retirement was suspicious, pointing only to its temporal proximity to the Restatement.  Absent factual allegations connecting [the] retirement to the alleged fraud, his departure at best gives rise to only a weak inference of scienter."); *Saee v. Enservco Corp.*, No. 22-cv-01267-DDD-KAS, 2024 WL 6839572, at *3 (D. Colo. Mar. 4, 2024) ("Plaintiffs' bare assertion that the resignations are suspicious because of their proximity to the restatements does not provide an explanation for *why* the departures strongly imply scienter.").  Instead, Plaintiff appears to suggest that these executives' exits are suspicious simply because they were close in time to certain events.  *See* [Doc. 37 at ¶ 214 ("The suspiciousness of CRO Jensen's abrupt departure is borne out by its timing just three months after the IPO, after he had worked at Ibotta for eight years." (emphasis omitted)); *id.* at ¶ 215 ("The highly suspicious timing and circumstances of Defendant Patel's departure further support scienter.").  But temporal proximity does not alone suggest scienter.  *Molson Coors Beverage Co.*, 2020 WL 13499995, at *11; *El Paso Firemen & Policemen's Pension Fund*, 709 F. Supp. 3d at 1347; *Ellington*, 2026 WL 811109, at *15 ("[T]he argument that Mr. Deitsch's resignation is suspicious because it occurred months before the restatements were disclosed does not create a strong inference of scienter.").

Because Plaintiff's argument about Mr. Patel's departure relies solely on temporal proximity to "the end of the Class Period," [Doc. 45 at 41], Mr. Patel's departure does not support a strong inference of scienter.  As for Mr. Jensen, Plaintiff insists that his departure was suspicious because he resigned before a successor was in place.  [*Id.* at 40].  "A resignation that is effective immediately without a successor in place may be considered 'unusual,'" *El Paso Firemen & Policemen's Pension Fund*, 709 F. Supp. 3d at

1347, and some courts have found that an exit without a successor lends "very modest scienter support," *id.* (quoting *In re Myriad Genetics, Inc. Sec. Litig.*, No. 2:19-cv-00707-DBB-DBP, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021)).  But given that there are no allegations connecting Mr. Jensen to any fraud, the Court finds that Mr. Jensen's departure is not entitled to much weight, if any at all.  *Ellington*, 2026 WL 811109, at *16; *Molson Coors Beverage Co.*, 2020 WL 13499995, at *11.

### 4.    Defendants' Stock Sales

Plaintiff alleges that Mr. Leach, Mr. Lehrman, and Mr. Doshi sold millions of dollars' worth of Ibotta stock "on April 22, 2024 in connection with the Offering."  [Doc. 37 at ¶ 122].  He further alleges that Mr. Lehrman and Mr. Doshi "continued to sell shares of Ibotta common stock at artificially inflated prices throughout the Class Period."  [*Id.* at ¶¶ 124–25].  He argues that these stock sales "were unusual and suspicious under the factors courts consider in assessing whether they contribute to an inference of scienter." [Doc. 45 at 41].

"[A]llegations of sales, by themselves, do not create an inference of scienter."  *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1151 (D. Colo. 2011), *aff'd sub nom.*, *Sanchez v. Crocs, Inc.*, 667 F. App'x 710 (10th Cir. 2016).  "To determine whether trading activity is suspicious, courts consider several factors, including 'the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.'"  *Smallen*, 950 F.3d at 1310 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001)).  "Courts should not infer fraudulent intent based only on the fact that some officers sold stock.  Rather, plaintiffs must allege that the trades were made at times and in quantities that are suspicious enough to support

31

the necessary strong inference of scienter." *In re Qwest Commc'ns Int'l, Inc.*, 396 F.

Supp. 2d 1178, 1195 (D. Colo. 2004). "For individual defendants' stock sales to raise an

inference of scienter, plaintiffs must provide a meaningful trading history for purposes of

comparison to the stock sales within the class period." *Molycorp, Inc.*, 157 F. Supp. 3d

at 1009 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir.

2009)). "Plaintiffs are 'not excused from pleading the relevant [trading] history, regardless

of whether such history is available." *Id.* (quoting *Prissert v. EMCORE Corp.*, 894

F.Supp.2d 1361, 1373–74 (D.N.M. 2012)). "A 'meaningful trading history' requires

information on non-class period sales, the amount of stock retained by the defendants,

or whether the amount of stock owned by the defendants actually increased during the

class period." *Id.* (cleaned up).

Here, Plaintiff's allegations are limited to the Class Period, asserting that that Mr.

Leach, Mr. Lehrman, and Mr. Doshi sold stock "on April 22, 2024 in connection with the

Offering" and that Mr. Lehrman and Mr. Doshi continued to sell stock "at artificially inflated

prices" during the Class Period. [Doc. 37 at ¶¶ 122, 124–25]. Plaintiff alleges that, during

the Class Period, Mr. Doshi sold 6% of his shares in one sale. [*Id.* at ¶ 125]. He also

alleges that Mr. Lehrman made 10 different sales of various size throughout the Class

Period. [*Id.*]. The most sizeable sale occurred on December 12, 2024, when Mr. Lehrman

sold 44% of his then-remaining Ibotta stock. [*Id.*].

The percentage of shares Mr. Lehrman sold *could* be indicative of scienter, *see*

*Pluralsight*, 45 F.4th at 1267 (that CFO sold "a significant portion"—nearly 40%—of his

holdings contributed to inference of scienter), but Mr. Lehrman is not a named Defendant

in this claim, and Plaintiff does not explain how Mr. Lehrman's stock sales contribute to

establishing scienter on the part of any of the named Defendants, *see* [Doc. 45 at 42].

Moreover, Plaintiff does not direct the Court to any allegations setting out Mr. Lehrman's,

Mr. Doshi's, or Mr. Leach's "meaningful trading history" before or after the Class Period.

*See* [Doc. 45 at 36–37].  Without this additional context, "it is hard to reach any conclusion

as to what kind of financial gain is at issue and whether these sales are unusual or

suspicious."  *Smallen*, 950 F.3d at 1311; *see also Crocs, Inc.*, 774 F. Supp. 2d at 1151.

### 5.    Assessing Plaintiff's Allegations Holistically

Although Plaintiff's separate theories of scienter are not particularly compelling,

the Court recognizes that even if "individual allegations might not suffice, they can

sometimes complement each other."  *Meitav Dash*, 79 F.4th at 1223.  Accordingly, the

Court must consider Plaintiff's allegations holistically to determine whether "a reasonable

person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

The Court respectfully concludes that, even viewing Plaintiff's allegations in their

entirety, he has not alleged particularized facts giving rise to a strong inference of scienter

for any particular statement or any particular Defendant that is at least as compelling as

opposing inferences.  At a high level, and at a first glance, Mr. Tcherkezian's allegations

could cause a reasonable person to draw *some* inference of scienter.  But when viewed

with a closer eye, the Amended Complaint lacks specific factual allegations

demonstrating that any particular Defendant engaged in "conduct that [was] an extreme

departure from the standards of ordinary care, and which present[ed] a danger of

misleading buyers or sellers that [was] either known to the defendant or [was] so obvious

that the actor must have been aware of it."  *Zagg, Inc.*, 797 F.3d at 1201 (quotation

33

omitted).   For example, Mr. Tcherkezian's argument that Mr. Leach knew about certain internal issues based on his meeting attendance fails upon examination of Mr. Tcherkezian's *actual* allegations, which reference Mr. Leach's meeting attendance only rarely and do not identify the specific information he allegedly learned.   Accepting Plaintiff's argument on this point would require the Court to rely on vague references to "management" and assume that the information discussed in meetings contradicted Mr. Leach's public statements.   Permitting this sort of inferential leap is contrary to the purposes of the PSLRA.   *See* 15 U.S.C. § 78u-4(b)(2)(A) (requiring the plaintiff to, "with respect to each act or omission," state "*with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind" (emphasis added)).

Similarly, Mr. Patel's prominent position at Ibotta could, if accompanied by "additional detailed allegations about [his] actual exposure to information," help support an inference of scienter.  *S. Ferry LP*, 542 F.3d at 784.   But as explained above, there are no such allegations with respect to Mr. Patel; conclusory allegations that Mr. Patel "knew about" "material, undisclosed problems" at Ibotta, *see* [Doc. 37 at ¶ 166], are insufficient, *see RJ&CS SC Holdings*, 2023 WL 5646158, at *8.   And Mr. Lehrman's significant stock sales could be considered suspicious, *Pluralsight*, 45 F.4th at 1267, but Plaintiff does not explain how a non-named Defendant's suspicious stock sales contribute to an inference of scienter for any named Defendant or any particular statement or omission, *see* [Doc. 45].

Moreover, Plaintiff's theory of the case does not withstand a comparison to plausible, nonculpable explanations for Defendants' conduct.   Mr. Tcherkezian must establish an inference of scienter that is "more than merely plausible or reasonable."

34

*Tellabs, Inc.*, 551 U.S. at 314.  The inference "must be 'powerful or cogent' not only in its own right but 'strong in light of other explanations.'"  *Smallen*, 950 F.3d at 1305 (quoting *Tellabs, Inc.*, 551 U.S. at 324).  Based on the allegations in the Amended Complaint, the more compelling explanation for the challenged conduct is that Defendants were overly, and perhaps erroneously, optimistic about Ibotta's outlook going forward, or were otherwise negligent in failing to account for (or appreciate the impact of) red flags.  This is insufficient to establish a strong, compelling, and cogent inference of scienter.  *See Smallen*, 950 F.3d at 1312 (allegations that individual defendants were too optimistic about company systems and "failed to give adequate weight to certain red flags" led to a more compelling inference "of negligence or . . . gross negligence," not recklessness); *Anderson*, 827 F.3d at 1238 ("[I]t is more probable that the Spirit executives were overly optimistic and failed to give adequate weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism.").

Because Plaintiff has not adequately alleged an essential element of a Section 10(b) claim, the Motion to Dismiss is **GRANTED** with respect to this claim.  *See Cupat*, 2025 WL 1141534, at *13.  Count Four is **DISMISSED without prejudice**.

### B.    Count Five:  Section 20(a)

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Where a "plaintiff's complaint does not allege 'a primary violation of the securities

laws,' his Section 20(a) claim also fails." *Level 3 Commc'ns*, 667 F.3d at 1347 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)).  Because Plaintiff has not adequately pleaded a Section 10(b) claim, his Section 20(a) claim must also be dismissed.  *Cupat*, 2025 WL 1141534, at *13.  The Motion to Dismiss is **GRANTED** as to Count Five, and this claim is **DISMSISED without prejudice**.

### C.    Count Six:  Section 20A

"Section 20A provides that insiders who trade stock 'while in possession of material, nonpublic information' are liable to any person who traded contemporaneously with the insider."  *In re Overstock Sec. Litig.*, 119 F.4th 787, 807 (10th Cir. 2024) (quoting 15 U.S.C. § 78t-1(a)).  The Tenth Circuit has "not yet decided the pleading parameters of a § 20A claim," but other circuits "interpret § 20A to require insider trading plaintiffs to plead a predicate violation of the Exchange Act or its rules and regulations."  *Id.* (first citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 175 (3d Cir. 2014); then citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994); and then citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993)).  Courts in this District have similarly concluded that "[a] Section 20A claim must be predicated on a separate violation of the [Exchange Act] or its rules and regulations."  *Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1200; *In re Molycorp, Inc. Sec. Litig.*, No. 12-cv-00292-RM-KMT, 2015 WL 1540523, at *30 (D. Colo. Mar. 31, 2015); *Cupat*, 2025 WL 1141534, at *13.

Mr. Tcherkezian does not dispute that a Section 20A claim requires an underlying predicate claim.  [Doc. 45 at 45].  And because Plaintiff has not adequately pleaded a predicate claim, the Motion to Dismiss is **GRANTED** with respect to Count Six.  Count Six is **DISMISSED without prejudice**.

**III.    Leave to Amend**

In a footnote in his response brief, Mr. Tcherkezian states that "if the Court grants the Motion [to Dismiss] in whole or in part, Plaintiff requests leave to amend." [Doc. 45 at 45 n.14]. But as explained above, the Court will not grant a request to amend without a formal written motion requesting that relief. *See supra* section I.A; *Johnson,* 950 F.3d at 721. Instead, if Plaintiff believes the pleading deficiencies may be cured through amendment, he may file a formal motion to amend that complies with the Local Rules and the Federal Rules of Civil Procedure no later than **August 31, 2026**, after conferring with Defendants. If Plaintiff does not file a motion to amend by this deadline, the Court will direct the Clerk of Court terminate this case without further notice to the Parties.

**CONCLUSION**

For the reasons set forth above, **IT IS ORDERED** that:

(1)    Defendants' Motion to Dismiss [Doc. 41] is **GRANTED**;

(2)    Plaintiff's claims are **DISMISSED without prejudice**;

(3)    If Plaintiff wishes to amend the Amended Complaint, he shall file a motion to amend on or before **August 31, 2026**; and

(4)    The Request for Judicial Notice in Support of Defendants' Motion to Dismiss [Doc. 43] is **DENIED as moot**.

DATED: August 3, 2026                    BY THE COURT:

_____

Nina Y. Wang
United States District Judge